# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "Agreement") is made and entered into as of January 16, 2023, by and among **SOUTHERN BAKERIES, LLC,** an Indiana limited liability company ("Company"), **HARLAN BAKERIES, LLC,** an Indiana limited liability company ("Harlan," and together with Company, the "Seller Entities"), an Arkansas corporation to be formed by EBC or its owner (except as qualified by the following paragraph, "Purchaser"), and **EAST BAKING COMPANY, INC.,** a Massachusetts corporation ("EBC", and together with Purchaser, the "Purchaser Entities").

The parties acknowledge that Purchaser was not yet in existence as of the Effective Date (as defined in Section 1.3 below), and is in the process of being formed, so until the effective time of the filing of Purchaser's Articles of Incorporation with the Arkansas Secretary of State ("Purchaser's AOI Effective Time"), EBC shall be deemed the Purchaser hereunder; and from and after the Purchaser's AOI Effective Time, Purchaser shall be deemed the Purchaser hereunder and Purchaser shall promptly confirm same by executing an appropriate joinder to this Agreement.

## Recitals

A. Company is engaged in the business of the production and sale of rolls, bread sticks, English muffins and other baked goods products for itself and others at its production facility located at 2700 E. 3rd Street, Hope, Arkansas (the "Business"), and Harlan is the sole owner of the outstanding equity of Company.

B. Subject to the terms and conditions hereinafter set forth, Company desires to sell, and Purchaser desires to purchase, certain assets of Company used in the Business at such Hope facility.

## Agreement

NOW, THEREFORE, in consideration of the recitals and of the respective covenants, representations, warranties and agreements herein contained, the parties hereto hereby agree as follows:

## ARTICLE I - PURCHASE AND SALE

1.1 Agreement to Sell and Purchase. In reliance on the representations, warranties and covenants of Seller Entities contained herein, upon and subject to the terms and conditions of this Agreement, and except as otherwise specifically provided in Section 1.1.2 hereof, Company shall grant, sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase, all right, title and interest of Company in and to (a) certain assets and rights of Company used in the Business as further described in Section 1.1.1 below (the "Business Assets"); and (b) that certain real property located at 2700 E. 3rd Street, Hope, Arkansas, 71801 (the "Business Land"); the buildings, structures, fixtures and improvements erected or located on the Business Land

consisting of a facility of approximately 200,000 square feet (the "Business Improvements"); and all rights, privileges, easements and appurtenances belonging or in any way pertaining to the Business Land or the Business Improvements (the "Business Appurtenances") (the Business Land, Business Improvements and Business Appurtenances are collectively referred to herein as the "Property"). The Business Assets and the Property are sometimes referred to herein collectively as the "Assets". The consummation of the transactions contemplated hereby will take place at the times specified in Section 2.1 below.

The sale and purchase of the Assets shall be free and clear of all mortgages, liens, pledges, security interests, charges, claims, restrictions and encumbrances of any nature whatsoever, except Permitted Exceptions as defined in Section 5.1.5 hereof.

1.1.1 Included Assets. In addition to the Property to be conveyed at the Property Closing (as hereinafter defined), the Assets shall include only the following assets and rights of Company used in the conduct of, or generated by or constituting, the Business, excluding, for the avoidance of doubt, those assets set forth in Section 1.1.2 hereof:

(a) any machinery and equipment (together with parts which may be needed for the repair of such machines and equipment), tools, furniture and furnishings located at the Property, as well as the vehicles listed on Exhibit 1.1.1(a) attached hereto, some of which vehicles are owned by Company's wholly-owned subsidiary Southern Bakeries Trucking, LLC ("SB Trucking"), which vehicles Company will cause SB Trucking to convey to Purchaser at the Initial Closing (as hereinafter defined), and also the rights as to the Freightliner vehicles shown as leased on Exhibit 1.1.1(a) (the "Leased Vehicles"), pursuant to Schedule A of a certain Truck Lease & Service Agreement dated October 1, 2021 (the "Ryder Contract");

(b) certain equipment associated with a cinnamon swirl line located at Gold Crust Baking Company in Maryland, as to which Company will seek to re-assume physical possession and transport the same to the Property, at the Company's expense, with such transport to take place no later than 60 days after the Initial Closing;

(c) certain rights under any customer agreements pertaining to the production of the products at the Property in the operation of the Business as set forth in Exhibit 1.1.1(c) attached hereto (collectively and together with the Ryder Contract, the "Contracts");

(d) all rights to use the "Southern Bakeries" trade name (the "Trade Name"), as well as assigned or sublicensed rights under the License Agreement with Flowers Bakeries Brands, LLC dated February 3, 2005, as amended, to be memorialized in an appropriate document at the Initial Closing;

(e) all methods, recipes, formulations, formulas, trade secrets, know-how, and other intellectual property used in the production of products in the Business, acknowledging, however that certain recipes, formulations and formulas used in the Business are owned by customers and may only be used if permitted by such customers, and provided further, nothing contained herein is intended to convey any of the foregoing which may be owned or used by Harlan or other affiliates at locations other than the Property;

(f) all Authorizations (as defined in Section 3.1.6), to the extent legally transferrable;

(g) information, files, records, data and knowledge, including customer and supplier lists, related to the foregoing, except that Purchaser will ensure Company will continue to have access to such items as are required to be maintained by Company in accordance with applicable law; and

(h) all goodwill associated with the Business.

1.1.2 Excluded Assets. Notwithstanding the foregoing, for the avoidance of doubt, the Assets to be sold to Purchaser shall not include, without limitation, the following:

(a) the seals, minute books, membership interest books, tax returns, books of account or other records having to do with the organization of Company as an entity;

(b) the rights which accrue or will accrue to Company under this Agreement;

(c) any tax refunds, credits or benefits;

(d) Company's rights under any (i) Contracts not specifically assumed by Purchaser under Section 1.4 of this Agreement or (ii) other agreements;

(e) all cash or cash equivalents, in hand or in bank accounts, prepaid expenses or deposits and accounts receivable;

(f) the personal property set forth on Exhibit 1.1.2(f) attached hereto;

(g) permits, licenses and government authorizations, if not legally transferrable (however, where any such permit, license or government authorization that may lawfully be transferred is one which Purchaser desires to have assigned or transferred to Purchaser and requires consent or approval for assignment or transfer from a governmental agency or authority, such permit, license and government authorization shall be included as part of the Assets upon receipt of such consent or approval, and pending such consent or approval, Purchaser may operate under same on a transition basis to the extent not prohibited by applicable law);

(h) Company's ownership of SB Trucking;

(i) inventories, raw materials, work-in-process, finished goods, parts not included in Section 1.1.1(a) and supplies (the "Inventory"); and

(j) any other assets set forth on Exhibit 1.1.2(j) attached hereto.

Notwithstanding the fact that the Peerless mixer is an Excluded Asset on Exhibit 1.1.2(f), Company will permit Purchaser to continue to use it for up to six (6) months after the Initial Closing, at which time Company will be entitled to access the Property and remove it therefrom at its expense to a location of its own choosing.

1.2 The Purchase Price.

1.2.1 Purchase Price. The purchase price for the Assets shall be an amount equal to Five Million Seven Hundred Fifty Thousand Dollars ($5,750,000) (the "Base Purchase Price"), plus the Silo Repair Purchase Price Increase Amount (as hereinafter defined, and together with the Base Purchase Price, the "Purchase Price"), if the conditions set forth in Section 1.2.2 below are met. Of the Base Purchase Price, the amount of $2,250,000, plus the Silo Repair Purchase Price Increase Amount, if applicable, will be paid for the Business Assets (the "Business Assets Price") and the amount of $3,500,000 will be paid for the Property (the "Property Price").

1.2.2 Silos. The parties acknowledge that silos 3, 4 and 7 at the Property (the "Silos") are in need of repair. Purchaser has agreed that the Seller Entities will have a period of ninety (90) days after the Initial Closing to effect repairs so that the Silos and their components (including transfer lines to the portion of the Property to which raw materials used in production are transported from the Silos) are in operational condition and protected from rain intrusion and free of leaking due to weather or other conditions. Purchaser agrees that if the Seller Entities effect such repairs as required above, the Purchase Price will include an additional Seven Hundred Fifty Thousand Dollars ($750,000) (the "Silo Repair Purchase Price Increase Amount"), and the Asset Note (as defined below) will increase by the Silo Repair Purchase Prince Increase Amount. Purchaser will allow the Seller Entities and their contractors to have access to the Property to effect such repairs and will otherwise reasonably cooperate with Seller Entities in such efforts. The Seller Entities will use their reasonable efforts to not disrupt the normal operations of Purchaser at the Property while the repairs are effected and will be responsible for their acts while making such repairs at the Property.

1.2.3 Payment of Purchase Price. At the Initial Closing on the Initial Closing Date (as hereinafter defined) and on account of the Business Assets Price, Purchaser shall pay to Company in immediately available funds the sum of Seven Hundred Fifty Thousand Dollars ($750,000) (the "Initial Payment"). The obligation to pay the balance of the Business Assets Price will be evidenced by a promissory note in customary commercial form (the "Original Asset Note"), and the amount outstanding will be increased by the Silo Repair Purchase Price Increase Amount, if the conditions set forth in Section 1.2.2 are met. At such time, a new promissory note in customary commercial form (the "New Asset Note") will be executed and delivered to Company reflecting the increased amount (the Original Asset Note and the New Asset Note, as applicable, the "Asset Note"). The Asset Note will provide for monthly payments of interest, with interest fixed at seven percent (7%) per annum and default interest at a rate of ten percent (10%) per annum, with all principal and then unpaid interest paid two years after the Closing Date, unless prepaid in accordance with Section 7.4. The Asset Note will be guaranteed by EBC and secured by a first lien on the Business Assets to be memorialized in a security agreement to

be executed at the Initial Closing, and the Asset Note will be subject to subordination in accordance with Section 7.4, if applicable.

At the Property Closing on the Property Closing Date (as hereinafter defined), Purchaser shall execute and deliver to Company a promissory note in form substantially similar to the Asset Note and in the amount of the Property Price (the "Property Note"). The Property Note will provide for monthly payments of interest, with interest fixed at seven percent (7%) per annum and default interest at a rate of ten percent (10%) per annum, with all principal and then unpaid interest paid two years after the Initial Closing Date, unless prepaid in accordance with Section 7.4. The Property Note will be guaranteed by EBC and secured by a first lien on the Property to be memorialized in a mortgage to be executed at the Property Closing, and the Property Note will be subject to subordination in accordance with Section 7.4, if applicable.

The Asset Note and the Property Note are sometimes referred to herein as a "Note".

1.2.4 Allocation of Purchase Price. The Purchase Price shall be allocated among the Assets acquired hereunder as set forth in Section 1.2.1 above and as further described on Exhibit 1.2.4 hereof as agreed upon by Company and Purchaser. All parties hereby covenant and agree that they each will not take a position on any income or other tax return, before any governmental agency charged with the collection of any income or other tax, or in any judicial proceeding that is in any way inconsistent with the terms of this Section 1.2.4, unless so ordered by a governmental agency or a court of competent jurisdiction.

1.2.5 Inventory. The parties acknowledge that subject to the provisions below in this Section 1.2.5, Company is retaining the Inventory as an Excluded Asset. Nevertheless, the parties acknowledge that pursuant to Section 1.3 below, the Purchaser Entities have assumed responsibility for the operation of the Business since the Effective Date and in connection therewith, have commenced using the Inventory. At the Initial Closing, Purchaser will pay Company for the value of such Inventory, at Company's cost. Further, for a period of at least six (6) months after the Initial Closing and thereafter until such time as either party provides notice to the other party, Company will permit Purchaser to utilize Inventory in its operations so long as Purchaser pays for same on a monthly basis. Purchaser will perform an inventory on a monthly basis in a manner customary to the way in which Company has performed monthly inventory counts, and no later than ten (10) days after the end of each month following the Closing, Purchaser will provide a written report to Company which will itemize the Inventory utilized by Purchaser in the prior month and will be accompanied by payment for same, which will be based on Company's cost. Company also will have access to the applicable books and records to verify the Inventory counts and the amount of Inventory utilized by Purchaser and the cost thereof. Although Purchaser is not obligated to purchase the Inventory, it is expected that Purchaser will acquire Inventory which is of a quality or quantity that is usable or salable in the ordinary course of business consistent with past practice with respect to the Company's sale of such products to customers in the ordinary course of business. If at the Initial Closing Purchaser and Company mutually determine in writing that certain Inventory will be purchased at the Initial Closing, then Purchaser may acquire such Inventory by payment at the Initial Closing to Company of the agreed upon purchase price for such Inventory confirmed by Purchaser and Company in writing, notwithstanding Section 1.1.2.

1.3 Effective Date. The parties hereby acknowledge that by agreement, the Purchaser Entities assumed responsibility for the operation of the Business from and after January 1, 2023 (the "Effective Date"), with the parties' intent being that the operation of the Business is intended to be for the account of Purchaser since the Effective Date, meaning that Purchaser will be entitled to the revenue and other benefits of operating the Assets since the Effective Date as if the Initial Closing had been consummated then, while at the same time requiring Purchaser to bear the costs and expenses incurred to allow Purchaser to realize such revenue and benefits; provided, such costs and expenses to be borne by Purchaser shall not include any Losses (as defined in Section 6.1(a)) to be indemnified by Seller Entities under Section 6.1 below. In this regard, the parties acknowledge that the Purchaser Entities will have incurred expenses, utilized the services of Company's employees, paid amounts to third parties attributable to the operation of the Business, sold and shipped Inventory and generated accounts receivable and conducted other normal and customary business activity. The parties agree that it will be necessary to make financial adjustments at the Initial Closing as a result of the operation of the Business by the Purchaser Entities since the Effective Date. Accordingly, in accordance with the foregoing principles, the parties will make any necessary payments to the appropriate party at the Initial Closing so that the activities of the Business from and after the Effective Date are properly allocable to Purchaser, with due regard to the retention by Company of the Excluded Assets; provided, such obligations of Purchaser shall not include any Losses to be indemnified by Seller Entities under Section 6.1 below. Similarly, if for whatever reason the Initial Closing does not occur, the parties will properly account to one another for the operation of the Business and the use of the Assets by the Purchaser Entities between the Effective Date and such termination, except that Company will not be responsible for any losses which may be suffered by the Purchaser Entities in connection with their operation of the Business, including, for the avoidance of doubt, any obligations or liabilities undertaken by the Purchaser Entities in connection therewith; provided, such losses to be borne by Purchaser shall not include any Losses to be indemnified by Seller Entities under Section 6.1 below.

1.4 Assumption of Obligations and Liabilities. Assuming the Initial Closing occurs, Purchaser shall be deemed to have assumed, as of the Effective Date, and perform when due, Company's obligations to be performed under the Contracts, but only to the extent such obligations relate to the period on or after the Effective Date; provided, however, Purchaser shall not assume any obligation under the Contract, which such obligation has been prepaid by the other party to such Contract, or which otherwise relates to the period prior to the Effective Date, or any event or required performance under the Contract relating to the period prior to the Effective Date. Except for the foregoing obligations and liabilities expressly assumed by Purchaser in connection with such Contracts or as may otherwise be provided in any other documents to be executed by Purchaser at the Initial Closing to memorialize any provisions hereof, the parties hereto agree that Purchaser is not assuming and shall not be liable or responsible for any liabilities, debts or obligations of Company or Harlan of any type (whether direct or indirect, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, asserted or unasserted, known or unknown, secured or unsecured, absolute, fixed, contingent or otherwise). Seller Entities shall pay all of their respective liabilities, debts and other obligations as and when the same become properly due and payable, and Purchaser shall have no obligation

whatsoever with respect to any of Seller Entities' creditors or any other third party with claims against either the Company or Harlan.

1.5 Further Adjustments.

1.5.1 Utilities. Company shall be responsible for all utility costs and charges incurred in the Business attributable to the period prior to the Effective Date and Company shall pay for such utility expenses promptly after the Initial Closing, if not already paid by then. Assuming the Initial Closing occurs, Purchaser shall be responsible for all such costs and charges from and after the Effective Date. In the event that utility costs and charges referred to in this Section 1.5.1 are not precisely ascertainable, then the parties shall appropriately prorate the liability of Company and Purchaser for the payment of such costs and charges and account for same to one another at the Initial Closing or promptly thereafter.

1.5.2 Property Taxes and Transfer Taxes. Company has paid for real and personal property taxes as to the Business Assets and the Property for the 2021 tax year, which were due on October 15, 2022, and has also paid all such taxes due for prior years. Real and personal property taxes for the 2022 tax year, which will be due and payable after March 1, 2023 shall be paid by Company at the Initial Closing (for the Business Assets) and at the Property Closing (for the Property), or if not yet payable at the applicable Closing, then Company shall provide Purchaser with a credit against the Purchase Price in the amount of such taxes for 2022 (which may be based on the most recent county records if actual amounts are not yet determined). Assuming that the Initial Closing (for the Business Assets) and subsequently the Property Closing (for the Property), respectively, occur, Company shall have no responsibility for real or personal property taxes, respectively, for the 2023 tax year, given Purchaser's control of the Business since the Effective Date. In the event any transfer taxes are imposed on the sale of the Property or the Business Assets, Company and Purchaser shall split the cost of such taxes equally.

ARTICLE II - CLOSINGS, ITEMS TO BE DELIVERED AND FURTHER ASSURANCES

2.1 Closings. The parties intend that the closing (the "Initial Closing") of the sale and purchase of the Business Assets shall take place at 10:00 A.M., local time, on or before January 20, 2023, but in any event no later than January 27, 2023, but subject to the conditions set forth in this Agreement, at such place as the parties shall agree or on such other date as may be mutually agreed upon in writing by the parties. The date of the Initial Closing is sometimes referred to herein as the "Initial Closing Date."

The parties intend that the closing (the "Property Closing") of the sale and purchase of the Property shall take place within five (5) days after the conditions set forth in Section 5.1 below, that relate to the Property or Property Closing, are met or waived, but in any event no later than June 30, 2023, subject to the satisfaction, or waiver in writing by Purchaser, of such conditions. The date of the Property Closing is sometimes referred to herein as the "Property Closing Date."

The Initial Closing and the Property Closing are sometimes referred to herein as a "Closing", and the Initial Closing Date and the Property Closing Date are sometimes referred to herein as a "Closing Date".

2.2 Items to be Delivered at Closings. At the applicable Closing and subject to the terms and conditions herein contained:

(a) Company shall execute and deliver (or make available) to Purchaser a special warranty deed as to the Property and such bills of sale and assignments as to the Business Assets as shall be necessary and effective to transfer and assign to, and vest in, Purchaser all of Company's right, title and interest in and to the Assets, free of all liens, claims and encumbrances, except Permitted Exceptions.

(b) Purchaser shall provide to Company the applicable executed Note and at the Initial Closing shall provide to Company by wire transfer the Initial Payment.

(c) At or prior to the applicable Closing, the parties hereto shall also deliver to each other the agreements, certificates and other documents and instruments referred to in Article V hereof.

(d) The Company shall provide to Purchaser prior to the Initial Closing Date a customary "tax clearance letter" from the Arkansas Department of Finance & Administration reflecting no tax deficiencies on the part of the Company and otherwise in a form reasonably acceptable to Purchaser.

(e) The Purchaser shall provide to the Company a customary "purchase for re-sale" certificate in appropriate form with respect to the purchase of any Inventory purchased by Purchaser hereunder.

(f) At the Property Closing, the Company shall provide Purchaser with appropriate executed documents for changing its name to a name not including the name "Southern Bakeries" (or using "Southern" in its name) in proper form for filing with the Indiana and Arkansas Secretaries of State.

2.3 Third Party Consents. To the extent that Company's rights under any Contract or other Asset (including any Authorization) to be assigned to Purchaser hereunder may not be assigned without the consent of another person or governmental agency or authority which has not been obtained, this Agreement shall not constitute an agreement to assign the same if an attempted assignment would constitute a breach thereof or be unlawful (unless and until such consent shall have been obtained), and Company shall use its commercially reasonable efforts to obtain any such required consent(s) as promptly as possible. If any such consent shall not be obtained or if any attempted assignment would be ineffective or would impair Purchaser's rights under the Asset (including any Authorization) in question so that Purchaser would not in effect acquire the benefit of all such rights, Company, to the maximum extent permitted by law and the Asset (including any Authorization), shall act after the Initial Closing as Purchaser's agent in order to obtain for Purchaser the benefits thereunder and shall cooperate, to the maximum extent

permitted by law and the Asset (including any Authorization), with Purchaser in any other reasonable arrangement designed to provide such benefits to Purchaser.

2.4 Further Assurances. Company from time to time after the applicable Closing, at Purchaser's request, will execute, acknowledge and deliver to Purchaser such other instruments of conveyance and transfer and will take such other actions and execute and deliver such other documents, certifications and further assurances as Purchaser may reasonably require in order to vest more effectively in Purchaser, or to put Purchaser more fully in possession of, any of the Assets and to carry out, evidence and confirm the intended purposes of this Agreement.

## ARTICLE III - REPRESENTATIONS AND WARRANTIES

3.1 Representations and Warranties of the Seller Entities. Much of the disclosure to be made to Purchaser hereunder shall as provided herein be set forth or described in the Disclosure Schedule of the Seller Entities attached hereto (the "Disclosure Schedule"), including attachments, if any, to the Disclosure Schedule. The Seller Entities hereby jointly and severally represent and warrant to Purchaser that, except as set forth in the Disclosure Schedule attached hereto:

3.1.1 Existence. Company is a limited liability company duly organized and validly existing under the laws of the State of Indiana. Company is duly qualified to do business as a foreign entity in the State of Arkansas and any such other states where the failure to so qualify would not have a material adverse effect on Company. Harlan is the sole owner of the equity interests of Company and no third party has any rights to acquire any ownership of Company. Company has no ownership interest in any third party, other than SB Trucking.

3.1.2 Power; Authorization; Enforceable Obligations. Each Seller Entity has the power, authority and legal right to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement by each Seller Entity have been duly authorized by all necessary corporate and member action. This Agreement has been, and the other agreements, documents and instruments required to be delivered by Seller Entities in accordance with the provisions hereof (the "Company Documents") will be, duly executed and delivered by such Seller Entity, as the case may be, and this Agreement constitutes, and the Company Documents when executed and delivered will constitute, the legal, valid and binding obligations of such Seller Entity enforceable against each such party in accordance with their respective terms.

3.1.3 Validity of Contemplated Transactions, etc. Except as set forth on Schedule 3.1.3 of the Disclosure Schedule, the execution, delivery and performance of this Agreement and the Company Documents by Seller Entities, do not and will not violate, conflict with or result in the breach of any term, condition or provision of, or require the consent of any other person under: (a) any law, ordinance, or governmental rule or regulation to which Company or Harlan is subject, (b) any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority which is applicable to Company or Harlan, (c) the organizational documents of Company, or (d) any mortgage, indenture, Contract, Authorization (hereinafter defined in Section 3.1.6), or other understanding, oral or written, to which Company or Harlan is a party, by which Company or Harlan may have

rights or by which any of the Assets may be bound or affected, or give any party with rights thereunder the right to terminate, modify, accelerate or otherwise change the existing rights or obligations of Company or Harlan thereunder. Except as set forth on Schedule 3.1.3 of the Disclosure Schedule, no authorization, approval or consent of, and no registration or filing with, any governmental or regulatory official, body or authority is required in connection with the execution, delivery or performance of this Agreement and the Company Documents by Company or Harlan. There are no existing agreements, options, commitments or rights with, of or to any person to acquire any of Company's assets, properties or rights included in the Assets or any interest therein.

3.1.4 Inventory. All Inventory used in the conduct of the Business has been acquired and maintained in the ordinary course of the Business.

3.1.5 Title to Properties. Company has good, valid and marketable title to all of its assets, including without limitation the Assets (except for Inventory sold since the date thereof in the ordinary course of business consistent with past practice) free and clear of all mortgages, liens, pledges, security interests, charges, claims, restrictions and other encumbrances and defects of title of any nature whatsoever, except for (i) liens for current real or personal property taxes not yet due and payable; (ii) liens disclosed in Schedule 3.1.5 of the Disclosure Schedule in response to this Section, which Company agrees to pay and satisfy in full at the Initial Closing; and (iii) the Permitted Exceptions defined in Section 5.1.5.

3.1.6 Compliance with Law; Authorizations. Except as set forth in Schedule 3.1.6 of the Disclosure Schedule, Company has complied in all material respects with each, and is not in violation in any material respect of any, law, ordinance, or governmental or regulatory rule or regulation, whether federal, state, local or foreign, to which Company's business, operations, assets or properties is subject ("Regulations"). Company owns, holds, possesses or lawfully uses in the operation of its Business all governmental licenses, permits, registrations and other authorizations (collectively, the "Authorizations") which are necessary for it to conduct its Business as now conducted or for the ownership and use of the Assets owned or used by Company in the conduct of the Business, free and clear of all liens, charges, restrictions and encumbrances and in compliance with all Regulations. All such Authorizations are listed and described in Schedule 3.1.6 of the Disclosure Schedule. Company is not in default or violation of any Authorizations, nor has it received any notice of any claim of such default or violation, with respect to any such Authorization.

3.1.7 Litigation. Except as set forth on Schedule 3.1.7 of the Disclosure Schedule (the NLRB Matter), no litigation, including any arbitration, investigation or other proceeding of or before any court, arbitrator or governmental or regulatory official, body or authority is pending or, to the knowledge of Company or Harlan, threatened against Company or the Assets, nor does Company and Harlan know of any reasonably likely basis for any such litigation, arbitration, investigation or proceeding. Company is not a party to or subject to the provisions of any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority.

3.1.8 Contracts and Commitments. Except as described in Schedule 3.1.8 of the Disclosure Schedule, Company is not a party to any written or oral:

(a) Contract with any present or former employee or consultant or for the employment of any person, including any consultant (other than any at-will employment arrangements);

(b) Contract with any customer as to whom Company has sold products with a sales value in the aggregate of $1,000,000 or more in 2022;

(c) lease under which Company is either lessor or lessee relating to the Assets;

(d) Contract limiting or restraining Company, the Business or any successor thereto from engaging or competing in any manner in the Business; or

(e) other material contract relating to the Business not made in the ordinary course of business.

Each Contract, and other instruments, documents and undertakings listed in Schedule 3.1.8 of the Disclosure Schedule in response to this Section, is valid and enforceable in accordance with its terms; Company and to Company's and Harlan's knowledge all other parties thereto are, in compliance with the provisions thereof; Company is not, and to Company's and Harlan's knowledge no other party thereto is, in default in the performance, observance or fulfillment of any obligation, covenant or condition contained therein; and, except as set forth in Schedule 3.1.8 of the Disclosure Schedule, no event has occurred which with or without the giving of notice or lapse of time, or both, would constitute such a default thereunder.

3.1.9 Labor Matters. Except as described in Schedule 3.1.9: (a) Company has not suffered any strike, slowdown, picketing or work stoppage by any union or other group of employees or suffered any other labor trouble affecting the Business; and (b) Company is not a party to any collective bargaining agreement and no collective bargaining agent has been certified as a representative of any of the employees of Company.

3.1.10 Employee Benefit Plans. Schedule 3.1.10 of the Disclosure Schedule contains a complete list of all employee benefit plans, whether formal or informal, whether or not set forth in writing, and whether covering one person or more than one person employed by the Company, sponsored or maintained by the Seller Entities. For the purposes hereof, the term "employee benefit plan" includes all plans, funds, programs, policies, arrangements, practices, customs and understandings providing benefits of economic value to any employee, former employee, or present or former beneficiary, dependent or assignee of any such employee or former employee, other than regular salary, wages or commissions paid substantially concurrently with the performance of the services for which paid. Each plan providing benefits which are funded through a policy of insurance is indicated by the word "insured" placed by the listing of the plan in the Disclosure Schedule. Schedule 3.1.10 of the Disclosure Schedule also

lists employees of Company with their current compensation. Purchaser shall not assume, or be required to continue, any employee benefit plan maintained by the Seller Entities.

3.1.11 Trademarks. To the knowledge of Company and Harlan: Company does not infringe upon or unlawfully or wrongfully use any trademarks owned or claimed by another; Company is not in default under any agreement relating to trademarks; and no notice is pending from a third party claiming infringement nor is any other claim or proceeding pending relating to any trademarks.

3.1.12 Environmental Matters. Except as described in Schedule 3.1.12 and to the knowledge of Company and Harlan: the Business and Company are in compliance in all material respects with any Environmental Laws (as defined below); there are no liabilities, whether accrued, contingent, absolute, determined or otherwise arising under or relating to any Environmental Law; there are no facts, conditions or situations (including any discharges or releases of hazardous substances) which could reasonably be expected to result in such liability with respect to Company's past or present ownership, use or operations of the Company or as to any real property or other Asset (including the Property); and Company has not received any notice, request for information, citation, complaint, summons or order relating to any violation or alleged violation of, or any liability under, any Environmental Law in connection with the Business, the Company, the Property or any other Asset. None of the Assets (including the Property) is contaminated by any pollutant, contaminant or hazardous waste, substance or material.

For purposes of this Section 3.1.12, "Environmental Law" shall mean any applicable federal, provincial or local (including common law), judicial decision, permit, statute, ordinance, rule, regulation, code, order, judgment, decree or injunction relating to (i) the protection of the environment (including, without limitation, air, surface water, groundwater, drinking water and surface or subsurface land), (ii) the exposure to, or the use, storage, recycling, treatment, generation, transportation, processing, handling, labeling, protection, release or disposal of, pollutants, contaminants, wastes or chemicals or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material or (iii) the effect of the environment on human health or safety.

3.1.13 Real Property.

(a) Title. The Property is the only real estate which is used in the production of the products for the Business by Company and such Property is owned by Company. Company does not lease any real estate from any third party. Company's title to the Property is, and at Closing shall be, good and marketable, fee simple absolute, free and clear of all liens, claims and encumbrances, other than (i) Permitted Exceptions, and (ii) easements, covenants and restrictions of record that do not materially and adversely affect the present use and operation of the Property or the Business on the Property.

(b) Eminent Domain. Company has received no notices, oral or written, and there is no reason to believe, that any governmental body having the power of eminent domain over the Property has commenced or intends to exercise the power of eminent

domain or a similar power with respect to all or any part of the Property. If between the date of this Agreement and the Property Closing the Property or any material portion thereof or material interest therein shall be taken or condemned as a result of the exercise of the power of eminent domain, or if a governmental body having the power of eminent domain informs Company or the Purchaser that it intends to take or condemn all or a material part of the Property, in any such case which would adversely affect Purchaser's operation of the Business or its use or ownership of the Assets, then the Purchaser may elect to terminate this Agreement even if the Initial Closing has occurred. In the event of such termination, this Agreement and the related documents will be rescinded and each party will be placed in the same position as it was in prior to such termination, with the return of monies, as applicable, with interest at 7%, and the return of the Assets to the Company (the "Rescission Remedy"). If Purchaser does not terminate this Agreement as provided herein and proceeds with the Property Closing then Purchaser shall be entitled to all awards and proceeds payable to Company in connection with such eminent domain proceedings and the Company shall assign the same to Purchaser at such Closing.

3.1.14 Brokers and Finders. Company and Harlan have not engaged and have no liability to any broker or finder in connection with the transactions contemplated by this Agreement.

3.1.15 Tax Matters. All tax returns and reports of any nature relating to the Business or the Assets have been timely and properly prepared and filed in all material responses with the appropriate governmental agency and all taxes, assessments and governmental charges of every kind and nature (including, without limitation, income, gross receipts, excise, franchise, property, employment, social security, payroll, sales and use taxes, and any penalties, interest and additions to tax), required by law to be paid by Seller have been timely paid prior to delinquency. The Seller Entities are not delinquent in the filing of any tax return or report or payment of any tax, and has no knowledge of any pending or threatened proposed tax adjustments or deficiencies with respect to any previously filed tax return or report which relates to the Business or the Assets.

3.2 Representations and Warranties of Purchaser. The Purchaser Entities hereby jointly and severally represent and warrant to Company and Harlan as follows (with the parties acknowledging that as to Purchaser, these representations and warranties will be deemed to have been made and effective as of Purchaser's AOI Effective Time):

3.2.1 Existence. Purchaser is a corporation duly organized, in good standing, and validly existing under the laws of the State of Arkansas. EBC is a corporation duly organized, in good standing, and validly existing under the laws of the State of Massachusetts.

3.2.2 Corporate Power; Authorization; Enforceable Obligations. Each Purchaser Entity has the legal power, authority and right to execute, deliver and perform this Agreement. The execution, delivery and performance of this Agreement by each Purchaser Entity have been duly authorized by all necessary action on the part of Purchaser and EBC. This Agreement has been, and the other agreements, documents and instruments required to be delivered by each Purchaser Entity in accordance with the provisions hereof will be duly executed and delivered on behalf of such Purchaser Entity by duly authorized managers or

officers of such Purchaser Entity, and this Agreement constitutes, and the Purchaser Documents (as hereinafter defined) when executed and delivered will constitute, the legal, valid and binding obligations of each such Purchaser Entity enforceable against such party in accordance with their respective terms.

3.2.3 Validity of Contemplated Transactions, etc. The execution, delivery and performance of this Agreement by each Purchaser Entity and the various documents and instruments provided for herein or contemplated hereby (such documents collectively referred to herein as the "Purchaser Documents"), do not and will not violate, conflict with or result in the breach of any term, condition or provision of, or require the consent of any other party to, (a) any existing law, ordinance, or governmental rule or regulation to which such Purchaser Entity is subject, (b) any judgment, order, writ, injunction, decree or award of any court, arbitrator or governmental or regulatory official, body or authority which is applicable to such Purchaser Entity, (c) the organizational documents of, or any securities issued by, such Purchaser Entity, or (d) any mortgage, indenture, agreement, contract, commitment, lease, plan or other instrument, document or understanding, oral or written, to which such Purchaser Entity is a party or by which such Purchaser Entity is otherwise bound. Except as aforesaid, and subject to any required consents or approvals from the applicable governmental agency or authority with respect to the assignment to such Purchaser Entity of any Authorization hereunder, no authorizations, approval or consent of, and no registration or filing with, any governmental or regulatory official, body or authority is required in connection with the execution, delivery and performance of this Agreement and the Purchaser Documents by such Purchaser Entity.

3.2.4 Brokers and Finders. Each such Purchaser Entity has not engaged and has no liability to any broker or finder in connection with the transactions contemplated by this Agreement.

3.3 Representations and Warranties of Harlan. Harlan represents and warrants to Purchaser that this Agreement constitutes the legal, valid and binding obligation of Harlan, enforceable against Harlan in accordance with its terms, and no authorization, approval, or consent of any entity is required in connection with the execution, delivery and performance of this Agreement by the Harlan. The execution, delivery and performance of this Agreement by Harlan and the consummation by Harlan of the transaction contemplated hereby has been duly authorized by all necessary action on the part of Harlan and its respective members, managers, or board of directors.

3.4 Survival of Representations and Warranties. All representations and warranties made by the parties in this Agreement or in any certificate, schedule, statement, document or instrument furnished hereunder shall survive the Initial Closing for a period of twelve (12) months thereafter; and provided further however, that the representations contained in Sections 3.1.1, 3.1.2, 3.1.3, 3.1.5, 3.1.12, 3.1.13(a), 3.2.1, 3.2.2, 3.2.3, and 3.3 shall have no expiration date and claims thereunder shall be controlled by the applicable statute of limitations.

## ARTICLE IV - AGREEMENTS PENDING THE INITIAL CLOSING.

4.1 Agreements of Company and Harlan Pending the Initial Closing. Company and Harlan covenant and agree that, pending the Initial Closing and except as otherwise agreed to in writing by Purchaser:

4.1.1 Business in the Ordinary Course. Acknowledging the effects of Section 1.3: the Business otherwise shall be conducted solely in the ordinary course consistent with past practice and Company shall use its commercially reasonable efforts to maintain all of its existing business and employee relationships; and Company shall also effectuate all maintenance, repairs and replacements as needed in the ordinary course consistent with past practice.

4.1.2 Sale of Assets; Negotiations. Prior to the Initial Closing Date, Harlan shall not permit Company to, and Company shall not, directly or indirectly, sell any part of the Assets, other than Inventory in the ordinary course of the Business consistent with past practice, merge with or into any corporation or other entity, or initiate or participate in any discussions or negotiations or enter into any agreement to do any of the foregoing. Further, prior to the Initial Closing Date, Harlan shall not sell, agree to sell, or initiate or participate in any discussions or negotiations relating to, the sale of its ownership of Company. Except as otherwise provided or contemplated by this Agreement, Company and Harlan shall not provide any confidential information concerning the Business or its properties or Assets to any third party other than in the ordinary course of business.

4.1.3 Access to Information. Company and Harlan shall give Purchaser's officers, employees, counsel, accountants and other representatives reasonable access to and the right to inspect, during normal business hours, all of the premises, properties, assets, records, contracts and other documents relating to the Business and shall permit them to consult with the officers, counsel and independent accountants of or for Company for the purpose of making such investigation of the Business, as Purchaser shall desire to make.

4.2 Agreements of Purchaser Entities Pending the Initial Closing. Purchaser Entities covenant and agree that, pending the Initial Closing and except as otherwise agreed to in writing by Company, Purchaser Entities will hold, and shall cause their counsel, independent certified public accountants, and appraisers to hold in confidence any confidential data or information made available to Purchaser Entities in connection with this Agreement with respect to the Business and the Assets using the same standard of care to protect such confidential data or information as is used to protect Purchaser Entities' confidential information, but in no event less than reasonable care. If the transactions contemplated by this Agreement are not consummated, Purchaser Entities agree that they shall return or cause to be returned to Company all written materials and all copies thereof that were supplied to Purchaser Entities by Company and that contain any such confidential data or information and shall not use the same for any purpose for the benefit of any person other than Company. The parties agree that that certain Confidentiality and Non-Disclosure Agreement dated September 26, 2022 by and between Harlan and EBC remains in effect.

4.3 Agreements as to Press Releases. Except as required by applicable law, neither party will give notice to third parties or otherwise make any public statement or releases concerning this Agreement or the transactions contemplated hereby except for such written information as shall have been approved in writing as to form and content by the other party.

## ARTICLE V - CONDITIONS PRECEDENT TO THE CLOSINGS

5.1 Conditions Precedent to Purchaser's Obligations. All obligations of Purchaser under this Agreement are subject to the fulfillment or satisfaction, prior to or at the applicable Closing, of each of the following conditions precedent:

5.1.1 Representations and Warranties True as of the applicable Closing Date. The representations and warranties of Company and Harlan contained in this Agreement or in any Schedule, certificate or document delivered by Company and Harlan to Purchaser pursuant to the provisions hereof shall have been true on the date hereof and shall be true on the Initial Closing Date, with respect to the Initial Closing, and on the Property Closing Date with respect to the Property Closing, with the same effect as though such representations and warranties were made as of such date.

5.1.2 Compliance with this Agreement. Company and Harlan shall have performed and complied with all agreements, covenants and conditions required by this Agreement to be performed or complied with by them prior to or at the applicable Closing.

5.1.3 Closing Certificate. Purchaser shall have received a certificate from Company and Harlan dated the applicable Closing Date, certifying in such detail as Purchaser may reasonably request that the conditions specified in Sections 5.1.1 and 5.1.2 hereof have been fulfilled and certifying that Company and Harlan have obtained all consents and approvals required with respect to them or the Business by Section 5.1.4 hereof or the other provisions of this Agreement.

5.1.4 Consents and Approvals. As of the applicable Closing Date, the parties (other than Company) to any contract to which Company is a party or subject, any governmental or regulatory official, body or authority and any governmental, judicial or regulatory official, body or authority having jurisdiction over Company, Purchaser or any Authorization, to the extent that their consent or approval is required or necessary under the pertinent contract, Authorization or under applicable orders, laws, rules or regulations, for the consummation of the transactions contemplated hereby in the manner herein provided, shall have granted such consent or approval so as not to adversely impact the Assets (including any Authorization) or the transactions contemplated by this Agreement. The foregoing condition expressly includes approval by the Arkansas Department of Environmental Quality of the transfer or reissuance of Company's Operating Air Permit (No. 1940-AOP-R7) and Industrial Stormwater General Permit (No. ARR00C142) to Purchaser, without the imposition of any new conditions or restrictions on such permits which would render operation of the Business thereunder materially different than prior to the Effective Date.

5.1.5 <u>Title Insurance, Survey and Environmental Phase I</u>. Within twenty (20) days after the date of this Agreement, Company shall obtain and deliver to Purchaser a commitment for an owner's policy of title insurance for the Property issued by a title insurance company approved by Purchaser (the "Title Insurer"), together with legible copies of all documents constituting exceptions to Company's title as reflected therein (collectively, the "Commitment"). Such Commitment must be reasonably satisfactory to Purchaser in form, scope and substance, and must contain the agreement of the Title Insurer to insure good, merchantable and marketable title to the fee simple estate in the Property in Purchaser, free of any liens, claims or encumbrances, except for those title exceptions set forth in the Commitment for recorded easements, covenants and restrictions that do not materially and adversely affect the present use and operation of the Property and the lien for real property taxes not yet due and payable (collectively, the "Permitted Exceptions"), and with all preprinted standard exceptions deleted. Purchaser may obtain a survey of the Property, at Purchaser's expense, prior to the Property Closing (the "Survey"). In addition, Purchaser, its consultants and representatives shall have the right to conduct a phase I environmental assessment of the Property and, at Purchaser's option, an asbestos survey (collectively, the "Phase I") prior to the Property Closing, at Purchaser's expense. Purchaser must be reasonably satisfied as to the results of the environmental assessment and the form and contents of the Commitment and Survey before being obligated to purchase the Property. If recommended by Purchaser's environmental consultant due to one or more recognized environmental conditions revealed in the Phase I, Purchaser may also conduct a phase II environmental assessment of the Property (the "Phase II") of sufficient scope to test and analyze any recognized environmental conditions disclosed in the Phase I. The cost of the Phase II shall be paid by Company. To the extent title is not satisfactory based on the standards above in connection with Purchaser's reasonable review of the Commitment and Survey, Company will endeavor to correct such matter, if possible, at the Company's cost, after being notified of same by Purchaser. If the Phase I and Phase II (if applicable) disclose any recognized environmental conditions at the Property which require remediation under applicable law or governmental rule or regulation, Company shall, at Company's sole cost and expense, promptly prepare all necessary corrective action plans and perform all required remediation prior to the Property Closing Date and, if available, provide Purchaser with a "no further action" letter from the applicable governmental authority confirming that all such remediation has been completed. If any ongoing monitoring requirements are imposed at the Property as a condition to the issuance of a "no further action" letter, the Company shall be responsible for conducting and reporting all such monitoring at Company's sole cost and expense, with Purchaser providing all reasonable cooperation with respect to same.

If, after the exercise of all reasonable best efforts by the parties prior to the Property Closing Date, Company is unable to satisfy Purchaser as to the environmental condition of the Property or Company is unable to deliver to Purchaser good, merchantable, marketable and insurable title to the Property, as determined by Purchaser in its reasonable business judgment following receipt and review of the Commitment, Survey, and environmental assessments, the parties will extend the Property Lease (as hereinafter defined), with rent increasing annually thereafter by the CPI, without liability to any party as a result of the inability to satisfy such matters or the Purchaser acquiring such title. The period of the extension of the Property Lease will be reasonably acceptable to the parties but will at least be sufficiently long to permit Company to perform any environmental remediation so long as it can be completed within two

(2) years thereafter and without any adverse impact on Purchaser's operation of the Business. If any environmental remediation of the Property has not been completed, or if the governmental authorities have not delivered a "no further action" letter, if available, with regard to any such remediation, the Property Lease shall provide that the Company remains obligated to satisfy such conditions at the Company's sole cost and expense, and such obligation shall be guaranteed by Harlan.

At the Property Closing, Company shall furnish any documents reasonably required by the Title Insurer, including a customary owner's affidavit and all documents required from Company to satisfy the Schedule B-1 requirements applicable to Company, to induce the Title Insurer to issue to Purchaser a final owner's policy of title insurance in an amount not less than the Purchase Price allocated for the Property. At the Property Closing, Company shall pay for all search and exam fees for the title commitment and the premium of the owner's title insurance policy, and Purchaser shall pay the cost of any mortgagee policy. Further, the cost of any endorsements requested by Purchaser or its lender shall be paid for by Purchaser. The cost of deed documentary transfer stamps, and any other closing fees charged by the Title Insurer, such as recording fees and closing/escrow fees, shall be split equally between Company and Purchaser.

5.1.6 <u>Authorizations and Property Lease</u>. The parties acknowledge that Purchaser has obtained certain Authorizations which are referenced in Schedule 3.1.6 of the Disclosure Schedule. As such Authorizations may not be transferable, after the Initial Closing, Company and Purchaser will timely apply for the equivalent permits ("New Authorizations") in order to enable Purchaser to continue to operate the Business in the ordinary course. Company agrees to promptly execute and deliver to Purchaser or the applicable governmental authority all applications and supporting documents required from Company to secure the New Authorizations, and Purchaser shall pay all application and transfer fees. In order to allow Purchaser to operate the Business after the Initial Closing and to be reasonably satisfied with the matters referenced in Section 5.1.5 above to ultimately allow for the Property Closing, at the Initial Closing, the parties will enter into a lease agreement for the Property (the "Property Lease") in form and content mutually acceptable to the parties, pursuant to which Purchaser will lease the Property from Company, paying rent in the amount of $20,500 per month, payable in advance of the end of each month, and otherwise on a triple net basis. When the New Authorizations are obtained and Purchaser is reasonably satisfied as to the matters set forth in Section 5.1.5 above, the parties will close the purchase of the Property, subject to the other Property Closing conditions hereunder, and at that time Purchaser will execute the Property Note and the mortgage referenced in Section 1.2.3.

5.1.7 <u>Hazel Avenue Lease</u>. The parties acknowledge that Company owns other property in Hope, Arkansas located on Hazel Avenue (the "Hazel Avenue Property"), which has been used by Company to store Inventory and miscellaneous equipment and parts. At the Initial Closing, the Company and Purchaser will enter into a customary lease, in mutually acceptable form, for the Hazel Avenue Property for a period of six months, with Purchaser paying Company rent of One Dollar ($1). The lease to be agreed upon by the parties will also grant Purchaser an option to purchase the Hazel Avenue Property for appraised value to be set by a mutually agreed upon appraiser, but no less than Two Hundred Seventy Five Thousand Dollars ($275,000),

exercisable at any time during the two month period prior to the termination of the lease and the purchase price paid in cash upon consummation of the option. Whether or not Purchaser exercises the option, it will pay to Company at either the termination of the lease or the closing of the purchase of the Hazel Avenue Property, as applicable, a mutually agreed upon (in writing) amount for any Inventory stored at the Hazel Avenue Property Purchaser wishes to purchase and retain, or, in the event the Inventory Purchaser then wishes to purchase is in excess of $100,000, Purchaser and Company shall mutually agree on payment terms therefor. If any Inventory remains upon exercise of the option to purchase the Hazel Avenue Property that Purchaser does not elect to purchase as aforesaid, Company will remove such other Inventory at its expense before that closing. The foregoing shall not preclude Company from selling any personal property at the Hazel Avenue Property at any time. In addition, so long as Seller Entities abide by Section 8.16, this Section and Section 1.2.5 also will not preclude Seller Entities from using or selling Inventory stored at the Hazel Avenue Property.

5.1.8 Transition Services Agreement. To assist Purchaser in the transition of the Business, Company will permit the Purchaser to utilize certain software systems of Company, as reasonably requested by Purchaser, for up to six (6) months after the Initial Closing, with Purchaser paying Seller the costs and expenses of Seller in providing such access, monthly in arrears.

5.2 Conditions Precedent to the Obligations of Company and Harlan. All obligations of Company and Harlan under this Agreement are subject to the fulfillment or satisfaction, prior to or at the Initial Closing or the Property Closing, as the case may be, of each of the following conditions precedent:

5.2.1 Representations and Warranties True as of the Applicable Closing Date. The representations and warranties of Purchaser contained in this Agreement or in any list, certificate or document delivered by Purchaser to Company pursuant to the provisions hereof shall be true on the Initial Closing Date or the Property Closing Date, as the case may be, with the same effect as though such representations and warranties were made as of such date.

5.2.2 Compliance with this Agreement. Purchaser shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by them prior to or at the Initial Closing or the Property Closing, as the case may be.

5.2.3 Closing Certificates. Company shall have received a certificate from Purchaser dated the Initial Closing Date or the Property Closing Date, as the case may be, certifying in such detail as Company may reasonably request that the conditions specified in Sections 5.2.1 and 5.2.2 hereof have been fulfilled.

5.3 Conditions Precedent to the Obligations of the Parties. All obligations of the parties under this Agreement are subject to the fulfillment or satisfaction, prior to, or at the applicable Closing, of each of the following conditions precedent:

5.3.1 No Threatened or Pending Litigation. On the applicable Closing Date, no suit, action or other proceeding, or injunction or final judgment relating thereto, shall be threatened or be pending before any court or governmental or regulatory official, body or authority commenced by any person not a party hereto in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with this Agreement or the consummation of the transactions contemplated hereby, and no investigation that might result in any such suit, action or proceeding shall be pending or threatened.

5.3.2 Approval of Counsel; Corporate Matters. All actions, proceedings, resolutions, instruments and documents (including the final form of the Property Lease) required to carry out this Agreement or incidental hereto and all other related legal matters shall have been approved on the applicable Closing Date by counsel for the respective parties in the exercise of their reasonable judgment. Each party shall also have delivered to the other party such other documents, instruments, certifications and further assurances as such counsel for the respective parties may reasonably require.

## ARTICLE VI - INDEMNIFICATION

6.1 General Indemnification Obligations of Company and Harlan. From and after the Initial Closing, but subject to Section 6.3, Company and Harlan will jointly and severally reimburse, indemnify and hold harmless Purchaser, EBC and their respective successors and assigns (an "Indemnified Purchaser Party") against and in respect of:

(a) Any and all damages, losses, deficiencies, liabilities, costs and expenses (collectively, "Losses") incurred or suffered by any Indemnified Purchaser Party that result from, relate to or arise out of:

(i) any failure by Company or Harlan to comply with any covenant of this Agreement;

(ii) any misrepresentation or breach of warranty on the part of Company or Harlan under this Agreement, or arising from any misrepresentation in or omission from any certificate, schedule, statement, document or instrument delivered or otherwise furnished to Purchaser pursuant hereto; and

(iii) any and all liabilities and obligations of Harlan or Company as to performance of obligations under Contracts or Authorizations to the extent relating to the period prior to the Effective Date or otherwise arising from events or matters occurring prior to the Effective Date in connection with Harlan's or Company's operation of the Business; and

(iv) the ownership or use of the Assets, the Property or the operation of the Business prior to the Effective Date, including, without limitation, the ownership, manufacture, processing, generation, distribution, use, storage, disposal, transportation handling, emission, discharge, release or threatened release into the environment, or the presence on the

Property or any of the other Assets, of any pollutant, contaminant or hazardous or toxic waste, substance or material;

(v) any employee benefit plan maintained by Company;

(vi) any and all liabilities and obligations of Company or Harlan of any nature whatsoever except for prospective obligations under Contracts which have been expressly assumed by Purchaser pursuant to Section 1.3; and

(vii) (A) the presence, release, or disposal of any pollutant, contaminant, hazardous substance or hazardous material at the Property, except to the extent caused by a Purchaser Entity or its successors and assigns; (B) the migration of any pollutant, contaminant, hazardous substance or hazardous material to or from the Property or any waterways, except to the extent caused by Purchaser or its successors and assigns; (C) the application of any environmental law, regulation or directive requiring the remediation or monitoring of any hazardous substance or material at the Property, or the placement of any environmental lien on the Property, except in either case to the extent caused by a Purchaser Entity or its successors and assigns; and (D) Company's failure to comply with any Environmental Law applicable to the Property, including the terms, conditions, and record keeping and/or reporting requirements of permits issued for operations at the Property.

(b) Any and all actions, suits, claims, proceedings, investigations, demands, assessments, audits, fines, judgments, costs and other expenses (including, without limitation, reasonable legal fees and expenses) incident to any of the foregoing or to the enforcement of this Section 6.1.

In addition, Purchaser will have the right to set off the unpaid amount of any appropriate indemnity claim hereunder against any amounts owed by Purchaser to Company under this Agreement, including any Note, and each Note shall expressly contain such set off right.

6.2 General Indemnification Obligation of Purchaser. From and after the Initial Closing, the Purchaser Entities will jointly and severally reimburse, indemnify and hold harmless Company, Harlan and their successors or assigns (an "Indemnified Company Party") against and in respect of:

(a) Any and all Losses incurred or suffered by any Indemnified Company Party that result from, relate to or arise out of:

(i) any failure by Purchaser to comply with any covenant of this Agreement;

(ii) any misrepresentation or breach of warranty on the part of Purchaser under this Agreement, or arising from any misrepresentation in or omission by Purchaser from any certificate, schedule, statement, document or instrument delivered or otherwise furnished to Company or Harlan pursuant hereto; or

(iii) any and all liabilities and obligations of Purchaser as to performance of obligations under Contracts to the extent relating to the period after the Initial Closing which are expressly assumed by Purchaser under Section 1.4, or otherwise arising from events or matters occurring after the Effective Date in connection with Purchaser's operation of the Business pursuant to Section 1.3 or otherwise (except to the extent relating to any Losses under Section 6.1(a) above).

(b) any and all actions, suits, claims, proceeding, investigations, demands, assessments, audits, fines, judgments, costs and other expenses (including, without limitation, reasonable legal fees and expenses) incident to any of the foregoing or to the enforcement of this Section 6.2.

6.3 Limitations. Notwithstanding anything contained herein to the contrary, the Seller Entities will not be obligated to indemnify and hold the Purchaser harmless for any claim pursuant to Section 6.1(a)(ii), except for Losses or claims for breaches of the representations contained in Sections 3.1.1, 3.1.2, 3.1.3, 3.1.5, 3.1.12, 3.1.15 and 3.3 (the "Fundamental Reps") , unless and until the aggregate amount of Losses as to breaches of representations not constituting Fundamental Reps exceeds $65,000 (the "Deductible") and then the Seller Entities will be liable to the Purchaser only for Losses which are in excess of the Deductible, and subject to an overall aggregate cap on the liability of the Seller Entities for any such breach as to representations not constituting Fundamental Reps equal to $2,000,000 (the "Cap"); provided, neither the Deductible nor Cap shall apply in the case of fraud. As to Losses arising under the Fundamental Reps which could be claimed pursuant to Section 6.1(a)(ii) or any Losses arising pursuant to any of Section 6.1(a)(i) or (iii) through (vii), no Deductible or Cap applies, except that in that event Seller Entities' liability will not exceed the Purchase Price.

6.4 Notice and Defense. The obligations and liabilities of the Seller Entities and the Purchaser Entities hereunder with respect to their respective indemnities pursuant to this Article VI, resulting from any claim or other assertion of liability by third parties (hereinafter, "Third Party Claims"), shall be subject to the following terms and conditions:

(a) The party seeking indemnification hereunder (the "Indemnified Party") shall give written notice of any such Third Party Claim to the party from whom indemnification is sought hereunder (the "Indemnifying Party") within a reasonable time after the Indemnified Party receives notice thereof; provided however, the failure to give such notice timely shall not affect the Indemnifying Party's obligations hereunder except to the extent that such failure materially prejudices the Indemnifying Party's ability to defend such Third Party Claim.

(b) The Indemnifying Party shall have the right to undertake, with counsel and other representatives of its own choosing and reasonably acceptable to the Indemnified Party, the defense or settlement of any such Third Party Claim. The Indemnified Party shall have the right in such circumstances to participate in such defense with its own counsel at its own cost, but if the use of counsel by the Indemnifying Party to defend such claim could reasonably be expected to give rise to a conflict of interest which cannot be reasonably resolved by the parties, the employment of separate counsel by the Indemnified Party shall be at the expense of the Indemnifying Party.

(c) In the event that the Indemnifying Party shall have the right to undertake the defense of any Third Party Claim, but shall fail to notify the Indemnified Party within fifteen (15) days of receipt of the notice that it has elected to undertake such defense or settlement, or if at any time the Indemnifying Party shall otherwise fail to diligently defend or pursue settlement of such claim, then the Indemnified Party shall have the right to undertake the defense, compromise or settlement of such claim, with counsel reasonably acceptable to the Indemnifying Party, and at the cost of the Indemnifying Party.

(d) Neither party shall compromise or settle any Third Party Claim or consent to the entry of any judgment with respect to any Third Party Claim, without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. Any such settlement shall include as an unconditional term thereof a complete release of the Indemnified Party and its officers, directors, employees, agents and affiliates from all liability with respect to such claim. Regardless of which party is conducting the defense of any such Third Party Claim, the other party, with counsel or other representatives of its own choosing, shall have the right to consult with the party conducting the defense of such claim and its counsel or other representatives concerning such claim and the Indemnifying Party and the Indemnified Party and their respective counsel or other representatives shall cooperate with respect to such claim, and the party conducting the defense of any such claim and its counsel shall in any case keep the other party and its counsel (if any) fully informed as to the status of any claim and any matters relating thereto. Each party shall provide to the other party such records, books, documents and other materials as shall reasonably be necessary for such party to conduct or evaluate the defense of any Third Party Claim.

## ARTICLE VII - POST CLOSING MATTERS

7.1 Employees.

(a) Company shall pay, on a timely basis, directly or indirectly, to each employee of the Business that portion of all benefits which has been accrued on behalf of that employee (or is attributable to expenses properly incurred by that employee) as of the Initial Closing Date (including accrued vacation liability), and Purchaser shall assume no liability therefor. In addition, Company shall be responsible for the payment of any bonuses it has customarily paid to employees attributable to year-end performance, in this case pertaining to 2022. Purchaser shall not assume, or be required to continue, any plan, fund, program or arrangement maintained by Company for its employees. All amounts payable directly to employees, or to any fund, program, arrangement or plan maintained by Company therefor shall be paid by Company within any required time frame after the Initial Closing Date. With respect to the current employees of Company working at the Property in the Business, before or at the Initial Closing, Purchaser will make offers of employment to such employees offering wages, salaries and benefits comparable to those currently provided by Company, so long as such employees meet the reasonable hiring criteria of Purchaser. Nothing herein shall be construed as an offer by the Purchaser for any employment contract, employment agreement or offer for employment for any definite period of time with any employee of the Company hired by the Purchaser as of or after the date of the Initial Closing. Any employee hired by the Purchaser

shall be hired on an at-will basis and is subject to discharge for any reason or no reason at all, with or without notice and employment is not guaranteed for any definite period of time. These terms are not intended to inure to the benefit of the third party employees who have no contractual right or expectation in future employment with the Purchase for any definite period of time. Notwithstanding the foregoing, however, the costs and expenses associated with the employees working in the Business for Purchaser's account pursuant to Section 1.3 will be appropriately factored in any payment adjustments which are required by Section 1.3.

(b) The Seller Entities shall be responsible for the COBRA coverage and COBRA notices as described in ERISA §§601–608 and the related resolutions and in the Internal Revenue Code § 4980B and the related regulations.

7.2 Discharge of Business Obligations. With due regard to the effect of Section 1.3, from and after the Initial Closing Date, Company shall pay and discharge, in accordance with past practice, all obligations and liabilities incurred (or which otherwise relate to the period) prior to or on the Initial Closing Date in respect of the Business, its operations or the assets and properties used therein (except for those expressly assumed by Purchaser hereunder), including without limitation any liabilities or obligations to trade creditors and customers of the Business.

7.3 Maintenance of Books and Records. Company, Harlan and Purchaser shall preserve for a period of three years after the Initial Closing Date or such longer time as required by applicable law or regulation all records possessed or to be possessed by such party relating to any of the assets, liabilities or business of the Business prior to the Initial Closing Date, if any. After the Initial Closing Date, where there is a legitimate purpose, such party shall provide the other parties with access to such records, to be held and used on a strictly confidential basis.

7.4 Financing. Purchaser agrees that no later than one hundred twenty (120) days after the Property Closing, it will begin communications with lenders in the pursuit of good faith efforts to obtain financing secured by the Assets to enable Purchaser to pre-pay the amount of each Note, with the goal to consummate such financing no later than nine (9) months after the Property Closing. If the financing obtained by Purchaser is not sufficient to pay the entire amount of each Note, the financing will be used to pay down the amount owed under each Note to the fullest extent. In that event, Company will agree to subordinate its lien on the Assets to such bank financing in accordance with customary lending subordination terms.

## ARTICLE VIII - MISCELLANEOUS

8.1 Termination. (a) Anything herein or elsewhere to the contrary notwithstanding, this Agreement may be terminated by written notice of termination at any time before the Initial Closing, only as follows:

(i) by mutual written consent of Company and Purchaser;

(ii) by Purchaser, (A) at any time if the representations and warranties of Company contained in Section 3.1 hereof or of Harlan contained in Section 3.3 hereof were incorrect in any material respect when made or at any time thereafter; (B) upon written notice to

Company given at any time after January 31, 2023 (or such later date as shall have been specified in a writing authorized on behalf of Company and Purchaser) if all of the conditions precedent set forth in Section 5.1 and Section 5.3 hereof have not been met or otherwise waived; or (C) pursuant to Section 3.1.13(b) or Section 8.13 hereof; or

(iii) by Company, (A) at any time if the representations and warranties of Purchaser contained in Section 3.2 hereof were incorrect in any material respect when made or at any time thereafter; or (B) upon written notice to Purchaser given at any time after January 31, 2023 (or such later date as shall have been specified in a writing authorized on behalf of Company and Purchaser) if all of the conditions precedent set forth in Section 5.2 and Section 5.3 hereof have not been met or otherwise waived.

(b) In the event of the termination hereof pursuant to the provisions of this Section 8.1, this Agreement (except for Section 4.2, and any other provisions of this Agreement which expressly state they survive termination of this Agreement, which shall continue) shall become void and have no effect, without any liability on the part of any of the parties or their directors or officers in respect of this Agreement unless the termination was the result of the representations and warranties of a party being materially incorrect when made or the material breach by a party of a covenant hereunder, in which case the non-breaching party shall be entitled to pursue all of its rights and remedies against the breaching party under applicable law.

(c) The parties acknowledge that if the conditions to the Property Closing are not satisfied (but subject to the extension of the Property Lease as provided in Section 5.15, if applicable) or the Property Closing otherwise does not take place because of Section 3.1.13(b) or 8.13, then the Rescission Remedy will be applicable. For the avoidance of doubt, if the Rescission Remedy is to be effectuated at any time pursuant to this Agreement, the effectuation of the Rescission Remedy will not reverse the financial adjustments provided for in Section 1.3 if the Initial Closing occurred, and as to the period between the Effective Date and the effectuation of the Rescission Remedy, Purchaser will be entitled to retain any revenue or income generated through the operation of the Business until the effectuation of the Rescission Remedy (the "Rescission Remedy Effective Time") and will bear any expenses and losses incurred through such period (other than Losses to be indemnified by Seller Entities under Section 6.1(a)); and Purchaser Entities will jointly and severally reimburse, indemnify and hold harmless the Seller Entities from and against any Losses arising from events or matters occurring after the Effective Date and prior to the Rescission Remedy Effective Time in connection with Purchaser's operation of the Business pursuant to Section 1.3 or otherwise (except to the extent relating to any Losses under Section 6.1(a)).

8.2 <u>Expenses.</u> Except as otherwise provided in this Agreement, each party hereto shall pay its own expenses incidental to the preparation of this Agreement, the carrying out of the provisions of this Agreement and the consummation of the transactions contemplated hereby.

8.3 <u>Contents of Agreement; Parties in Interest; etc.</u> This Agreement and the Company Documents and the Purchaser Documents set forth the entire understanding of the parties hereto with respect to the transactions contemplated hereby. No such document, instrument or agreement shall be amended or modified except by written instrument duly executed by each of

the parties hereto. Any and all previous agreements and understandings between or among the parties regarding the subject matter hereof, whether written or oral, are superseded by this Agreement.

8.4 Assignment and Binding Effect. This Agreement may not be assigned prior to the Initial Closing by any party hereto without the prior written consent of the other parties. Subject to the foregoing, all of the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and assigns of Company, Harlan, Purchaser and EBC.

8.5 Waiver. Any term or provision of this Agreement may be waived at any time by the party entitled to the benefit thereof by a written instrument duly executed by such party.

8.6 Notices. Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given only if delivered personally or sent by registered or certified mail, postage prepaid, return receipt requested, as follows:

If to Purchaser or EBC, to:

Dan Serra
East Baking Company, Inc.
104 Whiting Farms Road
Holyoke, MA 01040

With a courtesy copy to:

Judd Peskin
1515 Locust St.
Unit 901
Philadelphia, PA 19102

If to Company or Harlan, to:

Hal P. Harlan
c/o Harlan Bakeries, LLC
7597 E. US Highway 36
Avon, Indiana 46123

With a courtesy copy to:

Roberts E. Inveiss
Bose McKinney & Evans, LLP
111 Monument Circle, Suite 2700
Indianapolis, Indiana 46204

or to such other address as the addressee may have specified in a notice duly given to the sender as provided herein. Such notice, request, demand, waiver, consent, approval or other communication will be deemed to have been given as of the date so delivered, or, in the case of mailing, on the date indicated in the return receipt. Failure to transmit a courtesy copy shall not be deemed to be a failure to give effective notice.

8.7 Arkansas Law to Govern. This Agreement, the Company Documents and Purchaser Documents shall be governed by and interpreted and enforced in accordance with the laws of the State of Arkansas without regard to its conflicts of law provisions.

8.8 No Benefit to Others. The representations, warranties, covenants and agreements contained in this Agreement are for the sole benefit of the parties hereto and, in the case of Article VI hereof, the other indemnified parties, and their heirs, executors, administrators, legal

representatives, successors and assigns, and they shall not be construed as conferring any rights on any other persons.

8.9 Headings, Gender and "Person." All section headings contained in this Agreement are for convenience of reference only, do not form a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter, except as the context otherwise requires. Any reference to a "person" herein shall include an individual, firm, corporation, partnership, trust, governmental authority or body, association, unincorporated organization or any other entity.

8.10 Schedules and Exhibits. All Schedules and Exhibits referred to herein are intended to be and hereby are specifically made a part of this Agreement.

8.11 Severability. Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.12 Counterparts. This Agreement may be executed in any number of counterparts, including counterpart signature pages and any party hereto may execute any such counterpart, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become binding when one or more counterparts taken together shall have been executed and delivered by the parties, and such delivery may be effective by facsimile or email transmission in order to be legally binding.

8.13 Damage or Destruction. All risk of loss or damage to the Assets shall be borne by Company to and including the Initial Closing Date, and with respect to the Property, to and including the Property Closing Date. In the event of damage or destruction of any substantial portion of the Assets on or prior to the Initial Closing Date, and with respect to the Property, on or prior to the Property Closing Date, Purchaser may, at its option, (i) elect to terminate this Agreement prior to the Initial Closing, in which event of a termination prior to the Initial Closing, neither party shall have any further obligation hereunder (except pursuant to Section 4.2 and any other provisions which expressly state they survive termination of this Agreement); (ii) if prior to the Property Closing, elect the Rescission Remedy; or (iii) elect to proceed with the Initial Closing, or Property Closing, as the case may be, and this Agreement will remain in effect, in which event Purchaser shall be entitled to all insurance proceeds payable to Company under any and all policies of insurance covering the Assets so damaged or destroyed and the Purchase Price shall be reduced by the amount of any insurance deductible.

8.14 Negotiated Asset Purchase Agreement. This Agreement and the documents to be executed pursuant to this Agreement are the result of negotiations among the parties to this Agreement. Accordingly, no party to this Agreement shall be deemed to be the author of this

Agreement or the resulting documents, and there shall be no presumption to this Agreement or any of such documents are to be construed for or against any party to this Agreement on the basis of the authorship of the documents.

8.15 NLRB Matter. The parties acknowledge that the NLRB matter described on Schedule 3.1.7 of the Disclosure Schedule may affect Purchaser and accordingly, the parties have agreed that so long as Purchaser uses the services of Company's existing counsel, Bose McKinney & Evans LLP ("Bose"), in connection with the continued defense of the NLRB matter, Company agrees to continue to pay the fees and expenses of Bose in connection with the NLRB matter for up to two (2) years from the Initial Closing Date. The parties acknowledge that Bose will be entitled to continue to represent the Seller Entities on all other matters related to the relationship with Purchaser and this Agreement after the Initial Closing and the parties hereby waive any and all conflicts of interest which would preclude Bose from representing Purchaser in connection with the NLRB matter and Bose representing the Seller Entities with respect to all other matters, including the relationship with Purchaser and matters related to this Agreement. If the NLRB matter is not concluded at the expiration of two years from the Initial Closing Date, then Purchaser will continue to prosecute and defend the NLRB matter at its own expense and without any liability to any of the Seller Entities.

8.16 Non-Solicitation of Customers. For a period of three (3) years after the Closing, the Seller Entities and their affiliates will not solicit the customers of Purchaser set forth in the attached Exhibit 8.16 solely with respect to the "active products" sold to the customers set forth in said Exhibit, or sell such products to any such customer during said 3-year period. The Seller Entities acknowledge that the foregoing restriction is reasonable, given that such customers have been sold such products by Company prior to the date hereof.

*[Remainder of page left intentionally blank; signature page follows]*

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement on the date first above written.

SOUTHERN BAKERIES, LLC

By: [signature]
Its: President

HARLAN BAKERIES, LLC

By: [signature]
Its: President

EAST BAKING COMPANY, INC.

By:______________________________
Its:______________________________

4481146_15

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement on the date first above written.

SOUTHERN BAKERIES, LLC

By:______________________________
Its:______________________________

HARLAN BAKERIES, LLC

By:______________________________
Its:______________________________

EAST BAKING COMPANY, INC.

By:______________ DANNY SERKA
Its:______________ President
1/16/23

4481146_14

**Exhibit 1.1.1(a)**

Vehicles

See Attached

## VEHICLE SCHEDULE

**Harlan Foods, Inc.**
7599 E US Highway 36 Avon, IN 46123

**AS OF:** 1/16/2023

| VEH # | STATE | YEAR | MAKE | MODEL | VIN | TYPE | CLASSIFICATION | COST NEW | COMP DED | COLL DED | GARAGING LOCATION | COMMENT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 32 | | 2003 | Ford | F350 Diesel Truck | 1FDWF36FX3EA65432 | Truck | | $9,480 | | | Hope | Hope, AR |
| 29 | | 1996 | FREIGHTLINER | CONVENTIONAL FLD112 | 1FUY3MDB2TL797747 | Truck-Tractor | Tractor | $115,433 | | | Hope | Hope, AR |
| 31 | | 1998 | FREIGHTLINER | CONVENTIONAL FLD112 | 1FUY3MDB0WP919180 | Truck-Tractor | Tractor | $79,416 | | | Hope | Hope, AR |
| 75 | | 2001 | 48" Utility Trailer | Utility Dry Van 53' | 1UYVS25301P409317 | 48' Dry Van | Trailer | | | | Hope, Arkansas | Hope, AR |
| 76 | | 2001 | 48" Utility Trailer | Utility Dry Van 53' | 1UYVS25341P409319 | 48' Dry Van | Trailer | | | | Hope, Arkansas | Hope, AR |
| 77 | | 2001 | 48" Utility Trailer | Utility Dry Van 53' | 1UYVS25301P409320 | 48' Dry Van | Trailer | | | | Hope, Arkansas | Hope, AR |
| 78 | | 2001 | 48" Utility Trailer | Utility Dry Van 53' | 1UYVS25341P409322 | 48' Dry Van | Trailer | | | | Hope, Arkansas | Hope, AR |
| 79 | | 2001 | 48" Utility Trailer | Utility Dry Van 53' | 1UYVS25381P409324 | 48' Dry Van | Trailer | | | | Hope, Arkansas | Hope, AR |
| 80 | | 2001 | 48" Utility Trailer | Utility Dry Van 53' | 1UYVS25331P409327 | 48' Dry Van | Trailer | | | | Hope, Arkansas | Hope, AR |
| 63 | | 2002 | 53' Utility Tralier | Utility T/A Reefer VSR 53' W SB-III 30 SR Thermo King | 1UYVS25333M054101 | 53" Reefer Trailer | Trailer | | | | Hope, Arkansas | Hope, AR |
| 64 | | 2002 | 53' Utility Tralier | Utility T/A Reefer VSR 53' W SB-III 30 SR Thermo King | 1UYVS25353M054102 | 53" Reefer Trailer | Trailer | | | | Hope, Arkansas | Hope, AR |
| 65 | | 2002 | 53' Utility Tralier | Utility T/A Reefer VSR 53' W SB-III 30 SR Thermo King | IUYVS25373M054103 | 53" Reefer Trailer | Trailer | | | | Hope, Arkansas | Hope, AR |
| 66 | | 2002 | 53' Utility Tralier | Utility T/A Reefer VSR 53' W SB-III 30 SR Thermo King | 1UYVS25393M054104 | 53" Reefer Trailer | Trailer | | | | Hope, Arkansas | Hope, AR |
| 67 | | 2002 | 53' Utility Tralier | Utility T/A Reefer VSR 53' W SB-III 30 SR Thermo King | IUYVS25303M054105 | 53" Reefer Trailer | Trailer | | | | Hope, Arkansas | Hope, AR |
| 68 | | 2002 | 53' Utility Tralier | Utility T/A Reefer VSR 53' W SB-III 30 SR Thermo King | IUYVS25323M054106 | 53" Reefer Trailer | Trailer | | | | Hope, Arkansas | Hope, AR |
| 69 | | 2002 | 53' Utility Tralier | Utility T/A Reefer VSR 53' W SB-III 30 SR Thermo King | IUYVS25343M054107 | 53" Reefer Trailer | Trailer | | | | Hope, Arkansas | Hope, AR |
| 70 | | 2002 | 53' Utility Tralier | Utility T/A Reefer VSR 53' W SB-III 30 SR Thermo King | IUYVS25363M054108 | 53" Reefer Trailer | Trailer | | | | Hope, Arkansas | Hope, AR |
| 71 | | 2002 | 53' Utility Tralier | Utility T/A Reefer VSR 53' W SB-III 30 SR Thermo King | IUUVS25383M054109 | 53" Reefer Trailer | Trailer | | | | Hope, Arkansas | Hope, AR |
| 72 | | 2002 | 53' Utility Tralier | Utility T/A Reefer VSR 53' W SB-III 30 SR Thermo King | IUYVS25343M054110 | 53" Reefer Trailer | Trailer | | | | Hope, Arkansas | Hope, AR |
| 98 | | 2023 | FREIGHTLINER | Cascadia/Sleeper - leased | 3AKJHHFG4PSUD1930 | Truck-Tractor | Tractor | $148,619 | | | Hope, Arkansas | Hope, AR |
| 99 | | 2023 | FREIGHTLINER | Cascadia/Sleeper - leased | 3AKJHHFG6PSUD1931 | Truck-Tractor | Tractor | $148,619 | | | Hope, Arkansas | Hope, AR |
| 100 | | 2023 | FREIGHTLINER | Cascadia/Sleeper - leased | 3AKJHHFG8PSUD1932 | Truck-Tractor | Tractor | $148,619 | | | Hope, Arkansas | Hope, AR |
| 81 | | 1997 | Stainless Steel Tank | Heil | 5HTSN4427V7W04698 | Heil | Trailer | | | | Hope, Arkansas | Hope, AR |
| 82 | | 1996 | Stainless Steel Tank | Heil | 1HLS5M7B0T7W04123 | Heil | Trailer | | | | Hope, Arkansas | Hope, AR |

**Exhibit 1.1.1(c)**

Contracts

1) Supply Agreement with Fazoli's System Management, LLC, which commenced October 1, 2013
2) Purchasing Contract with ALDI Inc. dated September 29, 2021
3) Supplier Authorization Agreement Non-Produce U.S. with Sysco Merchandising and Supply Chain Services, Inc. dated in August, 2014 (note that such Contract is month to month)
4) Harry & David Purchase Order Standard Terms and Conditions

**Exhibit 1.1.2(f)**

Excluded Personal Property

1) BOSCH carton former
2) BOSCH carton closer
3) Interconnecting conveyors as to the foregoing
4) Peerless 2000 pound mixer

**Exhibit 1.1.2(j)**

Other Excluded Assets

1) The Hazel Avenue Property and contents thereof

**Exhibit 1.2.4**

Allocation of Purchase Price

| Asset | Amount |
|---|---|
| Land/Land Improvements | $ 275,000 |
| Building/Building Improvements | 3,225,000 |
| Machinery & Equipment * | 2,100,000 |
| Furniture and Fixtures | 100,000 |
| IT Equipment | 50,000 |
| Customer Lists, Formulations, Trade Secrets, Trade Name, License Agreement and other Intangibles | 750,000 |
| | $6,500,000 |

*Includes amount allocated to silo repair

**Exhibit 8.16**

Customers and Active Products Subject to Non-Solicitation by Seller Entities

4485405_6

SOUTHERN ™

Strictly Confidential

**Southern Bakeries, LLC Customer & Product List**

**16-Jan-23**

| Customer | Active Products |
|---|---|
| 1. Albertsons | Brown & Serve Rolls |
| 2. ALDI | a. English Muffins<br>b. Brown & Serve Rolls |
| 3. Associated Grocers / Topco | a. Brown & Serve Rolls |
| 4. Brookshire Brothers | a. Brown & Serve Rolls |
| 5. Fazoli's | a. Breadsticks |
| 6. Harry & David | a. English Muffins |
| 7. HEB | a. Brown & Serves<br>b. English Muffins<br>c. Buns<br>d. Dinner Rolls |
| 8. HyVee | a. Brown & Serve Rolls |

Strictly Confidential

## Southern Bakeries, LLC Customer & Product List

16-Jan-23

| | Customer | Active Products |
|---|---|---|
| 9. | Kroger / Dillons / Harris Teeter / Fred Meyer | a. Brown & Serve Rolls |
| 10. | Mitchell's Grocery | a. Brown & Serve Rolls |
| 11. | New York Deli & Bagel | a. English Muffins |
| 12. | Piggly Wiggly | a. Brown & Serve Rolls |
| 13. | Rudi's Organic Bakery | a. English Muffins |
| 14. | Stater Brothers | a. Brown & Serve Rolls |
| 15. | Sysco | b. English Muffins |
| 16. | Walmart | a. Brown & Serves |
| | | b. English Muffins |

# DISCLOSURE SCHEDULE

**to**

**ASSET PURCHASE AGREEMENT**

**by and among**

**SOUTHERN BAKERIES, LLC,**

**HARLAN BAKERIES, LLC**

**AN ARKANSAS CORPORATION TO BE FORMED**

**AND**

**EAST BAKING COMPANY, INC.**

**Dated as of January 16, 2023**

## Disclosure Schedule

This Disclosure Schedule is being delivered in connection with that certain Asset Purchase Agreement, dated as of January 16, 2023, by and among Southern Bakeries, LLC ("Company"), Harlan Bakeries, LLC ("Harlan", and together with Company, the "Seller Entities"), an Arkansas corporation to be formed by EBC or its owner ("Purchaser") and East Baking Company, Inc., a Massachusetts corporation ("EBC") (the "Agreement"). Capitalized terms used in this Disclosure Schedule that are not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

Matters reflected in this Disclosure Schedule are not necessarily limited to matters required by the Agreement to be reflected herein. Such additional matters are set forth for informational purposes and do not necessarily include other matters of a similar nature.

This Disclosure Schedule is arranged in separate parts corresponding to the numbered and lettered sections and subsections contained in the Agreement, and the information disclosed in any such numbered or lettered part shall qualify and be deemed to relate to, and be incorporated in, such sections and subsections, and all other sections and subsections of the Agreement if and to the extent that it is reasonably apparent on the face of such disclosure, without reference to, or review to, the applicable matter, document or other item disclosed therein, that it applies to such other section or subsection of the Agreement.

Without limiting the foregoing, for convenience of reference, the Seller Entities may have, in certain instances, included cross-references to other sections of this Disclosure Schedule. Appendices, exhibits, and other documents attached hereto and referenced herein form an integral part of the parts, subparts, sections and subsections of this Disclosure Schedule into which such appendices, exhibits, and other documents are incorporated by reference for all purposes as if fully set forth herein. A heading has been inserted on each section of this Disclosure Schedule for convenience of reference only, which shall not have the effect of amending or changing the express description of the sections as set forth in the Agreement and shall not be referred to in connection with the construction or interpretation of the Agreement.

## Schedule 3.1.3

### Validity of Contemplated Transactions, etc.

The following Contracts may not be assigned without the prior written consent of the other party:

1) Supply Agreement with Fazoli's System Management, LLC, which commenced October 1, 2013
2) Purchasing Contract with ALDI Inc. dated September 29, 2021
3) Supplier Authorization Agreement Non-Produce U.S. with Sysco Merchandising and Supply Chain Services, Inc. dated in August, 2014 (note that such Contract is month to month)
4) Harry & David Purchase Order Standard Terms and Conditions
5) Schedule A to Truck Lease & Service Agreement dated October 1, 2021, pursuant to that certain Truck Lease & Service Agreement dated October 4, 2005, with Ryder as to the Leased Vehicles

Company's lender, Bank of America, N.A., as Agent, must consent to the Agreement and the transactions contemplated by the Agreement and release its lien on the Business Assets, which is expected as contemplated by Schedule 3.1.5.

## Schedule 3.1.5

**Existing Liens**

1) Bank of America, N.A., as Agent — to be released at the Initial Closing as to the Business Assets (but not including the Excluded Assets under Section 1.1.2 of the Agreement).

2) Toyota Industries Commercial Finance, Inc. — one forklift; final payment was sent on January 12, 2023.

Note: The UCC financing statement of Robert Reiser & Co., Inc. should be terminated as the Company has paid the debt associated with the financing statement in full.

**<u>Schedule 3.1.6</u>**

**Compliance with Law; Authorizations**

Oven Air Emission Reporting Violations resulted in a Consent Administrative Order finalized in September, 2022, with Company paying a fine of $7,200. The Company also was required to submit a Compliance Action Plan, which was approved by the Arkansas Division of Environmental Quality.

Set forth below is a list of Authorizations.

1) Arkansas Department of Health Water Potability Certificate dated April 20, 2022.
2) Arkansas Department of Environmental Quality Industrial Stormwater General Permit ARR00C142 issued on May 2, 2019.
3) Arkansas Division of Environmental Quality Operating Air Permit 1940-AOP-R7 dated October 15, 2021.
4) Boiler certification, which expires February 28, 2023, and certain repairs will need to be effected before recertification.

## Schedule 3.1.7

**Litigation**

*Southern Bakeries and Bakery, Confectionary, Tobacco and Grain Millers Union, Local 111* (the "Union")

A March 27, 2023 hearing is scheduled before an Administrative Law Judge of the National Labor Relations Board Region 15 ("NLRB" or "Board") in Hope, Arkansas
Cases: 15-CA-220275; 15-CA-225791; and 15-CA-234243

These consolidated cases flow from unfair labor practice charges filed by the Union against the Company during the period from May of 2018 through January of 2019 with respect to a bargaining unit of full-time and regular part-time production and sanitation employees at its Hope, Arkansas facility. The Company has operated without a union since its withdrawal of recognition at the end of 2018 and the Company has contested all charges. Moreover, the withdrawal-of-recognition petition was signed and supported by a majority of the former union-represented employees; and there has been no known union activity or support among any of the employees at the Hope, Arkansas facility since that time.

The primary remedy the NLRB seeks against the Company through the hearing is immediate recognition of the Union as the exclusive bargaining representative of the production and sanitation employees and to bargain in good faith with the Union thereafter. The Board also seeks certain non-monetary remedies and to order the extraordinary and unprecedented remedy of reimbursing the Union for all costs and expenses incurred in mandated negotiations for a full 12-month period, and to make employee negotiators whole for any earnings lost while attending bargaining sessions. The Administrative Law Judge's decision when rendered may be appealed to the full NLRB; and the NLRB's decision may be appealed to the appropriate federal court of appeals for enforcement or to vacate. Any decision of the ALJ or the full NLRB must be enforced in court if not accepted by the Company.

## Schedule 3.1.8

### Contracts and Commitments

1) Employment Agreement with Rick Ledbetter
2) Agreement with Stefan Fischer, which includes a bonus opportunity
3) The Contracts referenced on Schedule 3.1.3

## Schedule 3.1.9

**Labor Matters**

See Schedule 3.1.7.

## Schedule 3.1.10

### Employee Benefit Plans

See attached list of plans, employees and compensation. In addition, the Seller Entities maintain a 401(k) plan.

SOUTHERN

| Current Southern Bakeries Cost 2022-23 Plan Year | Current Enrollment | Current Total Cost | Current Employee Cost | Current Southern Cost |
|---|---|---|---|---|
| (UHC) Fully Insured Medical | 109 | $1,157,425 | $291,312 | $882,286 |
| (Alight) Health Navigation | 109 | $3,270 | | |
| (Wellfleet) Medical Sweeteners: ACC & HI | 66 | $12,903 | | |
| (ArmadaCare) Executive Health Benefit | 1 | $11,328 | $0 | $11,328 |
| Health Subtotal | 109 | $1,184,926 | $291,312 | $893,614 |
| (UHC) Dental (EE Paid) | 110 | $62,259 | $62,259 | $0 |
| (UHC) Vision (EE Paid) | 94 | $13,345 | $13,345 | $0 |
| (MoO) Basic Life/AD&D (ER Paid) | 185 | $21,689 | $0 | $21,689 |
| (MoO) Voluntary EE Life/AD&D (EE Paid) | 44 | $17,596 | $17,596 | $0 |
| (MoO) Voluntary SP Life/AD&D (EE Paid) | 17 | $3,850 | $3,850 | $0 |
| (MoO) Voluntary CH Life/AD&D (EE Paid) | 7 | $126 | $126 | $0 |
| (Atlantic American) Voluntary EE Whole Life (EE Paid) | 22 | $9,548 | $9,548 | $0 |
| (Atlantic American) Voluntary SP Whole Life (EE Paid) | 4 | $1,735 | $1,735 | $0 |
| (Atlantic American) Voluntary CH Whole Life (EE Paid) | 2 | $120 | $120 | $0 |
| (CoreSource) STD Admin | 68 | $1,763 | $0 | $1,763 |
| Self-Funded STD Claims | Claim information available in Southern's payroll | | | |
| (One America) Voluntary STD (EE Paid) | 27 | $7,258 | $7,258 | $0 |
| (MoO) LTD (ER Paid) | 23 | $11,824 | $0 | $11,824 |
| (CoreSource) FSA (ER & EE Paid) | 10 | $11,520 | $9,360 | $2,160 |
| (Wellfleet) Accident (EE Paid) | 35 | $3,710 | $3,710 | $0 |
| (Wellfleet) Hospital Indemnity (EE Paid) | 26 | $4,563 | $4,563 | $0 |
| (Wellfleet) Critical Illness (EE Paid) | 75 | $18,526 | $18,526 | $0 |
| (AllState) ID Theft (EE Paid) | 18 | $2,727 | $2,727 | $0 |
| (SmartBen) Benefit Administration | 213 | $8,946 | $0 | $8,946 |
| (Gatekeeper) ACA Tracking + 1095C's | 213 | $1,811 | $0 | $1,811 |
| (Terrill Flex) COBRA | 140 | $924 | $0 | $924 |
| Total | | $1,388,766 | $446,036 | $942,730 |

**Notes**:

Alight Health Navigation and Price Transparency sweetener provides service to employees for the medical plan (cost analysis, billing questions, finding a provider, booking appointments, coverage & benefit questions, etc.)

Accident and Hospital Indemnity coverage through Wellfleet is included automatically for employees who elect Medical Plans III and IV.

STD Claims are approved by CoreSource and paid by Southern. Total claimants and amounts should be available in payroll.

Cobra is $0.55 PEPM (included on Join Plus services invoice)

Gatekeeper helps track employee eligibility for benefits (variable hour EEs) and assists in producing and mailing 1095Cs in accordance with the Affordable Care Act (ACA). Cost is $0.50 PEPM (Total Employees) + $2.50 per 1095C Mailing

SmartBen is $3.50 PEPM (Benefit Eligible Employees). This includes call center and additional support by JoinPlus team. Some subsidizing of cost provided by MMA

MoO is short for Mutual of Omaha. UHC is United Healthcare. FSA is Flexible Spending Account

Southern pays the cost for FSA Administration ($180 / month) and the employee pays the full amount of their election.

ArmadaCare is an Executive Health Benefit - covering many out of pocket Medical / Rx costs for those covered on plan.

MarshMcLennan Agency

Southern Bakeries, LLC

Strictly Confidential

01.13.2023

## Office Personnel

| | First Name | Last Name | Date Hired | Date Re-Hired | Date Seniority | Hourly Pay | Salary | Department | Department(Sub Department) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Adolfo | Aguirre | 11/06/2003 | | 06/10/2005 | - | $53,000 | Indirect Production - Hope | Production - Salary |
| 2 | April | Ames | 03/05/2002 | | 03/05/2002 | - | $55,000 | Indirect Production - Hope | Production - Salary |
| 3 | Eduardo | Anzaldua | 11/21/2010 | 07/22/2019 | 02/04/2011 | - | $53,000 | Indirect Production - Hope | Production - Salary |
| 4 | Israel | Armendariz | 09/04/2005 | | 09/04/2005 | - | $50,000 | Sanitation - Hope | Sanitation - Salary |
| 5 | Sinai | Bautista | 05/05/2021 | | 05/05/2021 | - | $50,000 | Human Resources - Hope | Human Resources - Salary |
| 6 | Bob | Buckley | 10/24/2011 | | 10/24/2011 | - | $50,000 | Indirect Production - Hope | Production - Salary |
| 7 | David | Capetillo | 01/12/2004 | | 01/12/2004 | - | $72,000 | Maintenance - Hope | Maintenance Machinery - Salary |
| 8 | Stefan | Fischer | 04/04/2022 | | 04/04/2022 | - | $130,000 | Indirect Production - Hope | Production - Salary |
| 9 | Franklin | Hackler | 10/18/2001 | | 10/18/2001 | - | $75,000 | Maintenance - Hope | Maintenance Machinery - Salary |
| 10 | Charles | Hardin | 08/01/1995 | 05/20/1996 | 03/25/1997 | - | $52,000 | Indirect Production - Hope | Production - Salary |
| 11 | Veronique | Ivory | 09/28/2015 | | 04/10/2016 | - | $48,000 | QA - Hope | Quality Assurance - Salary |
| 12 | Rickey | Ledbetter | 06/23/2003 | | 06/23/2003 | Confidential | Confidential | G & A Administration - Hope | Administration - Salary |
| 13 | Gayla | McCoy | 09/25/2000 | | 09/25/2000 | - | $61,500 | G & A Administration - Hope | Administration - Salary |
| 14 | Cynthia | McMahen | 04/12/1999 | 06/03/2013 | 10/18/2000 | - | $78,000 | Distribution - Hope | Distribution - Salary |
| 15 | Russell | Norman | 10/24/2006 | 07/23/2007 | 03/12/2007 | - | $65,000 | Maintenance - Hope | Maintenance Machinery - Salary |
| 16 | Justin | Ray | 09/15/2020 | 08/03/2022 | 03/13/2021 | - | $50,000 | Indirect Production - Hope | Production - Salary |
| 17 | Brian | Weems | 10/25/1999 | | 10/25/1999 | - | $74,000 | Customer Service - Hope | Customer Service - Salary |
| 18 | Kenneth | White | 01/24/1990 | | 01/24/1990 | - | $74,500 | Indirect Production - Hope | Production - Salary |
| 19 | Jody | Yocom | 06/13/1990 | | 06/13/1990 | - | $94,000 | Maintenance - Hope | Maintenance Machinery - Salary |
| 20 | Shannon | Callicott | 10/15/2018 | | 10/15/2018 | $18.50 | - | Customer Service - Hope | Customer Service - Hourly |
| 21 | Aimee | Guilfoyle | 08/28/2018 | 03/28/2022 | 12/31/2019 | $20.50 | - | Purchasing - Hope | Purchasing - Hourly |
| 22 | Erica | Munoz Torres | 10/04/2021 | | 10/04/2021 | $15.50 | - | Human Resources - Hope | Human Resources - Hourly |

## Direct Production

| | First Name | Last Name | Date Hired | Date Re-Hired | Date Seniority | Hourly Pay | Department | Job | Job(1) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Phillip | Agee | 06/08/2021 | | 06/08/2021 | $13.25 | Brown & Serve | Boxer | Prod Line Operator I |
| 2 | Jessi | Aguilar | 07/29/2020 | 04/20/2022 | 04/20/2022 | $13.25 | Brown & Serve | Pan Setter/Panner/Stacker | Prod Line Operator I |
| 3 | Adolfo | Aguirre | 10/20/1981 | | 10/20/1981 | $14.25 | Variety/Sticks | Pan Setter/Panner/Stacker | Prod Line Operator I |
| 4 | Luis | Alonzo | 08/10/2022 | | 08/10/2022 | $13.00 | Muffin Line 2 | Boxer | Prod Line Operator I |
| 5 | Esmeralda | Arevalo | 10/18/2009 | | 11/07/2010 | $15.50 | Variety/Sticks | Variety Pan-O-Mat | Prod Line Operator III |
| 6 | Joshua | Baker | 08/17/2022 | | 08/17/2022 | $13.00 | Brown & Serve | Boxer | Prod Line Operator I |
| 7 | Cristina | Barraza Hernan | 07/13/2022 | | 07/13/2022 | $13.25 | Muffin Line 2 | Packer | Prod Line Operator I |
| 8 | Ruben | Barrientos | 12/17/2014 | | 04/19/2015 | $15.50 | Muffin Line 1 | Mixer Operator | Prod Line Operator III |
| 9 | Charles | Black | 08/02/2018 | 04/23/2019 | 08/02/2018 | $13.50 | Brown & Serve | Boxer | FLEX - Prod Line Operator I |
| 10 | Kenneth | Blake | 10/02/2008 | 03/04/2021 | 03/04/2021 | $13.50 | Brown & Serve | Pan Setter/Panner/Stacker | Prod Line Operator I |
| 11 | Shaundriel | Blakely | 09/25/2005 | | 09/25/2005 | $16.00 | Variety/Sticks | Oven Operator | Prod Line Operator III |
| 12 | Jose | Bonilla | 06/08/2012 | | 06/08/2012 | $16.00 | Muffin Line 2 | Mixer Operator | Prod Line Operator III |
| 13 | Earnest | Brewer | 09/20/2017 | | 03/25/2018 | $14.00 | Muffin Line 3 | Boxer | Prod Line Operator I |

**Direct Production**

| | First Name | Last Name | Date Hired | Date Re-Hired | Date Seniority | Hourly Pay | Department | Job | Job(1) |
|---|---|---|---|---|---|---|---|---|---|
| 14 | Jimmy | Brewer | 08/01/2001 | | 08/01/2001 | $14.50 | Variety/Sticks | Boxer | Prod Line Operator I |
| 15 | Gerardo | Briones | 04/01/2013 | | 04/01/2013 | $16.00 | Muffin Line 3 | Mixer Operator | Prod Line Operator III |
| 16 | Betty | Brisby | 09/08/2005 | 10/17/2022 | 03/19/2006 | $14.75 | Brown & Serve | B & S Versa Pack | Prod Line Operator II |
| 17 | Quadrick | Broom | 02/02/2022 | | 02/02/2022 | $13.25 | Brown & Serve | Boxer | Prod Line Operator I |
| 18 | Robert | Brown | 10/17/2016 | | 01/29/2017 | $14.00 | Brown & Serve | Boxer | FLEX - Prod Line Operator I |
| 19 | Matthew | Buckley | 07/22/2013 | 09/24/2021 | 05/17/2017 | $15.25 | Brown & Serve | BreakOut/Utility | Prod Line Operator III |
| 20 | David | Capetillo | 12/30/2011 | 11/17/2022 | 05/05/2021 | $14.25 | Muffin Line 2 | Line Operator III | Prod Line Operator III |
| 21 | Wendy | Cardona | 03/22/2022 | | 06/13/2022 | $13.25 | Variety/Sticks | Packer | Prod Line Operator I |
| 22 | Margarita | Cardona | 06/14/2022 | | 10/19/2022 | $13.00 | Muffin Line 1 | Packer | Prod Line Operator I |
| 23 | Virginia | Chavez | 10/23/2020 | 04/25/2022 | 06/13/2022 | $13.25 | Variety/Sticks | Packer | Prod Line Operator I |
| 24 | Dwight | Chiles | 10/22/2021 | | 02/21/2022 | $13.25 | Muffin Line 1 | Boxer | Prod Line Operator I |
| 25 | Courtney | Clemons | 07/08/2016 | | 10/09/2016 | $14.75 | Variety/Sticks | BreakOut/Utility | Prod Line Operator III |
| 26 | Stephanie | Cortinas | 02/28/2013 | | 02/28/2013 | $15.50 | Variety/Sticks | Variety Pan-O-Mat | Prod Line Operator III |
| 27 | Reginald | Cox | 03/04/2020 | | 08/16/2020 | $14.75 | Brown & Serve | Oven Operator | Prod Line Operator III |
| 28 | Veronica | Cruz | 09/22/2008 | | 08/09/2009 | $14.25 | Muffin Line 3 | Packer | Prod Line Operator I |
| 29 | Maria | Davila | 07/08/2016 | | 10/23/2016 | $14.00 | Muffin Line 1 | Packer | Prod Line Operator I |
| 30 | Fausto | De La Cruz | 03/28/2013 | | 03/28/2013 | $15.00 | Variety/Sticks | BreakOut/Utility | Prod Line Operator III |
| 31 | Reyna | Del Carmen | 09/28/2015 | 06/01/2020 | 04/04/2018 | $13.75 | Brown & Serve | Inspector/Monitor | Prod Line Operator I |
| 32 | Michelle | Delgado | 07/30/2019 | 04/20/2021 | 06/12/2022 | $13.50 | Muffin Line 2 | Packer | Prod Line Operator I |
| 33 | Sabrina | Diaz | 08/27/2015 | | 02/10/2016 | $14.00 | Muffin Line 2 | Packer | Prod Line Operator I |
| 34 | Martha | Dotson | 08/29/2005 | 10/12/2018 | 08/29/2005 | $14.25 | Variety/Sticks | Packer | Prod Line Operator I |
| 35 | Lakisha | Edwards | 09/25/2020 | | 03/21/2021 | $14.00 | Brown & Serve | B & S Versa Pack | Prod Line Operator II |
| 36 | Elijah | Edwards | 10/14/2021 | 10/12/2022 | 05/30/2022 | $13.25 | Variety/Sticks | Boxer | Prod Line Operator I |
| 37 | Nikolia | Edwards | 07/13/2009 | 07/20/2022 | 07/06/2022 | $13.25 | Brown & Serve | Inspector/Monitor | Prod Line Operator I |
| 38 | Carneshia | Ellis | 04/22/2021 | | 04/22/2021 | $15.00 | Muffin Line 3 | Wrap/Bagger Operator | Prod Line Operator III |
| 39 | Shamonica | Evans | 10/16/2018 | | 10/16/2018 | $14.75 | Brown & Serve | B & S Versa Pack | Prod Line Operator II |
| 40 | Jeramy | Fielding | 08/02/2018 | 04/23/2019 | 08/02/2018 | $13.50 | Brown & Serve | Boxer | FLEX - Prod Line Operator I |
| 41 | Jerry | Fielding | 04/04/2018 | | 04/04/2018 | $13.50 | Muffin Line 2 | Line Operator I | Prod Line Operator I |
| 42 | Herman | Flenory | 08/07/2012 | | 08/07/2012 | $14.25 | Muffin Line 2 | Boxer | Prod Line Operator I |
| 43 | Zaira | Fraire Martinez | 11/06/2019 | 07/06/2020 | 01/03/2021 | $13.75 | Muffin Line 1 | Packer | Prod Line Operator I |
| 44 | Pedro | Frayre Diaz | 08/19/2020 | | 08/19/2020 | $14.75 | BoxMakers | Box Operator | Prod Line Operator III |
| 45 | Donna | Gannon | 09/07/2022 | | 09/07/2022 | $13.00 | Variety/Sticks | Packer | Prod Line Operator I |
| 46 | Alexis | Garcia | 08/17/2020 | 09/14/2022 | 04/02/2022 | $14.25 | Brown & Serve | Mixer | Prod Line Operator III |
| 47 | Krystal | Garcia | 12/29/2011 | 07/23/2021 | 05/12/2018 | $13.00 | Variety/Sticks | Packer | Prod Line Operator I |
| 48 | Kristina | Garza | 12/02/2014 | | 03/15/2015 | $15.50 | Muffin Line 2 | Wrap/Bagger Operator | Prod Line Operator III |
| 49 | Ernesto | Gaytan | 04/19/2012 | | 04/19/2012 | $14.25 | Muffin Line 3 | Boxer | Prod Line Operator I |
| 50 | Yuni | Gomez | 08/23/2013 | 06/11/2019 | 11/08/2016 | $14.00 | Variety/Sticks | Packer | Prod Line Operator I |
| 51 | Rebecca | Gomez | 03/10/2006 | 06/24/2020 | 03/10/2006 | $15.75 | Brown & Serve | Wrap/Bagger Operator | Prod Line Operator III |
| 52 | Michelle | Gonzales | 05/16/2022 | | 08/17/2022 | $13.00 | Muffin Line 2 | Packer | Prod Line Operator I |
| 53 | Lisa | Gonzalez | 07/13/2012 | 03/28/2018 | 03/28/2013 | $16.20 | Variety/Sticks | Team Leader | Production Line Operator IV |
| 54 | Teresia | Green | 08/10/1995 | 02/25/1996 | 02/25/1996 | $14.25 | Variety/Sticks | Packer | Prod Line Operator I |
| 55 | Takeshia | Griffin | 09/14/2021 | 06/24/2022 | 10/19/2022 | $13.00 | Muffin Line 2 | Packer | Prod Line Operator I |
| 56 | Veronica | Guerra | 03/21/2012 | | 03/21/2012 | $14.25 | Muffin Line 2 | Packer | Prod Line Operator I |

## Direct Production

| | First Name | Last Name | Date Hired | Date Re-Hired | Date Seniority | Hourly Pay | Department | Job | Job(1) |
|---|---|---|---|---|---|---|---|---|---|
| 57 | Lorenzo | Gutierrez | 10/20/2021 | | 10/20/2021 | $14.50 | Muffin Line 1 | Wrap/Bagger Operator | Prod Line Operator III |
| 58 | Victoria | Gutierrez | 06/15/2022 | | 09/07/2022 | $13.00 | Variety/Sticks | Packer | Prod Line Operator I |
| 59 | Victoria | Haley | 09/21/2022 | | 09/21/2022 | $13.00 | Variety/Sticks | Packer | Prod Line Operator I |
| 60 | Marcus | Hamilton | 08/14/1996 | 05/18/2022 | 11/19/2005 | $15.75 | Variety/Sticks | Mixer Operator | Prod Line Operator III |
| 61 | Crystal | Hernandez | 09/28/2017 | | 01/07/2018 | $15.25 | Variety/Sticks | Wrap/Bagger Operator | Prod Line Operator III |
| 62 | Andrew | Hickman | 10/13/2004 | | 10/13/2004 | $16.00 | Variety/Sticks | Oven Operator | Prod Line Operator III |
| 63 | Brenda | Ibarra | 07/14/2008 | | 08/09/2009 | $15.50 | Muffin Line 2 | BreakOut/Utility | Prod Line Operator III |
| 64 | Dorris | Ingram | 08/18/1988 | | 08/18/1988 | $16.75 | Variety/Sticks | Team Leader | Production Line Operator IV |
| 65 | Hipolito | Jimenez | 12/29/2011 | | 12/29/2011 | $16.00 | Variety/Sticks | Mixer Operator | Prod Line Operator III |
| 66 | Patrick | Johnson | 02/12/1990 | | 02/12/1990 | $16.00 | Brown & Serve | Wrap/Bagger Operator | Prod Line Operator III |
| 67 | Lonti | Johnson | 09/26/1996 | | 09/26/1996 | $14.25 | Variety/Sticks | Packer | Prod Line Operator I |
| 68 | Dun | Johnson | 02/23/2021 | | 01/23/2022 | $13.50 | Muffin Line 3 | Line Operator | Prod Line Operator I |
| 69 | Jeanette | LaMay | 03/06/1991 | | 03/06/1991 | $14.25 | Variety/Sticks | Packer | Prod Line Operator I |
| 70 | Robert | Langston | 09/25/2020 | 09/28/2022 | 09/28/2022 | $13.00 | Brown & Serve | Boxer | Prod Line Operator I |
| 71 | Catalina | Lara | 10/13/2004 | 10/19/2015 | 01/06/2006 | $14.25 | Brown & Serve | Inspector/Monitor | Prod Line Operator I |
| 72 | Felipe | Lara | 09/29/2004 | | 09/29/2004 | $16.25 | Muffin Line 2 | Mixer Operator | Prod Line Operator III |
| 73 | Ramiro | Longoria | 02/23/2000 | | 02/23/2000 | $16.00 | Brown & Serve | BreakOut/Utility | Prod Line Operator III |
| 74 | Trayonna | Love | 09/24/2019 | | 10/04/2020 | $14.25 | Brown & Serve | B & S Versa Pack | Prod Line Operator II |
| 75 | Tiffany | Luna | 01/25/2012 | 06/20/2014 | 10/12/2014 | $15.50 | Variety/Sticks | Bread Pan-O-Mat Operator | Prod Line Operator III |
| 76 | Jimmy | Martin | 01/30/1989 | 11/29/2021 | 06/15/1998 | $15.75 | Muffin Line 1 | Mixer Operator | Prod Line Operator III |
| 77 | Cirilo | Martinez | 07/14/2008 | | 07/14/2008 | $14.00 | Muffin Line 2 | Boxer | Prod Line Operator I |
| 78 | Andrea | Martinez | 12/29/2011 | | 12/29/2011 | $16.25 | Variety/Sticks | Team Leader | Production Line Operator IV |
| 79 | Gladys | McFadden | 10/12/2022 | | 10/12/2022 | $13.00 | Muffin Line 2 | Packer | Prod Line Operator I |
| 80 | Marcus | Meeks | 07/08/2016 | | 07/08/2016 | $16.50 | Brown & Serve | Team Leader | Production Line Operator IV |
| 81 | Clifford | Morrison | 12/30/2011 | 06/27/2022 | 10/12/2018 | $14.75 | Variety/Sticks | Oven | Prod Line Operator III |
| 82 | Ervin | Nelson | 09/13/2018 | 04/23/2019 | 09/13/2018 | $13.50 | Brown & Serve | Packer | FLEX - Prod Line Operator I |
| 83 | Leon | Ogden | 08/29/2005 | | 08/29/2005 | $14.75 | Muffin Line 1 | Line Operator | Prod Line Operator II |
| 84 | Roger | Palmer | 06/07/2018 | | 06/07/2018 | $16.00 | Muffin Line 3 | Team Leader | Production Line Operator IV |
| 85 | Martin | Perez Jr | 12/29/2011 | 02/09/2022 | 04/14/2014 | $15.50 | Muffin Line 1 | Mixer Operator | Prod Line Operator I |
| 86 | Sandra | Phillips | 02/12/1993 | | 02/12/1993 | $14.25 | Variety/Sticks | Packer | Prod Line Operator I |
| 87 | Loshonta | Pugh | 07/10/2009 | 02/15/2022 | 10/14/2012 | $14.50 | Variety/Sticks | Packer | Prod Line Operator I |
| 88 | Jovan | Purifoy | 07/14/2008 | 06/08/2022 | 12/14/2011 | $13.75 | Brown & Serve | Inspector/Monitor | Prod Line Operator I |
| 89 | O'Keith | Quarles | 08/02/2018 | 04/23/2019 | 08/02/2018 | $13.50 | Brown & Serve | Boxer | FLEX - Prod Line Operator I |
| 90 | Michael | Ramirez | 03/28/2013 | | 03/28/2013 | $14.00 | Variety/Sticks | Pan Setter/Panner/Stacker | Prod Line Operator I |
| 91 | Mario | Rendon | 08/07/2012 | | 08/07/2012 | $15.25 | Variety/Sticks | K Operator | Prod Line Operator III |
| 92 | Patricia | Reyes | 04/10/2012 | | 04/10/2012 | $15.50 | Variety/Sticks | Variety Pan-O-Mat | Prod Line Operator III |
| 93 | Maria | Reyes | 05/30/2014 | | 09/21/2014 | $14.25 | Brown & Serve | Inspector/Monitor | FLEX - Prod Line Operator I |
| 94 | Bianca | Reyna | 06/10/2014 | 10/17/2016 | 01/29/2017 | $15.25 | Muffin Line 1 | Wrap/Bagger Operator | Prod Line Operator III |
| 95 | Christian | Reynolds | 05/17/2016 | 08/04/2021 | 08/10/2020 | $13.75 | Brown & Serve | Boxer | Prod Line Operator I |
| 96 | Leela | Ridgell | 07/27/2022 | | 07/27/2022 | $14.00 | Brown & Serve | Wrap/Bagger Operator | Prod Line Operator III |
| 97 | Laquitta | Robinson | 11/02/2021 | | 11/02/2021 | $13.25 | Muffin Line 1 | Packer | Prod Line Operator I |
| 98 | Javier | Rodriguez | 11/17/2020 | 09/14/2022 | 08/27/2022 | $13.00 | Brown & Serve | Boxer | Prod Line Operator I |
| 99 | Exavier | Rogers | 09/28/2022 | | 09/28/2022 | $14.00 | Brown & Serve | Wrap/Bagger Operator | Prod Line Operator III |

## Direct Production

| | First Name | Last Name | Date Hired | Date Re-Hired | Date Seniority | Hourly Pay | Department | Job | Job(1) |
|---|---|---|---|---|---|---|---|---|---|
| 100 | Martika | Rojas | 10/19/2015 | | 02/10/2016 | $14.00 | Muffin Line 3 | Packer | Prod Line Operator I |
| 101 | Quenten | Salcido | 03/13/2020 | | 03/21/2021 | $14.00 | Muffin Line 3 | Boxer | Prod Line Operator I |
| 102 | Francisca | Salinas | 07/03/2013 | | 12/22/2013 | $14.50 | Variety/Sticks | Inspector/Monitor | Prod Line Operator I |
| 103 | Juan | Scott | 06/24/2022 | | 10/19/2022 | $13.00 | Brown & Serve | Boxer | Prod Line Operator I |
| 104 | Chris | Segovia | 12/02/2014 | 08/21/2015 | 02/21/2016 | $15.50 | Brown & Serve | BreakOut/Utility | Prod Line Operator III |
| 105 | Maria | Serrano | 09/24/2018 | 09/14/2022 | 08/27/2022 | $13.00 | Variety/Sticks | Packer | Prod Line Operator I |
| 106 | Cory | Shipp | 08/02/2018 | 04/23/2019 | 08/02/2018 | $13.50 | Brown & Serve | Boxer | FLEX - Prod Line Operator I |
| 107 | Adam | Solis | 09/20/2012 | | 09/20/2012 | $14.50 | Variety/Sticks | Packer | Prod Line Operator I |
| 108 | Santos | Soto-Ponce | 06/23/1998 | 12/13/2018 | 01/22/1999 | $16.75 | Muffin Line 3 | Team Leader | Production Line Operator IV |
| 109 | Abigail | Torres | 11/17/2015 | | 06/12/2016 | $14.00 | Variety/Sticks | Boxer | Prod Line Operator I |
| 110 | Denise | Torres | 03/24/2006 | | 03/24/2006 | $16.70 | Muffin Line 3 | Team Leader | Production Line Operator IV |
| 111 | Myrle | Trotter | 08/01/2013 | | 12/22/2013 | $14.00 | Muffin Line 3 | Packer | Prod Line Operator I |
| 112 | Agustin | Valdez | 09/21/2012 | 01/25/2016 | 01/25/2016 | $15.25 | BoxMakers | Box Operator | Prod Line Operator III |
| 113 | Cindy | Vazquez | 03/28/2017 | | 07/02/2017 | $15.75 | Variety/Sticks | Bread Pan-O-Mat Operator | Prod Line Operator III |
| 114 | Richard | Villarreal | 07/10/2017 | | 09/10/2017 | $14.25 | Variety/Sticks | Boxer | Prod Line Operator I |
| 115 | Terence | White | 08/13/2018 | 01/29/2020 | 03/21/2021 | $13.50 | Muffin Line 2 | Boxer | Prod Line Operator I |
| 116 | Londell | Wiley | 02/04/1993 | | 02/04/1993 | $16.00 | Brown & Serve | Oven Operator | Prod Line Operator III |
| 117 | Shasmakelyia | Woodbury | 07/12/2018 | 04/08/2022 | 07/16/2021 | $13.50 | Variety/Sticks | Inspector/Monitor | Prod Line Operator I |
| 118 | Edward | Woods | 03/13/2020 | | 03/21/2021 | $14.50 | BoxMakers | Box Operator | Prod Line Operator III |
| 119 | Naomi | Wyrick | 07/05/2018 | 10/19/2022 | 10/19/2022 | $13.00 | Brown & Serve | Packer | Prod Line Operator I |
| 120 | Saira | Zambrano | 06/29/2022 | | 06/29/2022 | $13.25 | Muffin Line 2 | Packer | Prod Line Operator I |
| 121 | Rosa | Zamora | 07/03/2013 | | 12/22/2013 | $15.25 | Brown & Serve | K Operator | Prod Line Operator III |

## Shipping - Receiving - Transportation

| | First Name | Last Name | Date Hired | Date Re-Hired | Date Seniority | Hourly Pay | Department | Job | Employee Pay Grade |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Noel | Balbuena | 10/02/2020 | | 10/05/2020 | $15.25 | Shipping - Hourly | Loader | SBShipCII |
| 2 | Joseph | Cortez | 05/14/2012 | | 05/14/2012 | $16.50 | Receiving - Hourly | Loader | SBRecCII |
| 3 | Larry | Cowart | 09/22/1978 | | 09/22/1978 | $13.00 | Distribution - Hourly | Driver | SBTTruckHrly |
| 4 | Christopher | Craig | 08/01/1997 | | 08/01/1997 | $21.25 | Shipping - Hourly | Shipping Specialist | SBShipGral |
| 5 | Ricardo | De Haro | 12/29/2011 | 08/02/2022 | 09/05/2013 | $16.00 | Shipping - Hourly | Puller | SBShipCII |
| 6 | Jessie | Dixon | 09/16/1986 | | 09/16/1986 | $16.00 | Shipping - Hourly | Loader | SBShipCII |
| 7 | Frederick | Frierson | 06/28/2018 | 06/17/2019 | 09/28/2018 | $17.50 | Receiving - Hourly | Yard Driver | SBRecCIII |
| 8 | Richard | Harris | 02/06/1990 | | 02/06/1990 | $16.00 | Shipping - Hourly | Loader | SBShipCII |
| 9 | James | Harris | 09/23/2022 | | 01/11/2023 | $15.00 | Shipping - Hourly | Puller | SBShipCII |
| 10 | Anthony | Hernandez | 10/27/2022 | | 10/27/2022 | $15.00 | Shipping - Hourly | Loader | SBShipCII |
| 11 | Gregg | Horton | 10/12/2022 | | 10/12/2022 | $17.50 | Receiving - Hourly | Yard Driver | SBRecCIII |
| 12 | Daniel | Jordan | 10/12/2022 | | 10/12/2022 | $15.00 | Shipping - Hourly | Puller | SBShipCII |
| 13 | Irvin | Martinez Petata | 03/14/2022 | | 03/14/2022 | $15.50 | Receiving - Hourly | Adm/Inventory | SBCIII |
| 14 | Johnny | Oller | 08/11/1989 | | 08/11/1989 | $13.00 | Distribution - Hourly | Driver | SBTTruckHrly |
| 15 | Tomas | Perez | 09/09/1998 | | 09/09/1998 | $18.00 | Receiving - Hourly | Adm/Inventory | SBRecCIII |

**Shipping - Receiving - Transportation**

| | First Name | Last Name | Date Hired | Date Re-Hired | Date Seniority | Hourly Pay | Department | Jobs | Employee Pay Grade |
|---|---|---|---|---|---|---|---|---|---|
| 16 | Stacy | Pickens | 07/27/2009 | 09/13/2021 | 08/08/2021 | $16.25 | Receiving - Hourly | Adm/Inventory | SBRecCIII |
| 17 | Raymon | Sanders | 01/07/2021 | | 01/07/2021 | $20.00 | Receiving - Hourly | Receiving Supervisor | SBRecCIII |
| 18 | Francisco | Sepulveda | 08/27/2009 | 08/13/2020 | 08/13/2020 | $16.00 | Receiving - Hourly | Puller | SBRecCIII |
| 19 | James | Stutler | 07/11/2005 | | 07/11/2005 | $16.00 | Shipping - Hourly | Loader | SBShipCI |
| 20 | Jesse | Terrell | 08/26/1996 | | 08/26/1996 | $21.25 | Shipping - Hourly | Shipping Specialist | SBShipGral |
| 21 | Jamie | Thomas | 11/15/2018 | 12/29/2022 | 12/29/2022 | $15.00 | Shipping - Hourly | Puller | SBShipCII |
| 22 | Rodney | Watson | 04/20/2022 | | 04/20/2022 | $16.25 | Receiving - Hourly | Receiving Clerk | SBRecCIII |
| 23 | Mark | Williams | 07/13/1992 | | 07/13/1992 | $16.00 | Shipping - Hourly | Puller | SBShipCII |

**Sanitation - QA**

| | First Name | Last Name | Date Hired | Date Re-Hired | Date Seniority | Hourly Pay | Department | Job | Employee Pay Grade |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Rachel | Anderson | 08/28/2018 | 04/27/2022 | 04/27/2022 | $13.25 | Sanitation - Hourly | Sanitor | SBCI |
| 2 | Nicole | Broom | 09/25/2020 | | 03/21/2021 | $13.50 | Sanitation - Hourly | Sanitor | SBSanCI |
| 3 | Michael | Clark | 02/16/2022 | | 02/16/2022 | $17.50 | Quality Assurance - Hourly | Quality Assurance Technician | SBQAHrly |
| 4 | Jerry | Haga | 07/12/2018 | 12/08/2022 | 12/08/2022 | $13.00 | Sanitation - Hourly | Sanitor | SBSanCI |
| 5 | Mykethia | Ingram | 02/13/1990 | | 02/13/1990 | $21.00 | Quality Assurance - Hourly | Quality Assurance Technician | SBQAHrly |
| 6 | Doacha | Jefferson | 03/28/2018 | | 09/08/2019 | $18.00 | Quality Assurance - Hourly | Quality Assurance Technician | SBCIII |
| 7 | Melanie | McCain | 12/29/2022 | | 12/29/2022 | $13.00 | Sanitation - Hourly | Sanitor | SBSanCI |
| 8 | Maurice | Medina | 01/25/2012 | | 01/25/2012 | $16.45 | Sanitation - Hourly | Team Leader | SBTeamL |
| 9 | Cortney | Moore | 12/29/2022 | | | $13.00 | Sanitation - Hourly | Sanitor | SBSanCI |
| 10 | Robert | Ortiz | 08/23/2018 | 03/31/2022 | 06/12/2021 | $13.25 | Sanitation - Hourly | Sanitor | SBSanCI |
| 11 | Bessie | Parker | 09/10/1993 | 02/18/1994 | 02/18/1994 | $14.50 | Sanitation - Hourly | Sanitor | SBSanCI |
| 12 | Bryanna | Rinehart | 07/10/2019 | 04/13/2022 | 07/20/2022 | $13.00 | Sanitation - Hourly | Sanitor | SBSanCI |
| 13 | Tomas | Saucedo | 10/18/2009 | | 11/07/2010 | $15.50 | Sanitation - Hourly | Sanitor III | SBSanCII |
| 14 | Robert | Schwartz | 03/28/2022 | | 03/28/2022 | $13.25 | Sanitation - Hourly | Sanitor | SBSanCI |
| 15 | Kenneth | Tidwell | 05/10/1988 | | 05/10/1988 | $16.75 | Sanitation - Hourly | Team Leader | SBTeamL |
| 16 | Joyce | Wright | 04/04/2018 | 07/20/2021 | 03/18/2019 | $13.50 | Sanitation - Hourly | Sanitor | SBSanCI |

**Maintenance**

| | First Name | Last Name | Date Hired | Date Re-Hired | Date Seniority | Hourly Pay | Job | Employee Pay Grade | Job(1) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Constantino | Barrientos-Ram | 11/16/2011 | | 11/16/2011 | $21.00 | Maintenance Technician - Lev | SBMaintCII | Maintenance Class II |
| 2 | Martin | Capetillo | 12/28/2009 | | 12/28/2009 | $23.50 | Maintenance Technician - Lev | SBMaintCIII | Maintenance Class III |
| 3 | Kaden | Carter | 06/15/2022 | | 09/19/2022 | $21.50 | Maintenance Technician - Lev | SBMaintCII | Maintenance Class II |
| 4 | Russell | Chism | 11/29/2005 | | 11/29/2005 | $22.50 | Maintenance Technician - Lev | SBMaintCIII | Maintenance Class III |
| 5 | Kevin | Cobb | 06/15/2022 | | 10/09/2022 | $21.50 | Maintenance Technician - Lev | SBMaintCII | Maintenance Class II |
| 6 | Juan | Dominguez | 11/19/2019 | 09/06/2022 | 07/20/2022 | $17.00 | Maintenance Technician - Lev | SBMaintCI | Maintenance Class I |
| 7 | Cameron | Drury | 10/27/2022 | | 10/27/2022 | $20.00 | Maintenance Technician - Lev | SBMaintCII | Maintenance Class II |
| 8 | Roberto | Flores | 06/02/2022 | 10/10/2022 | 08/30/2022 | $17.50 | Maintenance Technician - Lev | SBMaintCI | Maintenance Class I |
| 9 | Eric | Gilbert | 08/05/2010 | 03/21/2022 | 08/05/2010 | $23.00 | Maintenance Technician - Lev | SBMaintCIII | Maintenance Class III |
| 10 | Kenneth | Givens | 10/10/1992 | | 10/10/1992 | $25.90 | Maintenance Technician - Lev | SBMaintCIII | Maintenance Class III |
| 11 | Glen | Griffin | 11/09/2022 | | 11/09/2022 | $20.00 | Maintenance Technician - Lev | SBMaintCII | Maintenance Class II |

**Maintenance**

| | First Name | Last Name | Date Hired | Date Re-Hired | Date Seniority | Hourly Pay | Job | Employee Pay Grade | Job(1) |
|---|---|---|---|---|---|---|---|---|---|
| 12 | Anthony | Hackler | 05/10/2017 | 07/27/2022 | 01/18/2021 | $20.00 | Maintenance Technician - Lev | SBMaintCII | Maintenance Class II |
| 13 | John | Hankins | 02/28/2011 | | 02/28/2011 | $23.00 | Inventory Clerk | SBAdmHrly | Maintenance |
| 14 | Ricky | Harris | 03/14/2016 | | 03/14/2016 | $19.75 | Maintenance Technician - Lev | SBMaintCII | Maintenance Class II |
| 15 | Forrest | Hutson | 12/08/2022 | | 12/08/2022 | $20.00 | Maintenance Technician - Lev | SBMaintCI | Maintenance Class I |
| 16 | Glen | Ivory | 12/29/2022 | | 12/29/2022 | $20.00 | Maintenance Tech/Bldg/Grour | SBMaintCII | Maintenance Class II |
| 17 | Kenneth | Jackson | 02/09/2016 | | 02/09/2016 | $24.65 | Maintenance Technician - Lev | SBMaintCIII | Maintenance Class III |
| 18 | Brett | Loe | 07/31/2015 | | 08/09/2015 | $29.50 | Maintenance Supervisor | SBMaintCIII | Maintenance Class IV |
| 19 | James | Loe | 09/08/2022 | | 09/08/2022 | $21.00 | Maintenance Technician - Lev | SBMaintCII | Maintenance Class II |
| 20 | Johnathan | Loe | 03/14/2022 | | 07/10/2022 | $21.00 | Maintenance Technician - Lev | SBMaintCII | Maintenance Class II |
| 21 | Curtis | Morris | 11/02/2020 | | 11/02/2020 | $21.00 | Inventory Clerk | | Maintenance |
| 22 | Buckley | Nichols | 02/02/2008 | | 02/02/2008 | $23.50 | Maintenance Technician - Lev | SBMaintCII | Maintenance Class III |
| 23 | Charles | Raney | 09/28/2022 | | 09/28/2022 | $20.00 | Maintenance Technician - Lev | SBMaintCI | Maintenance Class I |
| 24 | Jordan | Rodden | 09/07/2022 | | 09/07/2022 | $21.00 | Maintenance Technician - Lev | SBMaintCII | Maintenance Class II |
| 25 | Brad | Steed | 01/15/2021 | | 01/15/2021 | $19.00 | Maintenance Technician - Lev | SBMaintCI | Maintenance Class I |
| 26 | Jehosafat | Trejo | 02/17/2015 | 09/28/2022 | 09/14/2022 | $17.00 | Maintenance Technician - Lev | SBMaintCI | Maintenance Class I |
| | | | | | | | | | |
| | Salary- Office | 22 | | | | | | | |
| | Production | 121 | | | | | | | |
| | Ship - Rec - Transport | 23 | | | | | | | |
| | Sanitation - QA | 16 | | | | | | | |
| | Maintenance | 26 | | | | | | | |
| | **Total - Total** | **208** | | | | | | | |
| | #4501681 | | | | | | | | |

## Schedule 3.1.12

### Environmental Matters

See Schedule 3.1.6.

# JOINDER AND AMENDMENT TO ASSET PURCHASE AGREEMENT

This Joinder and Amendment ("***Joinder***") is executed effective as of January 27, 2023 by and among the undersigned to acknowledge and confirm the joinder by HOPE BAKING COMPANY, INC., an Arkansas corporation ("***New Party***"), as a party to that certain Asset Purchase Agreement among SOUTHERN BAKERIES, LLC, an Indiana limited liability company (the "***Company***"), HARLAN BAKERIES, LLC, an Indiana limited liability company ("***Harlan***, and together with the Company, the "***Seller Entities***"), and EAST BAKING COMPANY, INC., a Massachusetts corporation ("***EBC***" and together with the Seller Entities, the "***Original Parties***"), dated as of January 16, 2023 (the "***Agreement***"), and to amend the Agreement as to the timing of the Initial Closing (as such term is defined in the Agreement). The Original Parties, together with New Party, are hereafter referred to as the "***Parties***."

WHEREAS, New Party desires to join and become a party to the Agreement as the Purchaser (and one of the Purchaser Entities) thereunder; and

WHEREAS, the undersigned Original Parties also desire for New Party to so join and become a party to the Agreement as the Purchaser (and one of the Purchaser Entities) thereunder and the Parties also wish to provide for certain amendments to the Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties acknowledge and agree as follows:

1. Joinder. New Party hereby joins in, becomes a party to, and agrees to be bound by, the Agreement, as the Purchaser, and one of the Purchaser Entities, thereunder. New Party shall have all the rights and be subject to all the obligations of the Purchaser (and one of the Purchaser Entities) under the Agreement. New Party acknowledges receipt of a copy of the Agreement and confirms New Party's agreement to be bound by all the terms and conditions thereof as applicable to the Purchaser (and one of the Purchaser Entities) thereunder, and affirms the truth and accuracy of the representations and warranties contained in the Agreement as to New Party. The Original Parties hereby consent and agree to said joinder and acknowledge New Party's joinder thereunder as contemplated hereby.

2. Limited Amendments; Consistency. The Agreement is hereby amended solely as reasonably necessary and appropriate to fully and properly reflect New Party's joinder thereto as contemplated hereby, all in a manner consistent with the intent of the Agreement and this Joinder. Further, the Parties hereby agree that the January 27, 2023 date in Section 2.1 of the Agreement is hereby amended to February 3, 2023 and the January 31, 2023 date referenced in Section 8.1 (a) (ii) and (iii) of the Agreement is hereby amended to February 8, 2023.

3. Ratification; Continuation. The Agreement, together with this Joinder, are hereby ratified and reconfirmed in all respects.



Exhibit B

4. Miscellaneous.

(a) Further Assurances. The Parties agree that from time to time hereafter, upon request, each of them will execute, acknowledge and deliver such other commercially reasonable documents and instruments, and take such further commercially reasonable action, as may be reasonably necessary to carry out the intent of this Joinder.

(b) Binding Effect and Benefit. This Joinder shall be binding upon and inure to the benefit of the Parties hereto, and their respective successors and assigns.

(c) Headings and Captions. Subject headings and captions are included for convenience purposes only and shall not affect the interpretation of this Joinder.

(d) Gender and Number. Throughout this Joinder, the masculine shall include the feminine and neuter, and the singular shall include the plural, and vice versa as the context requires.

(e) Entire Agreement. This Joinder constitutes the entire agreement of the parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter hereof.

(f) Governing Law. This Joinder shall be subject to and governed by the laws of the State of Arkansas, without regard to conflict of law principles.

(g) Counterparts; Facsimile. This Joinder may be executed and delivered by facsimile or other electronic means, and/or in multiple counterparts, all of which together shall constitute one and the same instrument.

*[signature page follows]*

IN WITNESS WHEREOF, the undersigned have executed and delivered this Joinder effective as of the day and year aforesaid.

**New Party:**

HOPE BAKING COMPANY, INC.

By: ______________________
Danny Serra, President

**Original Parties:**

SOUTHERN BAKERIES, LLC

By: Hal P. Harlan

Title: President

HARLAN BAKERIES, LLC

By: Hal P. Harlan

Title: Executive Vice President

EAST BAKING COMPANY, INC.

By: ______________________
Danny Serra, President



4508330_2

# SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT

THIS SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT (this "**Second Amendment**"), dated as of the 29th day of March, 2023, is made and entered into by and among, on the one hand, **SOUTHERN BAKERIES, LLC**, an Indiana limited liability company ("**Company**"), and **HARLAN BAKERIES, LLC**, an Indiana limited liability company ("**Harlan**" and together with Company, the "**Seller Entities**"), and on the other hand, **HOPE BAKING COMPANY, INC.**, an Arkansas corporation ("**Purchaser**") and **EAST BAKING COMPANY, INC.**, a Massachusetts corporation ("**EBC**", and together with Purchaser, the "**Purchaser Entities**").

## WITNESSETH

**WHEREAS**, Seller Entities and Purchaser Entities are parties to that certain Asset Purchase Agreement, dated as of January 16, 2023, as amended by a certain Joinder and Amendment thereto dated January 27, 2023 (the "**Agreement**");

**WHEREAS**, the parties to this Second Amendment desire to amend certain provisions of the Agreement; and

**WHEREAS**, this Second Amendment is being entered into by the parties to this Second Amendment to amend the Agreement in accordance with Section 8.3 of the Agreement.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and promises contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.01 Capitalized Terms**. All capitalized terms used in this Second Amendment shall have the meanings set forth in the Agreement except to the extent expressly provided otherwise herein.

**Section 1.02 Additional Included Assets; Operation of the Business Since January 1, 2023; Effective Time; Other Agreements.** The parties hereby agree that the "southernbakeries.com" domain name and the associated email boxes are added to the Assets to be sold to the Purchaser. The parties also hereby agree that Section 1.3 of the Agreement is hereby deleted in its entirety. In lieu thereof, the parties have agreed on the provisions set forth in this Section 1.02. Although the Purchaser Entities assumed responsibility for the management and operation of the Business from and after January 1, 2023 as contemplated by the Agreement, the parties have agreed that the transfer of the Business and specifically the sale of the Business Assets to Purchaser will be effective as of 11:59 P.M. on March 24, 2023 (the "**Effective Time**" and such term will have the foregoing meaning in applicable provisions of the Agreements). The Purchaser Entities will not have any claim against the Seller Entities for any amounts, time or resources expended by the Seller Entities in connection with their management and operation of the Business from and after January 1, 2023. By the same token, the Purchaser Entities will not be liable to the Seller Entities for any losses which may have been incurred in connection with the management and operation of the Business prior to the Effective Time. The parties further acknowledge that

sales of products have been made by Company to EBC between the period from January 1, 2023 through the Effective Time. At the Initial Closing, EBC will pay to Company the amount of the invoices for product sold to EBC in January and February, 2023, which invoices the parties agree are in the amount of $281,352.25 for January, 2023 and $285,215.28 for February, 2023. In addition, as to any product which has been already sold to EBC in March, 2023, prior to the Effective Time, such product will be paid for by EBC to Company no later than April 30, 2023. EBC has represented to Company that the aggregate amount of any such March invoices based on EBC's selling price to its customers is $354,030.21, which amount Company will have the right to verify prior to EBC being obligated to pay Company for same pursuant to the preceding sentence.

Purchaser agrees that it will be responsible for the payment of certain invoices issued to Company for Purchaser's own account with respect to future operation of the Business, including the following: (a) an invoice for a heat sealer from Lenexa Manufacturing Company, LLC in the aggregate amount of $51,335.48, which will be paid by Purchaser upon delivery of the ordered items; (b) invoices from Ozark Equipment Solutions Inc. (invoices 898, 900 and 904) in the aggregate amount of $12,607.50 and (c) an invoice from iTrade Network in the amount of $1,625.72. Further, at the Initial Closing, Company will receive a credit against the Initial Payment for a portion of the Orthodox Union invoices in the amount of $15,898.96, a portion of the Nexcor invoice in the amount of $4,159.04, a portion of the Mettler-Toledo, LLC invoice in the amount of $7,588.32 and a portion of the COGZ Systems, LLC invoice in the amount of $2,493.74. Grainger invoice numbers 9638965963, 9638261942 and 9638424755 have been withdrawn and reissued. An invoice for 35 air filters has been directed directly to Company and an invoice for 415 air filters has been directed directly to Purchaser. Each will pay its invoice when due directly to Grainger and neither will be given or extended a credit to the other arising from the purchase of air filters.

The Purchaser Entities have also requested the Seller Entities to continue to provide access after the Initial Closing to the IT/warehouse/accounting network of the Seller Entities and to provide the services of personnel of the Seller Entities in connection with such access and the use of such network. The Purchaser Entities will pay to the Seller Entities the out of pocket costs of the Seller Entities which are incurred in providing such access and services, which will cease at such time as the Purchaser Entities have implemented their systems as soon as reasonably practicable after the Initial Closing. The Purchaser Entities will also reimburse Company after the Initial Closing for the payroll costs associated with the operation of the Business after the Effective Time which will be covered by the final payroll of Company to be paid on Friday, March 31, 2023.

Given the management and operation of the Business by the Purchaser Entities since January 1, 2023, the parties hereby agree that the representations and warranties of the Seller Entities contained in Sections 3.1.4, 3.1.6-3.1.10, 3.1.12 and 3.1.14 of Article III of the Agreement are qualified in their entirety by the facts which the Purchaser Entities have learned and discovered about the Business as a result thereof, and no indemnity claim may be asserted by the Purchaser Entities under Section 6.1 of the Agreement with respect thereto.

**Section 1.03 Amendments to the Agreement.**

(a) *Amendment to Section 1.2.5.* Section *1.2.5* of the Agreement is hereby amended by deleting Section *1.2.5* in its entirety and replaced with the following:

1.2.5 Inventory. The parties acknowledge that subject to the provisions below in this Section 1.2.5, Company is retaining the Inventory as an Excluded Asset. As to Inventory consisting of finished goods (the "**Finished Goods**"), Company after the Effective Time will have the right to continue to sell the Finished Goods to customers of the Business, except that those Finished Goods which are to be sold to EBC will be paid for by Purchaser after the Initial Closing. The Purchaser Entities agree that the sale of the Finished Goods to customers by Company will have priority over the sale of the Finished Goods produced by Purchaser after the Effective Time, and Purchaser will cooperate with Company in facilitating the sale by Company of the Finished Goods even if Purchaser has received an assignment of rights to customer Contracts associated with the sale of the Finished Goods. Company will remain responsible for such sales and be obligated to pay its pro rata share of storage costs associated with the Finished Goods retained by Company for sale to customers in the Business. In addition, to the extent that Purchaser incurs any out of pocket expenses in connection with facilitating such sales by Company, Company will pay such out of pocket expenses to Purchaser. The accounts receivables associated with any such sales will belong to the Company. Such sales of Finished Goods will not be deemed a violation of Section 8.16 of this Agreement.

For a period of at least six (6) months after the Initial Closing and thereafter until such time as either party provides notice to the other party, Company will permit Purchaser to utilize other Inventory (consisting generally of bags, labels, boxes and other packaging, and ingredients) (the "**Other Inventory**") in its operations with the understanding that Purchaser will pay for same on a monthly basis. Purchaser will perform an inventory on a monthly basis in a manner customary to the way in which Company has performed monthly inventory counts, and no later than ten (10) days after the end of each month following the Closing, Purchaser will provide a written report to Company which will itemize the Other Inventory utilized by Purchaser in the prior month and will be accompanied by payment for same, which will be based on Company's cost. Company also will have access to the applicable books and records to verify the Other Inventory counts and the amount of Other Inventory utilized by Purchaser and the cost therefor. Although Purchaser is not obligated to purchase all of the Other Inventory, Purchaser agrees to acquire and use Other Inventory which is of a quality or quantity that is usable or salable in the ordinary course of business consistent with past practice with respect to the Company's sale of such products to customers in the ordinary course of business, it being understood that Purchaser will purchase Other Inventory from Company so long as it is usable and salable, before it purchases inventory of like kind from other suppliers. Purchaser agrees to purchase from Company at Company's cost flour obtained from or through Crockett prior to the Effective Time, including the same which is already present at the Property, and to pay for it monthly as provided herein. The parties acknowledge that purchase orders for Other Inventory from vendors have been issued under Company's name prior to the Effective Time at Purchaser's direction, and such Other Inventory will be delivered after the Effective Time

and will be used by Purchaser. Purchaser agrees to assume Company's obligation to pay for such Other Inventory delivered after the Effective Time.

In addition, Purchaser will assist Company in reconciling with IBT the use of consigned parts at Company's facility. The parties acknowledge that IBT has provided an invoice to Company for all of the consigned parts, even though not all of the parts have been used and most of the parts remain at the Company's facility. If requested by Company, Purchaser will permit IBT to retrieve any such parts at the Property so that neither Company nor Purchaser are charged for unused parts by IBT. If Purchaser wishes to acquire parts from IBT, it will arrange for same. The Parties otherwise agree to sort out responsibility as to such consigned parts and address obligations accordingly.

(b) *Amendment to Section 1.4*. Section *1.4* of the Agreement is hereby amended by deleting Section *1.4* in its entirety and replaced with the following:

1.4 Assumption of Obligations and Liabilities. At the Initial Closing, Purchaser shall assume and perform when due, Company's obligations to be performed under the Contracts, but only to the extent such obligations relate to the period on or after the Effective Time. Further, Purchaser will not be deemed to have assumed obligations under the relevant Contracts to the extent they relate to the sales of Finished Goods by Company pursuant to Section 1.2.5. Except for the foregoing obligations and liabilities expressly assumed by Purchaser in connection with such Contracts or as may otherwise be provided in any other documents to be executed by Purchaser at the Initial Closing to memorialize any provisions hereof, the parties hereto agree that Purchaser is not assuming and shall not be liable or responsible for any liabilities, debts or obligations of Company or Harlan of any type (whether direct or indirect, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, asserted or unasserted, known or unknown, secured or unsecured, absolute, fixed, contingent or otherwise). Seller Entities shall pay all of their respective liabilities, debts and other obligations as and when the same become properly due and payable, and Purchaser shall have no obligation whatsoever with respect to any of Seller Entities' creditors or any other third party with claims against either the Company or Harlan.

(c) *Amendment to Section 1.5.2.* Section *1.5.2* of the Agreement is hereby amended by deleting Section *1.5.2* in its entirety and replaced with the following:

1.5.2 Property Taxes and Transfer Taxes. Company has paid for real and personal property taxes as to the Business Assets and the Property for the 2021 tax year, which were due on October 15, 2022, and has also paid all such taxes due for prior years. Real and personal property taxes for the 2022 tax year, which will be due and payable after March 1, 2023 shall be paid by Company when due. Company shall be responsible for its pro rata share of real and personal property taxes, respectively, for the 2023 tax year payable in 2024, which will be calculated with reference to the number of days from January 1 to the date of the Effective Time. Purchaser shall then be responsible for its pro rata share of personal property taxes for the 2023 tax year payable in 2024, which will be calculated with reference to the number of days from the date of the Effective Time to the end of 2023. Purchaser shall also be responsible for its pro rata share of real property

taxes for the 2023 tax year payable in 2024, which will be calculated with reference to the number of days from the date of the Effective Time to the earlier of the date on which the lease for the Property ends or the end of 2023. To the extent such lease extends beyond 2023, Purchaser will be responsible for its pro rate share of such taxes thereafter using the same methodology as provided above. Notwithstanding the foregoing, however, in no event will Purchaser be charged duplicative taxes covering the same period, given the other tax provisions in such lease. In the event any transfer taxes are imposed on the sale of the Property or the Business Assets, Company and Purchaser shall split the cost of such taxes equally.

(d) *Amendment to Section 2.1.* The first paragraph of Section *2.1* of the Agreement is hereby amended by deleting the first paragraph of Section *2.1* in its entirety and replaced with the following:

2.1 Closings. The parties intend that the closing (the "Initial Closing") of the sale and purchase of the Business Assets shall take place at 10:00 A.M., local time, on March 29, 2023, but subject to the conditions set forth in this Agreement, at such place as the parties shall agree. The date of the Initial Closing is sometimes referred to herein as the "Initial Closing Date."

(e) *Amendment to Section 5.1.5.* The first sentence of Section *5.1.5* of the Agreement is hereby amended by deleting the first sentence of Section *5.1.5* in its entirety and replaced with the following:

Within twenty (20) days after the Initial Closing, if not already obtained, Company shall obtain and deliver to Purchaser a commitment for an owner's policy of title insurance for the Property issued by a title insurance company approved by Purchaser (the "Title Insurer"), together with legible copies of all documents constituting exceptions to Company's title as reflected therein (collectively, the "Commitment").

(f) *Deletion of Section 5.1.8.* Section *5.1.8* of the Agreement is hereby amended by deleting Section *5.1.8* in its entirety.

(g) *Amendment to Section 6.2(a)(iii).* Section *6.2(a)(iii)* of the Agreement is hereby amended by deleting Section *6.2(a)(iii)* in its entirety and replaced with the following Section *6.2(a)(iii)*:

(iii) any and all liabilities and obligations of Purchaser as to performance of obligations under Contracts to the extent relating to the period after the Effective Time which are expressly assumed by Purchaser under Section 1.4, or otherwise arising from events or matters occurring after the Effective Time in connection with Purchaser's operation of the Business or otherwise (except to the extent relating to any Losses under Section 6.1(a) above).

(h) *Deletion of last sentence of Section 7.1(a).* The last sentence of Section *7.1(a)* is hereby deleted.

(i) *Amendment to Section 7.2.* Section *7.2* of the Agreement is hereby amended by deleting Section *7.2* in its entirety and replaced with the following:

7.2 Discharge of Business Obligations. From and after the Effective Time, Company shall pay and discharge, in accordance with past practice, all obligations and liabilities incurred (or which otherwise relate to the period) prior to the Effective Time in respect of the Business, its operations or the assets and properties used therein (except for those expressly assumed by Purchaser hereunder), including without limitation any liabilities or obligations to trade creditors and customers of the Business.

(j) *Amendment to Section 8.1(c).* Section *8.1(c)* of the Agreement is hereby amended by deleting Section *8.1(c)* in its entirety and replaced with the following:

8.1(c) The parties acknowledge that if the conditions to the Property Closing are not satisfied (but subject to the extension of the Property Lease as provided in Section 5.15, if applicable) or the Property Closing otherwise does not take place because of Section 3.1.13(b) or 8.13, then the Rescission Remedy will be applicable. For the avoidance of doubt, if the Rescission Remedy is to be effectuated at any time pursuant to this Agreement, and as to the period between the Effective Time and the effectuation of the Rescission Remedy, Purchaser will be entitled to retain any revenue or income Purchaser generated through the operation of the Business until the effectuation of the Rescission Remedy (the "Rescission Remedy Effective Time") and will bear any expenses and losses incurred through such period (other than Losses to be indemnified by Seller Entities under Section 6.1(a)); and Purchaser Entities will jointly and severally reimburse, indemnify and hold harmless the Seller Entities from and against any Losses arising from events or matters occurring after the Effective Time and prior to the Rescission Remedy Effective Time in connection with Purchaser's operation of the Business after the Effective Time (except to the extent relating to any Losses under Section 6.1(a)).

(k) *Effective Time*. For purposes of Sections 1.5.1, 5.1.4, 6.1(a)(iii) and 6.1(a)(iv) of the Agreement, the term "**Effective Date**" referenced therein is amended to refer to the term "**Effective Time**."

**Section 1.04 Continued Effectiveness of the Agreement**. Except as amended hereby, the Agreement remains in full force and effect without modification, amendment or alteration and is binding upon and enforceable by and against the parties thereto.

**Section 1.05 Governing Law**. This Second Amendment shall be governed by and construed in accordance with the laws of the State of Arkansas without giving effect to principles of conflicts of laws contained therein.

**Section 1.06 Counterparts**. This Second Amendment may be executed in multiple original, PDF or facsimile counterparts, each of which shall be deemed an original, but all of which shall together constitute one and the same agreement.

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Second Amendment as of the date first written above.

**SOUTHERN BAKERIES, LLC**

By: _[signature]_

Its: President

**HARLAN BAKERIES, LLC**

By: _[signature]_

Its: President

**HOPE BAKING COMPANY, INC.**

By: ______________________________

Its: ______________________________

**EAST BAKING COMPANY, INC.**

By: ______________________________

Its: ______________________________

4526184_9

**IN WITNESS WHEREOF**, the parties hereto have executed this Second Amendment as of the date first written above.

**SOUTHERN BAKERIES, LLC**

By:______________________________

Its:______________________________

**HARLAN BAKERIES, LLC**

By:______________________________

Its:______________________________

**HOPE BAKING COMPANY, INC.**

By: Danny Z. Serra

Its: Owner

**EAST BAKING COMPANY, INC.**

By: Danny Z. Serra

Its: Owner

4526184_9

EXHIBIT B

[see attached]

[redacted]

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address) 506787 - KATTEN

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

ININ

File with: Secretary of State, IN

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1a. INITIAL FINANCING STATEMENT FILE NUMBER
201000000601747 1/20/2010 SS IN

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:
Check one of these two boxes: This Change affects ☐ Debtor or ☐ Secured Party of record
AND Check one of these three boxes to: ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c ☐ ADD name: Complete item 7a or 7b, and item 7c ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME

OR

7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☒ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☒ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:
See the attached Exhibit A for released collateral.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME
Bank of America, NA, as Agent

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA: Debtor Name: Southern Bakeries, LLC
86075559 340027-32 Harlan



Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

Exhibit A

Secured Party hereby releases only that certain collateral which is being acquired by Hope Baking Company, Inc., an Arkansas corporation ("Hope Baking"), from Debtor pursuant to that certain Asset Purchase Agreement dated January 16, 2023 by and among Debtor, Harlan Bakeries, LLC ("Harlan"), Hope Baking and East Baking Company, Inc. (the "Agreement"), which released collateral includes only the Business Assets, which are more particularly described below:

(a) any machinery and equipment (together with parts which may be needed for the repair of such machines and equipment), tools, furniture and furnishings located at the Property, as well as the vehicles listed on Exhibit 1.1.1(a) attached to the Agreement, some of which vehicles are owned by Company's wholly-owned subsidiary Southern Bakeries Trucking, LLC, and also the rights as to the Freightliner vehicles shown as leased on Exhibit 1.1.1(a) attached to the Agreement, pursuant to Schedule A of a certain Truck Lease & Service Agreement dated October 1, 2021;

(b) certain equipment associated with a cinnamon swirl line located at Gold Crust Baking Company in Maryland;

(c) certain rights under any customer agreements pertaining to the production of the products at the Property in the operation of the Business as set forth in Exhibit 1.1.1(c) attached to the Agreement;

(d) all rights to use the "Southern Bakeries" trade name, as well as assigned rights under the License Agreement with Flowers Bakeries Brands, LLC dated February 3, 2005;

(e) all methods, recipes, formulations, formulas, trade secrets, know-how, and other intellectual property used in the production of products in the Business, acknowledging, however that certain recipes, formulations and formulas used in the Business are owned by customers and may only be used if permitted by such customers, and provided further, the foregoing may be owned or used by Harlan or other affiliates at locations other than the Property;

(f) all Authorizations to the extent legally transferrable;

(g) information, files, records, data and knowledge, including customer and supplier lists, related to the foregoing; and

(h) all goodwill associated with the Business.

For the avoidance of doubt, Secured Party is not releasing its security interest in the Excluded Assets, namely, the following:

(a) the seals, minute books, membership interest books, tax returns, books of account or other records having to do with the organization of Debtor as an entity;

(b) the rights which accrue or will accrue to Debtor under the Agreement;

(c) any tax refunds, credits or benefits;

(d) Debtor's rights under any (i) Contracts not specifically assumed by Purchaser under the Agreement or (ii) other agreements;

(e) all cash or cash equivalents, in hand or in bank accounts, prepaid expenses or deposits and accounts receivable;

(f) the personal property set forth on Exhibit 1.1.2(f) of the Agreement;

(g) permits, licenses and government authorizations, if not legally transferrable, or subsequently not transferred to Hope Baking pursuant to the Agreement;

(h) Debtor's ownership of Southern Bakeries Trucking, LLC;

(i) inventories, raw materials, work-in-process, finished goods, parts not included in the Business Assets and supplies; and

(j) any other assets set forth on Exhibit 1.1.2(j) of the Agreement.

All capitalized terms not herein defined shall have the meaning given within the Agreement.

[redacted]

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address) 506787 - KATTEN

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

ININ

File with: Secretary of State, IN

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
201700004333407 5/24/2017 SS IN

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:
Check one of these two boxes: This Change affects ☐ Debtor or ☐ Secured Party of record
AND Check one of these three boxes to: ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c ☐ ADD name: Complete item 7a or 7b, and item 7c ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME

OR 7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) SUFFIX

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

8. ☒ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☒ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:
See the attached Exhibit A for released collateral.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Bank of America, N.A., as Agent | | | |
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

10. OPTIONAL FILER REFERENCE DATA: Debtor Name: Southern Bakeries, LLC
86075580 340027-32 Harlan



Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

Exhibit A

Secured Party hereby releases only that certain collateral which is being acquired by Hope Baking Company, Inc., an Arkansas corporation ("Hope Baking"), from Debtor pursuant to that certain Asset Purchase Agreement dated January 16, 2023 by and among Debtor, Harlan Bakeries, LLC ("Harlan"), Hope Baking and East Baking Company, Inc. (the "Agreement"), which released collateral includes only the Business Assets, which are more particularly described below:

(a) any machinery and equipment (together with parts which may be needed for the repair of such machines and equipment), tools, furniture and furnishings located at the Property, as well as the vehicles listed on Exhibit 1.1.1(a) attached to the Agreement, some of which vehicles are owned by Company's wholly-owned subsidiary Southern Bakeries Trucking, LLC, and also the rights as to the Freightliner vehicles shown as leased on Exhibit 1.1.1(a) attached to the Agreement, pursuant to Schedule A of a certain Truck Lease & Service Agreement dated October 1, 2021;

(b) certain equipment associated with a cinnamon swirl line located at Gold Crust Baking Company in Maryland;

(c) certain rights under any customer agreements pertaining to the production of the products at the Property in the operation of the Business as set forth in Exhibit 1.1.1(c) attached to the Agreement;

(d) all rights to use the "Southern Bakeries" trade name, as well as assigned rights under the License Agreement with Flowers Bakeries Brands, LLC dated February 3, 2005;

(e) all methods, recipes, formulations, formulas, trade secrets, know-how, and other intellectual property used in the production of products in the Business, acknowledging, however that certain recipes, formulations and formulas used in the Business are owned by customers and may only be used if permitted by such customers, and provided further, the foregoing may be owned or used by Harlan or other affiliates at locations other than the Property;

(f) all Authorizations to the extent legally transferrable;

(g) information, files, records, data and knowledge, including customer and supplier lists, related to the foregoing; and

(h) all goodwill associated with the Business.

For the avoidance of doubt, Secured Party is not releasing its security interest in the Excluded Assets, namely, the following:

(a) the seals, minute books, membership interest books, tax returns, books of account or other records having to do with the organization of Debtor as an entity;

(b) the rights which accrue or will accrue to Debtor under the Agreement;

(c) any tax refunds, credits or benefits;

(d) Debtor's rights under any (i) Contracts not specifically assumed by Purchaser under the Agreement or (ii) other agreements;

(e) all cash or cash equivalents, in hand or in bank accounts, prepaid expenses or deposits and accounts receivable;

(f) the personal property set forth on Exhibit 1.1.2(f) of the Agreement;

(g) permits, licenses and government authorizations, if not legally transferrable, or subsequently not transferred to Hope Baking pursuant to the Agreement;

(h) Debtor's ownership of Southern Bakeries Trucking, LLC;

(i) inventories, raw materials, work-in-process, finished goods, parts not included in the Business Assets and supplies; and

(j) any other assets set forth on Exhibit 1.1.2(j) of the Agreement.

All capitalized terms not herein defined shall have the meaning given within the Agreement.

[redacted]

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address) 506787 - KATTEN

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

ININ

File with: Secretary of State, IN

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
201700004334428 5/24/2017 SS IN

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:
Check one of these two boxes: This Change affects ☐ Debtor or ☐ Secured Party of record
AND Check one of these three boxes to: ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c ☐ ADD name: Complete item 7a or 7b, and item 7c ☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME

OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME

OR 7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY

8. ☒ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☒ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral

Indicate collateral:
See the attached Exhibit a for released collateral.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME
Bank of America, N.A., as Agent

OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

10. OPTIONAL FILER REFERENCE DATA: Debtor Name: Harlan Bakeries, LLC
86075183 340027-32 Harlan



Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

Exhibit A

Secured Party hereby releases only that certain collateral which is being acquired by Hope Baking Company, Inc., an Arkansas corporation ("Hope Baking"), from Debtor pursuant to that certain Asset Purchase Agreement dated January 16, 2023 by and among Debtor, Harlan Bakeries, LLC ("Harlan"), Hope Baking and East Baking Company, Inc. (the "Agreement"), which released collateral includes only the Business Assets, which are more particularly described below:

(a) any machinery and equipment (together with parts which may be needed for the repair of such machines and equipment), tools, furniture and furnishings located at the Property, as well as the vehicles listed on Exhibit 1.1.1(a) attached to the Agreement, some of which vehicles are owned by Company's wholly-owned subsidiary Southern Bakeries Trucking, LLC, and also the rights as to the Freightliner vehicles shown as leased on Exhibit 1.1.1(a) attached to the Agreement, pursuant to Schedule A of a certain Truck Lease & Service Agreement dated October 1, 2021;

(b) certain equipment associated with a cinnamon swirl line located at Gold Crust Baking Company in Maryland;

(c) certain rights under any customer agreements pertaining to the production of the products at the Property in the operation of the Business as set forth in Exhibit 1.1.1(c) attached to the Agreement;

(d) all rights to use the "Southern Bakeries" trade name, as well as assigned rights under the License Agreement with Flowers Bakeries Brands, LLC dated February 3, 2005;

(e) all methods, recipes, formulations, formulas, trade secrets, know-how, and other intellectual property used in the production of products in the Business, acknowledging, however that certain recipes, formulations and formulas used in the Business are owned by customers and may only be used if permitted by such customers, and provided further, the foregoing may be owned or used by Harlan or other affiliates at locations other than the Property;

(f) all Authorizations to the extent legally transferrable;

(g) information, files, records, data and knowledge, including customer and supplier lists, related to the foregoing; and

(h) all goodwill associated with the Business.

For the avoidance of doubt, Secured Party is not releasing its security interest in the Excluded Assets, namely, the following:

(a) the seals, minute books, membership interest books, tax returns, books of account or other records having to do with the organization of Debtor as an entity;

(b) the rights which accrue or will accrue to Debtor under the Agreement;

(c) any tax refunds, credits or benefits;

(d) Debtor's rights under any (i) Contracts not specifically assumed by Purchaser under the Agreement or (ii) other agreements;

(e) all cash or cash equivalents, in hand or in bank accounts, prepaid expenses or deposits and accounts receivable;

(f) the personal property set forth on Exhibit 1.1.2(f) of the Agreement;

(g) permits, licenses and government authorizations, if not legally transferrable, or subsequently not transferred to Hope Baking pursuant to the Agreement;

(h) Debtor's ownership of Southern Bakeries Trucking, LLC;

(i) inventories, raw materials, work-in-process, finished goods, parts not included in the Business Assets and supplies; and

(j) any other assets set forth on Exhibit 1.1.2(j) of the Agreement.

All capitalized terms not herein defined shall have the meaning given within the Agreement.

**PROMISSORY NOTE**

$1,500,000 March 24, 2023

FOR VALUE RECEIVED, Hope Baking Company, Inc., an Arkansas corporation ("Borrower"), hereby promises to pay to the order of Southern Bakeries, LLC, an Indiana limited liability company ("Holder"), at the place designated by Holder, the principal amount of One Million Five Hundred Thousand Dollars ($1,500,000), together with interest thereon, in lawful money of the United States of America, on the terms set forth in Section 1 hereof.

1. Payments of Interest and Principal. Payments of principal plus interest on the principal amount of this Promissory Note (this "Note") outstanding from time to time shall be payable in accordance with the following:

(a) Payments. Borrower shall make monthly payments to Holder of the then accrued interest on the last day of each calendar month, with the first such interest payment being due and payable on April 30, 2023, and the last such monthly interest payment being due on March 31, 2025 (the "Maturity Date"), at which time Borrower will also pay to Holder the entire outstanding principal amount in full.

(b) Interest Rate. Interest on the outstanding principal amount of this Note shall be calculated on the basis of the actual number of days elapsed on the basis of a year of 365 days at a per annum rate equal to seven percent (7%). Interest shall accrue on any amount not paid when due hereunder at a rate of ten percent (10%) per annum. Contemporaneously with the repayment in full of this Note, including all interest thereon pursuant to the terms hereof, Holder shall surrender this Note, duly endorsed, to Borrower.

(c) Optional Prepayment. This Note may be prepaid, in whole or in part, by Borrower at any time or from time to time, without penalty or premium, which amount shall be applied first to then accrued interest and then to principal.

(d) Mandatory Prepayments.

(i) Borrower shall prepay this Note in full upon a Change of Control. As used herein, "Change of Control" means the occurrence of any of the following events: (i) the acquisition by any person or persons (other than an affiliate of an East Baking Entity, as hereafter defined) of beneficial ownership, directly or indirectly, through a purchase, merger or other acquisition, transaction or series of transactions, of the equity interests of Borrower and/or its parent company, East Baking Company, Inc., a Massachusetts corporation ("East Baking", and together with Borrower, the "East Baking Entities", and each individually, an "East Baking Entity") entitling such person to exercise 50% or more of the total voting power of all equity interests of any East Baking Entity; (ii) any consolidation of any East Baking Entity with, or merger of any East Baking Entity into, any other person (other than an affiliate of an East Baking Entity) and any merger of another person (other than an affiliate of an East Baking Entity) into any East Baking Entity, the result of which is that such East Baking Entity is not the surviving entity, or (iii) any sale, lease, exclusive license, transfer, or other disposition, in a single transaction or series of related transactions, of all or substantially all of the assets of an East Baking Entity

or its affiliates to another person, other than an affiliate of an East Baking Entity. For purposes hereof, an affiliate of an East Baking Entity shall mean Danny Serra, his spouse, any of his descendants, or any trust for any of their primary benefit, or any corporation, partnership, limited partnership, limited liability company, or other entity directly or indirectly controlled by Danny Serra, his spouse, any of his descendants, or any trust for any of their primary benefit.

(ii) Borrower shall also prepay this Note under the circumstances described in Section 7.4 of that certain Asset Purchase Agreement dated as of January 16, 2023, by and among Holder, Harlan Bakeries, LLC, Borrower (pursuant to a Joinder and Amendment to Asset Purchase Agreement dated January 27, 2023) and East Baking (as amended, the "Purchase Agreement").

(e) Payments. All payments hereunder shall be applied first to accrued and unpaid interest with the remainder, if any, to be applied to the payment of the outstanding principal amount of this Note. All payments of principal, interest, fees and other amounts due hereunder shall be made by Borrower in lawful money of the United States of America, by wire transfer of immediately available funds or by any other method approved in advance by Holder to the account of Holder at the address of Holder set forth in Section 5 hereof or at such other place designated by Holder from time to time in writing to Borrower.

2. Events of Default. Each of the following events shall constitute an "Event of Default" for purposes of this Note:

(a) if Borrower fails to make any payment on this Note within ten (10) days after the same is due and payable pursuant to the terms hereof; or

(b) if Borrower breaches any other covenants set forth in this Note and the same are not cured within ten (10) days after written notice from Holder; or

(c) if Borrower breaches any covenants set forth in the Purchase Agreement or Security Agreement (as hereinafter defined) and the same are not cured within the applicable notice and cure period thereunder, or if none, within ten (10) days after written notice from Holder; or

(d) the institution by any East Baking Entity of proceedings to be adjudicated as bankrupt or insolvent, or the consent by any East Baking Entity to institution of bankruptcy or insolvency proceedings against it or the filing by any East Baking Entity of a petition or answer or consent seeking reorganization or release under the federal Bankruptcy Act, or any other applicable federal or state law, or the consent by any East Baking Entity to the filing of any such petition or the appointment of a receiver, liquidator, assignee, trustee, or other similar official of any East Baking Entity, or of any substantial part of any East Baking Entity's property, or the making by any East Baking Entity of an assignment for the benefit of creditors, or the taking of action by any East Baking Entity in furtherance of any such action; or

(e) if a court having jurisdiction shall enter a decree or order for relief in respect of any East Baking Entity in an involuntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or the appointing of a receiver, liquidator, assignee, custodian, trustee or similar official of any East Baking Entity or for any substantial part of its property, or ordering the winding-up or liquidation of its affairs, and such decree or order shall remain unstayed and in effect for a period of sixty (60) consecutive days.

If any Event of Default shall have occurred and be continuing, for any reason whatsoever (and whether such occurrence shall be voluntary or involuntary or come about or be effected by operation of law or otherwise), the outstanding principal amount of, and the accrued interest on, this Note shall automatically become immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by Borrower, together with any expenses (including reasonable attorneys' fees) incurred by Holder in enforcing or collecting upon this Note.

3. No Waiver of Rights or Remedies. No extension of the time for the payment of this Note or any installment hereof shall operate to release, discharge, modify, change or affect the original liability under this Note, either in whole or in part, and Borrower agrees that this Note and any or all payments coming due hereunder may be extended from time to time in the sole discretion of Holder without in any way affecting or diminishing Borrower's liability hereunder. No delay in the exercise of any right or remedy hereunder shall be deemed a waiver of such right or remedy, nor shall the exercise of any right or remedy be deemed an election of remedies or a waiver of any other right or remedy.

4. Governing Law; Consent to Jurisdiction; Waiver of Jury Trial.

(a) This Note shall be governed by and construed in accordance with the domestic substantive laws of the State of Arkansas, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

(b) **HOLDER AND BORROWER HEREBY IRREVOCABLY SUBMIT THEMSELVES TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN LITTLE ROCK, ARKANSAS, FOR THE PURPOSES OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF THIS NOTE. HOLDER AND BORROWER IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY OBJECTION TO THE LAYING OF VENUE OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF THIS NOTE IN THE STATE OR FEDERAL COURTS LOCATED IN LITTLE ROCK, ARKANSAS, AND HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE AND AGREE NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION, SUIT OR PROCEEDING BROUGHT IN SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.**

(c) **HOLDER AND BORROWER HEREBY EXPRESSLY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHT, POWER, OR REMEDY UNDER OR IN CONNECTION WITH THIS NOTE OR UNDER OR IN CONNECTION WITH ANY AMENDMENT, INSTRUMENT, DOCUMENT, OR AGREEMENT DELIVERED OR THAT MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS NOTE, AND AGREE THAT ANY SUCH ACTION SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THE TERMS AND PROVISIONS OF THIS SECTION 4(c) CONSTITUTE A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS NOTE.**

5. Notices. All notices and other communications given to any party hereto pursuant to this Note shall be in writing and shall be mailed by certified or registered mail or sent by an overnight express courier service that provides written confirmation of delivery, charges prepaid, addressed as follows:

| | |
|---|---|
| If to Borrower: | Hope Baking Company, Inc.<br>c/o East Baking Company, Inc.<br>104 Whiting Farms Road<br>Holyoke, MA 01040<br>Attention: Dan Serra<br>Email: dan@eastbaking.com |
| With a copy to (copy not constituting notice): | Judd Peskin<br>1515 Locust St., Unit 901<br>Philadelphia, PA 19102<br>Email: Jlpeskin626@gmail.com<br>Judd@eastbaking.com<br><br>and<br><br>Friday, Eldredge & Clark, LLP<br>400 W. Capitol Ave., Suite 2000<br>Little Rock, AR 72201<br>Attention: Walter M. Ebel III<br>Email: ebel@fridayfirm.com |
| If to Holder: | Southern Bakeries, LLC<br>7957 E. US Highway 36<br>Avon, IN 46123<br>Attention: Hal P. Harlan<br>Email: halpharlan@harlancompanies.com |
| With a copy to (copy not constituting notice): | Bose McKinney & Evans LLP<br>111 Monument Circle, Suite 2700<br>Indianapolis, IN 46204<br>Attention: Roberts E. Inveiss<br>Email: rinveiss@boselaw.com |

Any communication given in conformity with this Section 5 shall be effective upon the earlier of actual receipt or deemed delivery. Delivery shall be deemed to have occurred as follows: if mailed by certified or registered mail, on the third business day after deposit in the mail, and if sent by overnight express courier service, the next business day following deposit therewith. Any party may at any time change its address for receiving communications pursuant to this Section 5 by giving notice of a new address in the manner provided herein.

6. Borrower's Waivers. Borrower, to the extent permitted by law, waives and agrees not to assert or take advantage of any of the following: (a) any defense based upon an election of remedies by Holder which may destroy or otherwise impair any subrogation or other rights of

Borrower or any guarantor or endorser of this Note; (b) any duty on the part of Holder to disclose any facts or other data Holder may now or hereafter know; (c) acceptance or notice of acceptance of this Note by Borrower; (d) presentment and/or demand for payment of this Note or any indebtedness or obligations hereby promised; and (e) protest and notice of dishonor with respect to this Note or any indebtedness or performance of obligations arising hereunder.

7. Right of Offset. Holder's rights under this Note are subject to Borrower's rights under the Purchase Agreement to set-off against amounts payable by Borrower under this Note any amounts legally owed by Holder to Borrower as a result of indemnification claims under the Purchase Agreement.

8. Security; Guaranty. Payment of this Note is secured by a security interest in all Collateral (as defined in the Security Agreement defined below) of Borrower pursuant to that certain Security Agreement dated of even date herewith executed by Borrower in favor of Holder (the "Security Agreement"). Payment of this Note is guaranteed by East Baking pursuant to that certain Guaranty dated of even date herewith executed by East Baking in favor of Holder.

9. Time of Essence. Time shall be of the essence as to each and every provision of this Note.

10. Assignment. The rights and obligations of Borrower and Holder shall be binding upon and inure to the benefit of the successors, assigns, heirs, legal representatives, administrators and transferees of the parties. Borrower expressly acknowledges that Holder may assign and transfer all rights and interests of Holder hereunder to one or more assignees to be identified by Holder, including its direct or indirect equity holders, and acknowledges and agrees that, upon execution and delivery of the assignment in relation thereto, any such assignee shall hold all of the rights and interests of Holder hereunder.

11. Severability. The parties hereto intend and believe that each provision in this Note comports with all applicable law. However, if any provision of this Note is found by a court of law to be in violation of any applicable law, and if such court should declare such provision of this Note to be unlawful, void or unenforceable as written, then it is the intent of Borrower that such provisions shall be given full force and effect to the fullest possible extent that it is legal, valid and enforceable, that the remainder of this Note shall be construed as if such unlawful, void or unenforceable provision were not contained therein, and that the rights, obligations and interests of Borrower and Holder under the remainder of this Note shall continue in full force and effect.

12. Headings; References. The headings of the sections of this Note are inserted for convenience only and do not constitute a part of this Note. Except where otherwise indicated, all references to Sections refer to Sections hereof.

13. Amendment. This Note shall only be amended, modified or supplemented, and provisions hereof may only be waived, following written consent of Holder and Borrower.

14. Counterparts. This Note may be executed in separate counterparts and by facsimile or email, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

[Signature page follows]

IN WITNESS WHEREOF, the undersigned has caused this Promissory Note to be signed and to be dated the date above written.

**BORROWER:**

HOPE BAKING COMPANY, INC.

By: ______________________________
Name: Danny Serra
Its: President

Accepted and acknowledged as of the date above written.

**HOLDER:**

SOUTHERN BAKERIES, LLC

By: ______________________________
Hal P. Harlan, President

IN WITNESS WHEREOF, the undersigned has caused this Promissory Note to be signed and to be dated the date above written.

**BORROWER:**

HOPE BAKING COMPANY, INC.

By: ______________________________
Name: Danny Serra
Its: President

Accepted and acknowledged as of the date above written.

**HOLDER:**

SOUTHERN BAKERIES, LLC

By: Hal P. Harlan
Hal P. Harlan, President

# SECURITY AGREEMENT

**HOPE BAKING COMPANY, INC.**, an Arkansas corporation (hereinafter referred to as "Debtor"), hereby grants a security interest to **SOUTHERN BAKERIES, LLC**, an Indiana limited liability company, with offices located at 7597 E. U.S. Highway 36, Avon, Indiana 46123 (hereinafter referred to as "Secured Party"), in and to and collaterally assigns to Secured Party all of its interest in, all assets of Debtor arising or used in connection with the operation of, the commercial baking facility located at 2700 E. Third Street, Hope, Arkansas 71801 (the "Premises"), including without limitation all furnishings, equipment, fixtures, goods, computer and data processing systems, software and hardware, inventory (including, without limitation, raw materials, work in process, parts, supplies, finished goods, and materials used or consumed in Debtor's business) and other articles of personal property of Debtor (the "Chattels"); all contracts, leases now or hereafter entered into by and between Debtor and any party; all accounts (as defined in the Arkansas Uniform Commercial Code as presently or hereafter in effect ("UCC"), deposit accounts, receivables, funds, instruments, documents, promissory notes, letter of credit rights, chattel paper (whether electronic or tangible), payables arising out of leases, licenses and/or assignments, and all other intangibles and general intangibles, investment property and payment intangibles of Debtor, now acquired or hereafter arising, including, but not limited to, all customer lists, logos, good will, permits, licenses, operating rights, inventions, processes, formulae, patent rights, copyrights, copyright rights, trademarks, trademark rights, service marks, service mark rights, trade names, trade name rights, franchises, franchise rights and other like business property rights, and all applications to acquire such rights, for which application may at any time be made by Debtor; all refunds, payments, repayments, deposits, supporting obligations and monies received or to be received and all claims therefor, arising from or relating to the ownership, sale, lease or other disposition of any of the Collateral (as hereinafter defined), irrespective of the time period to which such refunds, payments, repayments, deposits or monies relate, including property tax or other tax refunds and utility refunds, rebates or deposits; and all additions and accessions thereto, all replacements and renewals of any part thereof, and the proceeds (including, without limitation, insurance, indemnity, warranty and guaranty proceeds) of any of these items (all of which property, including the Chattels and all of the other aforementioned property is hereinafter collectively referred to as the "Collateral").

It is the intention of Debtor and of this Security Agreement, that the foregoing security interest shall also cover the interests of Debtor of whatever kind in and to all the Collateral of every kind and description owned by Debtor or in which Debtor may have an interest, constituting "Business Assets" as such term is defined in the Purchase Agreement (as such term is defined in the Note, as hereafter defined) together with replacements of any of the Collateral presently owned by Debtor, and all increases and additions thereto, and all after acquired personal property used in connection with the business operated principally at the Premises, or any interest therein, of any kind or description, hereafter acquired by Debtor for use in the operation of, or connected with the operation of, the business operated principally at the Premises, which after acquired property shall become a part of and be deemed a part of the Collateral (as herein defined).

## ARTICLE I
## SECURITY

Section 1.01. Performance and Obligations Secured. This Security Agreement is given to secure (a) the performance by Debtor of the covenants and agreements contained in this Security Agreement and (b) the payment by Debtor of the indebtedness to Secured Party evidenced by that certain Promissory Note



Exhibit E

dated of even date herewith in the amount of $1,500,000 (the "Note") and any and all other indebtedness or obligations now or hereafter incurred by Debtor to Secured Party or otherwise arising pursuant to the provisions of this Security Agreement or any other document executed in connection herewith or therewith (collectively, the "Debt Documents") and any other indebtedness or obligation or any part of the same as may be advanced by Secured Party to Debtor from time to time (all of such indebtedness and obligations collectively referred to as the "Obligations"). This Security Agreement shall also secure any and all renewals or extensions of the whole or any part of the Obligations, however evidenced, with interest at the rate provided for in the Note, and any such renewals or extensions or any change in the terms or rate of interest shall not impair in any manner the validity of or the priority of this Security Agreement, nor release Debtor from liability for the Obligations. Reference is hereby made to all other Debt Documents as if set out here at length and incorporated herein.

## ARTICLE II
## COVENANTS OF DEBTOR

Debtor covenants and agrees with Secured Party as follows:

Section 2.01. Covenants of Title. Except to the extent of any inaccuracy, if any, in the Secured Party's title warranty with respect to the Business Assets as set forth in the Purchase Agreement, Debtor warrants that it is lawfully possessed of and has good and complete title to all the Collateral, free and clear of all liens and encumbrances.

Section 2.02. Covenant To Comply with Terms. Debtor will pay and perform all Obligations, as the same become due, in accordance with its terms, without relief from valuation or appraisement laws, and it will keep, observe and perform all of the terms, provisions, covenants and agreements of this Security Agreement and the other Debt Documents.

Section 2.03. Additional Covenants. Debtor covenants and agrees that Secured Party shall have the right at any time to enforce Debtor's rights against account debtors and obligors. Debtor further acknowledges and agrees that Secured Party does not authorize, and Debtor agrees not to, make any sales or leases of any of the Collateral, license any of the Collateral, or grant any other security interest in any of the Collateral; provided, however, that such restrictions shall not prohibit the sale of inventory or goods in the ordinary course of Debtor's business, or the replacement of any equipment or fixtures at the Premises in the ordinary course of Debtor's business. Secured Party will agree to subordinate the Obligations to the indebtedness owed to any financial institution granted a security interest in the Collateral in accordance with the Purchase Agreement. Subject to the foregoing, Debtor further covenants and agrees not to create, make, incur, assume or permit to exist any mortgage, pledge, lien, security interest, encumbrance or charge of any kind upon any of the Collateral, whether now owned or hereafter acquired, other than general liens imposed by applicable law for property taxes (which Debtor covenants to pay prior to delinquency). Until the Obligations are paid in full (or unless the Obligations are paid in full at the closing of any of the following transactions), Debtor agrees that except to the extent not constituting a "Change of Control" as defined in the Note, it will preserve its corporate existence and not, in one transaction or a series of related transactions, (i) merge into or consolidate with any other entity, (ii) sell all or substantially all of its assets, (iii) change the state of its organization, or (iv) change its legal name, in any such case without providing Secured Party with thirty (30) days' prior written notice.

Section 2.04. Security Agreement. This Security Agreement is intended to be a security agreement pursuant to the UCC for any of the personal property and fixtures described herein. Debtor agrees to execute and deliver, or cause to be executed and delivered, to Secured Party UCC financing statements covering said personal property and fixtures from time to time and in such form as Secured Party may reasonably require to perfect or maintain the priority of Secured Party's security interest with respect to

said personal property and fixtures, and Debtor shall bear all costs thereof. Debtor will not create or suffer to be created any other security interest in said personal property and fixtures, including replacements thereof and additions thereto, except as otherwise authorized pursuant to this Security Agreement. Upon the occurrence of any Event of Default, Secured Party shall have the remedies of a secured party under the UCC and, at Secured Party's option, may also invoke the remedies provided herein with respect to such property. Debtor further authorizes and appoints Secured Party its attorney-in-fact, to execute and file on its behalf a financing statement or statements in those public offices reasonably deemed necessary by the Secured Party and authorizes Secured Party to file duplicates of any financing statements as reasonably determined by Secured Party. Debtor will pay all filing fees for the filing of this instrument or of financing statements filed to perfect the security interest provided in this Security Agreement or in connection with this Security Agreement.

Section 2.05. Further Assurances. Debtor shall, on request of Secured Party, (i) promptly correct any defect, error or omission which may be discovered in the contents of this Security Agreement or in any other Debt Document or in the execution or acknowledgment thereof; (ii) execute, acknowledge, deliver and record or file such further commercially reasonable instruments (including without limitation further commercially reasonable security agreements, financing statements and continuation statements) and do such further commercially reasonable acts as may be reasonably necessary, desirable or proper to carry out more effectively the purposes of this Security Agreement and the other Debt Documents and to subject to the liens and security interests hereof and thereof any property intended by the terms hereof and thereof to be covered hereby and thereby including specifically, but without limitation, any renewals, additions, substitutions, replacements, or appurtenances to the Collateral; and (iii) execute, acknowledge, deliver, procure and record or file any commercially reasonable document or instrument (including specifically any financing statement) reasonably deemed advisable by Secured Party to protect the lien or the security interest hereunder against the rights or interests of third persons, and Debtor shall pay all reasonable costs connected with any of the foregoing.

## ARTICLE III
## DEFAULT AND RIGHTS AND REMEDIES OF SECURED PARTY UPON DEFAULT

Section 3.01. Definition of Default. The term "Event of Default," wherever used in this Security Agreement, shall mean any one or more of the following events:

(a) the occurrence of a default or event of default under any indebtedness constituting an Obligation (beyond any applicable grace or cure period);

(b) failure of Debtor, for a period of thirty (30) days after notice, to cure any failure to comply with any covenant, term, agreement or condition contained in this Security Agreement;

(c) the institution by Debtor of proceedings of any nature wherein Debtor is seeking relief as a debtor; the making by Debtor of an assignment of its assets for the benefit of its creditors; the development of a plan or arrangement, composition agreement or other action taken as a result of a general meeting of Debtor's creditors; the consensual appointment of a receiver, custodian, trustee or like officer to take possession of Debtor's assets; the attachment, execution or other judicial seizure of all or any substantial part of Debtor's assets or any part thereof; or admission by Debtor in writing of its inability to pay its debts as they mature;

(d) the institution by any person or entity against Debtor of a case or other proceeding under the United States Bankruptcy Code, U.S.C. § 101 et seq., any regulation promulgated

thereunder, or any successor law or regulation, or any similar state bankruptcy law, or the involuntary appointment of a receiver, custodian, trustee or like officer to take possession of Debtor's assets, and in either case such action is not dismissed or stayed within sixty (60) days;

(e) any representation or warranty made by Debtor herein or in any of the documents executed by Debtor pursuant to or in connection with this Security Agreement or the other Debt Documents shall prove untrue in any material respect as of the date of which the facts set forth are represented or warranted (except to the extent the same constitutes a breach of representation or warranty by Secured Party to Debtor in the Purchase Agreement, as defined in the Note);

(f) the occurrence and continuance for a period of ten (10) days of a default or event of default under any instrument evidencing or creating a lien or security interest covering the Collateral or any part thereof, if permitted hereby; or

(g) the holder of any lien or security interest on the Collateral (without hereby implying the consent of Secured Party to the existence or creation of any such lien or security interest) instituting foreclosure or other proceedings for the enforcement of its remedies thereunder.

Section 3.02. Acceleration. Upon any Event of Default, the unpaid balance of the Obligations shall, at the option of Secured Party, become immediately due and payable, subject to any applicable terms of the applicable Debt Document. Notice of the exercise of this option is hereby waived by Debtor, except to the extent any such notice is required under the applicable Debt Document.

Section 3.03. Remedies of Secured Party. Upon any Event of Default, Secured Party shall have all the rights and remedies permitted under the UCC with respect to the security interest in the Collateral granted hereunder and all rights and remedies authorized under this Security Agreement and other laws.

Section 3.04. Remedies Are Cumulative. No remedy herein conferred upon or reserved to Secured Party is intended to be or shall be exclusive of any other remedy, but every remedy herein provided shall be cumulative and shall be in addition to every other remedy given hereunder, or in any instrument executed in connection herewith, or now or hereafter existing at law or in equity, or by statute; and every such right and remedy may be exercised from time to time and as often as may be deemed expedient.

In the event that Secured Party: (a) grants any extension of time or forbearance with respect to the payment of any indebtedness secured by this Security Agreement; (b) takes other or additional security for the payment thereof; (c) waives or fails to exercise any right granted herein or under the Debt Documents; (d) grants any release, with or without consideration, of the whole or any part of the security held at any time for the payment of the debt secured hereby and any guarantees thereof; or (e) amends or modifies in any respect any of the terms and provisions hereof or of the other Debt Documents; then and in any such event, such act or omission to act shall not release Debtor, or any co-maker or surety of this Security Agreement or of the other Debt Documents, under any covenant of this Security Agreement or of the other Debt Documents, nor preclude Secured Party from exercising any right, power, or privilege herein granted or intended to be granted in the event of any other Event of Default then made or any subsequent Event of Default and without in any way impairing or affecting the lien or priority of this Security Agreement.

## ARTICLE IV
## MISCELLANEOUS

Section 4.01. Successors and Assigns. Reference in this Security Agreement to Debtor and Secured Party shall in each case be deemed to include the successors and assigns of such party, and all the covenants, stipulations and agreements herein contained are and shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and assigns.

Section 4.02. Separability of Provisions. In the event any one or more of the provisions contained in this Security Agreement or in the other Debt Documents, the performance of which are secured hereunder, should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.

Section 4.03. Applicable Law; Jury Trial Waiver. This Security Agreement shall be governed by and construed in accordance with the laws of the State of Arkansas.

**DEBTOR HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHT, POWER, OR REMEDY UNDER OR IN CONNECTION WITH THIS SECURITY AGREEMENT OR UNDER OR IN CONNECTION WITH ANY AMENDMENT, INSTRUMENT, DOCUMENT, OR AGREEMENT DELIVERED OR THAT MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS SECURITY AGREEMENT, AND AGREES THAT ANY SUCH ACTION SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THE TERMS AND PROVISIONS OF THIS SECTION CONSTITUTE A MATERIAL INDUCEMENT FOR SECURED PARTY TO ACCEPT THIS SECURITY AGREEMENT.**

Section 4.04. Notice. All notices, requests, demands and other communications provided for hereunder shall be in writing (including telegraphic communication) and mailed by certified or registered mail or delivered via reputable national overnight courier to the applicable party at the address indicated below

If to Secured Party:

Southern Bakeries, LLC
7597 E. U.S. Highway 36
Avon, Indiana 46123
Attention: Hal P. Harlan, President

If to Debtor:

Hope Baking Company, Inc.
c/o East Baking Company, Inc.
104 Whiting Farms Road
Holyoke, MA 01040
Attention: Dan Serra

or, as to each party, at such other address as shall be designated by such parties in a written notice to the other party complying as to delivery with the terms of this Section. All such notices, requests, demands and other communications shall, when mailed or delivered, be effective upon the earlier of actual receipt or deemed delivery. Delivery shall be deemed to have occurred as follows: if mailed by certified or registered mail, on the third business day after deposit in the mail, and if sent by overnight courier, the next business day following deposit therewith.

Section 4.05. Duplicate Financing Statements. A photographic or other reproduction of this Security Agreement or of any financing statement relating to this Security Agreement shall be sufficient as a financing statement.

Section 4.06. Counterparts; Electronic Signature. This Security Agreement may be executed and delivered in multiple counterparts, all of which together shall constitute one and the same instrument, and/or by facsimile or other electronic means.

*[Remaining portion of this page left intentionally blank]*

Debtor has caused this Security Agreement to be executed and effective as of the 29th day of March, 2023.

**HOPE BAKING COMPANY, INC.**

By: ______________________
Name: Danny Serra
Title: President

STATE OF MASSACHUSETTS )
) SS:
COUNTY OF HAMPDEN )

Before me, a Notary Public in and for said State, personally appeared Danny Serra, by me known and by me known to be the President of Hope Baking Company, Inc., who acknowledged the execution of the foregoing "Security Agreement", and who, being first duly sworn, stated that he is duly authorized to execute such Security Agreement for and on behalf of said corporation.

WITNESS my hand and Notarial Seal this 29th day of March, 2023.

______________________
Notary Public

Printed JULA L. PESKIN

My Commission Expires: FEB. 27, 2026

My County of Residence: PHILADELPHIA CTY, PA

[*Signature Page*]

# GUARANTY

**THIS GUARANTY** from **EAST BAKING COMPANY, INC.**, a Massachusetts corporation ("Guarantor") to **SOUTHERN BAKERIES, LLC**, an Indiana limited liability company ("Southern"),

**WITNESSETH:**

1. **The Guaranty**. Guarantor and Southern hereby acknowledge that concurrently herewith, an affiliate of Guarantor, Hope Baking Company, Inc., an Arkansas corporation ("Hope Baking"), is acquiring certain assets of Southern pursuant to a certain Asset Purchase Agreement dated as of January 16, 2023, by and among Southern, Harlan Bakeries, LLC, Hope Baking (pursuant to a Joinder and Amendment to Asset Purchase Agreement dated January 27, 2023) and Guarantor (as amended, the "Purchase Agreement"). Pursuant to the Purchase Agreement, concurrently herewith Hope Baking is executing and delivering to Southern a Promissory Note dated as of March 24, 2023 (the "Note") in the amount of $1,500,000 (such amount, subject to Hope Baking's right of offset as provided in the Note, together with costs of collection and reasonable attorney's fees, the "Liabilities"). Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Purchase Agreement.

Guarantor hereby unconditionally guarantees the full and prompt payment when due and the performance by Hope Baking of the Liabilities. Specifically, in the event that Hope Baking fails to pay or perform any part or all of the Liabilities guaranteed when due (subject to any applicable notice and/or grace periods and/or cure rights set forth in the Note), Guarantor, upon written notice from Southern, will pay or perform the Liabilities guaranteed, in the same manner as if they constituted the direct and primary obligation of Guarantor, in accordance with the terms of the Note, and such obligation of Guarantor shall be without relief from valuation or appraisement laws.

2. **Waivers of Guarantor**. Guarantor hereby waives each of the following:

(a) Notice of acceptance of this Guaranty, of any extension of credit, advance, loan or similar accommodation by Southern to Hope Baking, and of the amount of the Liabilities which may exist from time to time;

(b) Presentment, demand, protest, or notice of dishonor, nonpayment, or other default with respect to any of the Liabilities (other than notices required under the Note); and

(c) Any requirement that Southern institute suit, or exercise or exhaust its rights or remedies against Hope Baking, collateral securing the Liabilities, or against any other person guaranteeing any part of the Liabilities, prior to enforcing any rights it has under this Guaranty, or otherwise against Guarantor.



Exhibit F

The existence of any conditions hereinabove waived shall in no way affect or release the obligations of Guarantor hereunder.

3. **Rights of Southern**. Southern shall have the right to deal with the Liabilities by exercising the following rights:

(a) to agree with Hope Baking on any modifications or other changes in the terms of payment with Hope Baking, or effecting any release, compromise or settlement with respect thereto;

(b) to extend payment of the Liabilities, and to forbear to take steps to enforce the payment of all or any part thereof against Hope Baking; and

(c) any payment received by Southern from Hope Baking, or from any other source other than Guarantor, will be applied to the Liabilities of Hope Baking to Southern in whatever order elected and any payment received from Guarantor will be applied to the Liabilities of Hope Baking to Southern guaranteed hereunder in whatever order Southern elects.

The obligations of Guarantor hereunder with respect to the Liabilities shall not be released, discharged or affected in any way by reason of any action which Southern may take or omit to take under the foregoing powers.

4. **Bankruptcy of Hope Baking**. Guarantor hereby irrevocably agrees that if Hope Baking becomes bankrupt or otherwise the subject of any case or proceeding under the bankruptcy laws of the United States of America, then until the Liabilities are irrevocably paid and satisfied in full: (i) Guarantor will not assert against Hope Baking any right or claim to indemnification, reimbursement, contribution or payment which Guarantor may have now or at any time against Hope Baking for or with respect to any amounts Guarantor may pay or be obligated to pay Southern with respect to the Liabilities, and (ii) Guarantor suspends enforcement of all such rights and claims to indemnification, reimbursement, contribution or payment which Guarantor may have against Hope Baking.

5. **Assignment of Liabilities**. If any of the Liabilities of Hope Baking guaranteed hereunder should be assigned by Southern, this Guaranty will inure to the benefit of Southern's assignee to the extent of such assignment, provided that such assignment will not operate to relieve Guarantor from any obligation to Southern hereunder with respect to any unassigned Liabilities guaranteed hereunder and further that the rights of any assignee will be subordinate to the rights of Southern under this Guaranty as to any unassigned Liabilities.

6. **Governing Law; Jurisdiction; Jury Trial Waiver**. The validity, construction and effect of this Guaranty shall be governed by the laws of the State of Arkansas, without regard to its conflict of laws principles.

**GUARANTOR HEREBY IRREVOCABLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN LITTLE**

**ROCK, ARKANSAS, FOR THE PURPOSES OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF THIS GUARANTY. GUARANTOR IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY OBJECTION TO THE LAYING OF VENUE OF ANY ACTION, SUIT OR PROCEEDING ARISING OUT OF THIS GUARANTY IN THE STATE OR FEDERAL COURTS LOCATED IN LITTLE ROCK, ARKANSAS, AND HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION, SUIT OR PROCEEDING BROUGHT IN SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.**

**GUARANTOR HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHT, POWER, OR REMEDY UNDER OR IN CONNECTION WITH THIS GUARANTY OR UNDER OR IN CONNECTION WITH ANY AMENDMENT, INSTRUMENT, DOCUMENT, OR AGREEMENT DELIVERED OR THAT MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS GUARANTY, AND AGREES THAT ANY SUCH ACTION SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THE TERMS AND PROVISIONS OF THIS SECTION CONSTITUTE A MATERIAL INDUCEMENT FOR SOUTHERN TO ACCEPT THIS GUARANTY.**

7. **General Provisions**. The rights and remedies of Southern with respect to this Guaranty are cumulative and may be exercised singly or concurrently, and the exercise of any one or more of them will not be a waiver of any other. No act, delay, omission or course of dealing between Southern and Hope Baking or Guarantor, or any other person, or any of them, will be a waiver of any of Southern's rights or remedies under this Guaranty, and no waiver, change, modification or discharge of this Guaranty or any obligation created hereby will be effective unless in writing signed by Southern. The rights and obligations created by this Guaranty shall inure for the benefit of and shall be binding upon the successors and assigns of the parties hereto.

Executed as of the 29th day of March, 2023.

EAST BAKING COMPANY, INC.

By: ______________________
Danny Z. Serra, President

Accepted and acknowledged as of the date above written.

SOUTHERN BAKERIES, LLC

By: [signature]
Hal P. Harlan, President

# LEASE AGREEMENT

**THIS LEASE AGREEMENT** (the "Lease"), is made and entered into as of the 29th day of March, 2023, by and between **SOUTHERN BAKERIES, LLC,** an Indiana limited liability company (hereinafter called "Lessor"), and **HOPE BAKING COMPANY, INC.**, an Arkansas corporation (hereinafter called "Lessee").

1. **PREMISES**. Lessor does hereby lease to Lessee that certain real estate in Hempstead County in the State of Arkansas (the "Real Estate"), including the building located at 2700 E. 3rd Street, Hope, Arkansas 71801, and any other improvements thereon ("Premises" and together with the Real Estate, the "Property"). The Real Estate is more fully described in Exhibit "A", which is attached hereto and incorporated by reference herein. The parties acknowledge that Lessee has been in possession of the Property and operating the Property since January 1, 2023 (the "Control Date").

2. **TERM**. The term of this Lease shall begin as of 11:59PM on March 24, 2023 and shall continue until June 30, 2023 ("Initial Lease Term"). The parties acknowledge that this Lease is being entered into pursuant to that certain Asset Purchase Agreement dated as of January 16, 2023, by and among Lessor, Harlan Bakeries, LLC ("Harlan"), Lessee and East Baking Company, Inc., and Joinder and Amendment thereto dated January 27, 2023 (as so amended, and as further amended as of even date herewith, the "Purchase Agreement"). Pursuant to the Purchase Agreement, and subject to the applicable conditions thereunder, it is anticipated that Lessee will purchase the Property prior to June 30, 2023. However, pursuant to Section 5.1.5 of the Purchase Agreement, Lessee must be satisfied as to certain aspects of the Property prior to purchasing the Property, including its environmental condition. If Lessor must perform environmental remediation as to the Property in accordance with Section 5.1.5 of the Purchase Agreement, and such remediation cannot be completed within the Initial Lease Term, then this Lease shall be renewed for an additional period of not more than two (2) years (such renewal term, the "Renewal Term"). If the conditions to the consummation of the Property Closing (as defined in the Purchase Agreement) are satisfied prior to the expiration of such two (2) years, then the parties will proceed to the Property Closing, at which time this Lease will terminate. Nevertheless, if the conditions requiring environmental remediation are not satisfied at the time of the Property Closing, Lessor nevertheless shall remain obligated to satisfy and complete such remediation at its sole cost and expense, and Harlan hereby agrees to guaranty the obligation of Lessor to satisfy and complete such remediation. The foregoing obligations of Lessor and Harlan shall survive the termination of this Lease following the Property Closing. The Initial Lease Term and the Renewal Term are collectively referred to herein as the "Lease Term".

3. **BASE RENT**. As base rent, Lessee agrees to pay Lessor monthly rental amounts (the "Monthly Rent") for the Property in the amounts identified on Exhibit "B". The Monthly Rent shall be paid in advance on the first day of each month. As additional rent for the Premises, Lessee agrees to pay all taxes, assessments, insurance, and utility expense on the Premises, as provided in this Lease (the "Additional Rent," and together with the Monthly Rent, the "Rent"). If the commencement date of the Lease Term is a date other than the first day of a calendar

month, there shall be due and payable on or before such date as Monthly Rent for the balance of such calendar month a sum equal to that proportion of the Monthly Rent specified for the first full calendar month as herein provided, which the number of days from such commencement date to the end of the calendar month during which the commencement date shall fall bears the total number of days in such month. If the last month of the Lease Term is less than a full calendar month, the Monthly Rent for such last month shall likewise be prorated.

This Lease is a net lease, and Lessee shall not be entitled to any abatement of Rent, reduction thereof or setoff against Rent, as the obligations of Lessee to pay Rent and perform and observe its other agreements hereunder shall be independent covenants.

4. **USE OF PREMISES**. The Property shall be used by Lessee for food production and warehouse use, in conformity with any relevant ordinances of the City of Hope, and in accordance with the laws of the State of Arkansas, but the liability with respect to any violation thereof existing or occurring prior to the Control Date shall remain with Lessor in accordance with the Purchase Agreement.

5. **UTILITIES**. Lessee will pay as Additional Rent, in addition to the Monthly Rent, all charges for gas, water, electricity and power, and any and all other utilities used by Lessee during the term of this Lease. Lessee shall also be responsible for any reasonably necessary snow removal costs, painting costs, parking lot maintenance, repaving and restriping and landscaping costs, except with respect to reasonably necessary repair, maintenance or replacement conditions existing as of the Control Date.

6. **CONDITION OF PREMISES AND REPAIRS**. Lessee shall keep and maintain in good working condition and repair, at its own expense, the Premises and all mechanical, plumbing and electrical equipment, telephone systems, heating, ventilating and air conditioning equipment, lighting fixtures, signs, and all replacements, additions or improvements thereto at all times during the Lease Term, except with respect to reasonably necessary repair, maintenance or replacement conditions as to the foregoing items existing as of the Control Date. Additionally, Lessee shall be responsible for maintaining the roof of the Premises, except with respect to reasonably necessary repair, maintenance or replacement conditions as to such roof existing as of the Control Date. Notwithstanding any contrary provision of this Lease, all maintenance obligations of Lessee hereunder shall be limited to maintaining the Property in at least as good condition and repair as existed on the Control Date, and Lessee shall not be required to make any capital repairs or replacements to the Property during the Lease Term. In the event that Lessee shall fail to properly maintain, repair and replace such systems and other items as may be necessary to keep and maintain the Premises in at least as good working condition and repair as existed on the Control Date, in accordance with this Lease, and shall not cure such failure within thirty (30) days after Lessor shall have given written notice to Lessee stating what maintenance, repair or replacements are required by this Lease, Lessor shall have the right, at its election and without obligation to do so, to pay all or any part of such charges or costs, and may expend such sums as to it may seem reasonably necessary in order to properly maintain, repair and replace such systems and items; and such amounts so paid by Lessor shall become a debt immediately due and owing from Lessee to Lessor upon Lessee's receipt of an invoice and reasonable back-up documentation substantiating the actual amounts so paid by

Lessor; provided, Lessee shall not be responsible for any such charges or costs to the extent attributable to any reasonably necessary repair, maintenance or replacement conditions existing as of the Control Date. However, if such maintenance, repairs or replacements (that are the obligation of Lessee hereunder) cannot be completed with reasonable diligence within such thirty (30) day period, and Lessee commences the necessary maintenance, repair or replacements within such thirty (30) day period and thereafter diligently prosecutes the same to completion, then Lessor shall not undertake such action and shall allow Lessee to complete the maintenance, repairs or replacements at its own expense. Upon the termination of this Lease, unless the Property is purchased by Lessee, Lessee will yield up the Property leased hereunder to Lessor in at least as good condition and repair as existed on the Control Date (loss by fire and ordinary wear and tear excepted), and deliver the keys thereof to Lessor.

7. **ALTERATIONS AND REPAIR OF PREMISES**. Lessee agrees to make, at its sole expense, all decorations, including painting and the repairs, which it may be required to make by the provisions of this Lease, but Lessee shall have no obligation to make any capital repairs or replacements to the Property. Lessee shall have the right, without consent of Lessor, to make any minor repairs or alterations of the Premises. No major changes or alterations of the Premises or any changes or alterations whatsoever which affect or change the existing exterior walls of the Premises shall be made by Lessee without first having submitted plans and specifications for such proposed repairs or alterations to Lessor and having Lessor's written approval of same, which written approval shall not be unreasonably withheld or delayed. All repairs, alterations, additions and improvements, which cannot be removed without structural damage to the Premises, shall run with the land and become the property of Lessor upon the expiration or termination of this Lease, unless the Property is purchased by Lessee. Any equipment installed by Lessee may be removed by Lessee if Lessee repairs any damages to the Premises caused by such removal.

8. **LIENS**. In the event that Lessor or its agents, without fault on its part, become involved, through or on account of the terms of this Lease or through or on account of the occupancy of the Property by Lessee or the conduct of Lessee's business upon the Property, in any controversy or litigation Lessee shall, upon notice from Lessor or its agent, immediately take all reasonable and necessary steps and do whatever may be reasonable and necessary to remove Lessor's connection with or liability under said controversy or litigation, and particularly if such controversy or litigation throws any cloud or encumbrance upon the title of Lessor to the Real Estate; provided, that if Lessee believes that it or Lessor has a good and valid defense or claim in such controversy or litigation which Lessee desires to set up and maintain thorough court procedure and litigation, then Lessee shall have the right to do so, provided it first transfers any lien to bond in accordance with applicable law, or agrees in writing to indemnify Lessor and its agents in all respects against all loss arising from said claim or controversy; provided, Lessee shall have no liability or obligation hereunder with respect to any event occurring or condition existing prior to the Control Date, and such liability and obligation with respect thereto shall remain with Lessor. Lessor shall cooperate with Lessee in all reasonable ways in connection with the defense of Lessee of any such controversy or litigation. Lessee shall immediately pay and discharge any and all final judgments, liens, costs, damages, expenses and obligations of Lessor whatsoever in, or arising out of, the controversy or litigation involving Lessor or its agents, including all reasonable costs, expenses and reasonable attorneys' fees incurred by

Lessor or its agents in protecting their interest or defending themselves in such controversy or litigation, to the extent the same are the obligation of Lessee hereunder and not caused or created by Lessor. This provision shall be applicable to and include, but not be limited to, mechanic's liens for alterations, repair and improvements of the Premises made by or on behalf of Lessee, and shall also include any claims or suits for personal injury or property damage incurred upon the Property with respect to events occurring after the Control Date.

9. **TAXES, ASSESSMENTS AND INSURANCE**.

(a) During the Lease Term, and in addition to any provisions provided for in the Purchase Agreement as to the tax obligations of the parties, Lessee shall pay all real estate taxes and/or ad valorem taxes assessed on the Real Estate and the Premises and payable during the Lease Term to the extent such taxes relate to the period on or after the Control Date and during the Lease Term. Lessee shall also be solely responsible for paying all other taxes, assessments and levies charged or assessed by any governmental authority upon Lessee's property. For the avoidance of doubt, in the event of any conflict between the foregoing provision and Section 1.5.2 of the Purchase Agreement, the Purchase Agreement will control and take precedence.

(b) Lessee agrees to maintain insurance upon the Premises, in the amount not less than fair replacement value as reasonably determined by Lessor and consistent with insurance coverage maintained by Lessor as of the Control Date, against loss from fire, windstorm, tornado, riot, civil commotion, vandalism or other casualty to the Premises, and any replacements therein or additions, improvements or alterations thereto, with Lessor named as an Additional Insured on the insurance policy. Said insurance shall protect Lessor and Lessee as their interests may appear. Lessee agrees to maintain such insurance, as it may desire upon its personal property located at the Premises, and upon its goods and wares stored therein. Lessor shall be named as an Additional Insured in Lessee's General Liability Insurance policy. Lessee further agrees to carry and maintain bodily injury liability and property damage insurance in reasonable amounts reasonably satisfactory to Lessor (it being understood that General Liability combined single limits of insurance of $1,000,000 for each occurrence, and $2,000,000 aggregate, shall be satisfactory to Lessor), and shall furnish Lessor with Certificates of Insurance evidencing same. Lessor and Lessee hereby waive all rights of subrogation each may have against each other to the extent of available and applicable insurance coverage.

10. **DESTRUCTION OF PREMISES**. If the Premises are partially or completely destroyed by fire or other casualty, this Lease shall remain in full force and effect and the proceeds of insurance applicable to such loss shall be used to promptly repair such damage; provided, however, that in the event of complete destruction, the payment of Rent will be fully abated and in the event of partial destruction, the payment of Rent will abate in proportion to the total square footage of the Premises leased by Lessee which is no longer usable by Lessee in relation to the total square footage of the Premises, except that if in any event the Premises cannot be used by Lessee to perform a material or substantial part of its operations, then (i) Rent will completely abate and (ii) if such condition continues for a period of more than one hundred twenty (120) days, Lessee shall have the right to terminate this Lease by written notice. All insurance proceeds as a result of the casualty shall be prorated between Lessee and Lessor as

their interests may appear, subject, however, to the applicable provisions of the Purchase Agreement if the Property Closing occurs.

11. **CONDEMNATION**. If any part or all of the Property shall be taken by right of eminent domain during the Lease Term, and if such condemnation materially affects Lessee's enjoyment of the Property, Lessee shall have the option to terminate this Lease as of the date of such taking by giving to Lessor, within thirty (30) days after the date of such taking, a written notice stating its intention to terminate. If only part of the Property shall be so taken and if Lessee shall not exercise its said option, Lessor shall, if commercially practicable, promptly restore the remainder of the Property not so taken so as to make them suitable for occupancy and use by Lessee, and the payment of Rent following such taking shall be adjusted by an amount which shall be in proportion to the reduction in usable floor space in the building or which Lessee is deprived by the taking; provided, however, that Lessor shall not by reason of this paragraph be required to expend more than the amount of any condemnation award for the restoration of the Premises. All damages resulting from a taking by condemnation shall belong to Lessor, whether such damages shall be awarded as compensation for diminution in value of the leasehold or to the fee of the Property, subject, however, to the applicable provisions of the Purchase Agreement if the Property Closing occurs.

12. **LESSOR'S REMEDIES**. Lessor may terminate this Lease upon the occurrence of any one or more of the following events of default:

(a) failure by Lessee to pay an installment of Rent within ten (10) days after the due date thereof;

(b) failure by Lessee to perform or observe any other of its covenants under this Lease within thirty (30) days after written notice; provided, however, that if the cure of any such failure cannot be completed with reasonable diligence within such thirty (30) day period, and Lessee commences the necessary action to cure the failure within such thirty (30) day period and thereafter diligently prosecutes the same to completion within an additional thirty (30) days, no event of default shall be deemed to have occurred;

(c) the making by Lessee of an assignment for the benefit of its creditors;

(d) the levying of a writ of execution of attachment on or against Lessee;

(e) Lessee's institution of voluntary proceedings for reorganization, liquidation or bankruptcy of Lessee, or Lessee's consent to the appointment of a receiver, trustee or liquidator to take charge of its assets;

(f) institution of involuntary proceedings for reorganization, liquidation or bankruptcy of Lessee, or the nonconsensual appointment of a receiver, trustee or liquidator to take charge of its assets, and in either case such proceedings are not dismissed or stayed within sixty (60) days; or

(g) Lessee doing or permitting to be done any act which creates a mechanic's

lien or claim therefore against Real Estate or the Premises, if the same is not released, transferred to bond in accordance with applicable law, or otherwise provided for by an indemnity agreement pursuant to Section 8 hereof within thirty (30) days after written notice thereof first given Lessee.

Upon the termination of this Lease for any of the foregoing reasons, Lessor may re-enter the Property, with or without process of law, using such force as may be reasonably necessary, and remove all persons and property therefrom, and Lessor shall not be liable for damages or otherwise by reason of such re-entry or termination of the Lease Term. No such termination, however, shall affect the liability of Lessee for any Rents and other charges due thereafter under this Lease as recoverable by law. In addition to Lessee's unpaid Rent, Lessee shall be liable to Lessor for all costs and expenses actually paid or incurred by Lessor from time to time, including reasonable attorneys' fees, in connection with the collection of the unpaid Rent, obtaining possession of the Property, removal and storage of Lessee's property at the Property, maintenance and repair or restoration of the Premises to substantially the same condition that existed on the Control Date, and reletting the Property. Lessor shall, in addition, retain all other remedies and rights at law or equity which it may have and collect other charges provided for in this Lease.

13. **RESERVED RIGHTS**. Lessor expressly reserves the following rights:

(a) To enter the Property at any reasonable time and in accordance with the policies and procedures of Lessee to examine same, or to make such repairs, alterations or additions as it is required to make hereunder or as it may deem reasonably necessary for the safety, improvement or preservation thereof or of the Premises; and

(b) During or after the time Lessee abandons or vacates the Property, to enter and remodel, repair, alter or otherwise prepare the Property for reoccupancy.

The exercise of any reserved rights by Lessor shall not be deemed an eviction or disturbance of Lessee's use and possession of the Property.

14. **NON-LIABILITY OF LESSOR**. It is agreed that Lessor shall not be liable to Lessee or any other person on the Property for any damage either to person or property unless caused by the negligence or willful or intentional conduct of Lessor. Lessor shall not be under any responsibility or liability in any way whatsoever for the quality, quantity or impairment, interruption, stoppage or other interference with service involving water, gas, heat, electric current for light and power, telephone or any other service by any public utility unless caused by Lessor or its contractors or agents. However, notwithstanding the foregoing, Lessor remains responsible with respect to any event occurring or condition existing prior to the Control Date.

15. **LIABILITY OF LESSEE**. Lessee agrees to be responsible for any damage to the property of Lessor which may result from any use of the Property or any act done thereon by Lessee or any person coming on or being thereon by the license of Lessee, express or implied, and also to save Lessor harmless from any liability to any other person for damage to person or property resulting from any such causes, except to the extent arising from (i) the negligence or willful or intentional conduct of Lessor or (ii) any event occurring or condition existing prior to

the Control Date.

16. **INDEMNIFICATION AND RELEASE**. If Lessor shall become a party to litigation commenced by or against Lessee, then Lessee shall indemnify and hold Lessor harmless, except to the extent arising from (i) the negligence or willful or intentional conduct of Lessor or (ii) any event occurring or condition existing prior to the Control Date. The indemnification provided by this paragraph shall include Lessor's reasonable legal costs and fees in connection with any such claim, action or proceeding. Lessor and Lessee do each hereby release the other from all liability for any accident, damage or injury caused to person or property, provided, this release shall be effective only to the extent that the injured or damaged party is insured against such injury or damage and only if this release shall not adversely affect the right of the injured or damaged party to recover under such insurance policy.

17. **NON-RECOURSE TO LESSOR**. Lessee agrees that Lessee shall look solely to Lessor's interests in and to the Property, for solicitation of any judgment (or other judicial process) requiring payment of money by Lessor in the event of default or breach by Lessor of any of the covenants, terms or conditions of this Lease to be observed or performed by Lessor, and that no other assets of Lessor shall be subject to levy, execution, or of the process for satisfaction of Lessee's remedies. The term Lessor as used in this Lease in relation to covenants, agreements and conditions to be observed and performed by Lessor, shall be limited to mean and include only the owner or owners from time to time of Lessor's interest in this Lease. In the event of any transfer of transfers of such interest (except a transfer for security), Lessor named herein (or the transferor, in the case of a subsequent transfer) shall, after the date of such transfer, be released from all personal liability for performance of any covenant, agreement, and conditions on the part of the Lessor which are thereafter to be performed hereunder to the extent assumed in writing by the transferee. Lessor shall deliver a copy of such assignment and assumption to Lessee, and thereafter the transferee shall be deemed to have assumed (subject to the limitations of this paragraph) all of the covenants, agreements and conditions herein to be observed by Lessor with the result that such covenants, agreements and conditions shall bind Lessor, its successors and assigns, only during and in respect of their respective successive periods of ownership. However, the provisions of this Section 17 shall not limit or otherwise affect Lessor's obligations to Lessee under the Purchase Agreement.

18. **QUIET POSSESSION**. Lessor hereby covenants that Lessee, upon paying the Rent and performing the covenants of this Lease, shall and may quietly have, hold and enjoy the Property during the Lease Term.

19. **NOTICES**. Any notice required or permitted by this Lease to be given by Lessor to Lessee, or by Lessee to Lessor, may be given by depositing the same in the United States mail, certified mail, postage-repaid or via reputable national overnight courier. If given to Lessor, such notice shall be addressed as follows:

Southern Bakeries, LLC

7597 East U.S. Highway 36
Avon, Indiana 46123-7171
Attn: Hal P. Harlan

With a copy to (copy not constituting notice):

Bose McKinney & Evans LLP
111 Monument Circle, Suite 2700
Indianapolis, Indiana 46204
Attn: Roberts E. Inveiss

If given to Lessee, such notice shall be addressed as follows:

Hope Baking Company, Inc.
c/o East Baking Company, Inc.
104 Whiting Farms Road
Holyoke, MA 01040
Attn: Dan Serra

With a copy to (copy not constituting notice):

Judd Peskin
1515 Locust St., Unit 901
Philadelphia, PA 19102

and

Friday, Eldredge & Clark, LLP
400 W. Capitol Ave., Suite 2000
Little Rock, AR 72201
Attention: Walter M. Ebel III

or as Lessee or Lessor may otherwise direct, from time to time, by written notice given to Lessor or Lessee. All such notices shall, when mailed or delivered, be effective upon the earlier of actual receipt or deemed delivery. Delivery shall be deemed to have occurred as follows: if mailed by certified mail, on the third business day after deposit in the mail, and if sent by overnight courier, the next business day following deposit therewith.

20. **WRITING CONTROLS; ENTIRE AGREEMENT**. It is agreed that Lessor has not made any statements, promises or agreements, or taken upon itself any engagement whatsoever, verbally or in writing, in conflict with the terms of this Lease or that in any way modifies, varies, alters, enlarges or invalidates any of its provisions. Any changes, modifications or alterations of this Lease shall be effective and binding upon the parties only after they have been reduced to writing and signed by the parties hereto. This Lease, together with the Purchase Agreement, constitutes the entire agreement of the parties and supersedes any and all other prior agreements, oral or written, with respect to the subject matter hereof. In the event of any conflict however, the Purchase Agreement controls.

21. **ASSIGNMENT OF LEASE OR SUB-LETTING OF LEASED PREMISES.**

Lessee shall not assign this Lease, or any part thereof, and shall not rent or sublet the whole or any part of the Premises without the written consent of Lessor. Any permitted assignment, renting, or sub-letting shall not release Lessee from any part of its obligation under this Lease.

22. **GOVERNING LAW**. The laws of the State of Arkansas will govern this Lease, without regard to its conflict of laws principles.

23. **COUNTERPARTS; ELECTRONIC SIGNATURES**. This Lease may be executed and delivered in multiple counterparts, all of which together shall constitute one and the same instrument, and/or by facsimile or other electronic means.

[*Remaining Portion of this Page Left Intentionally Blank*]

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year first above written.

LESSOR:

**SOUTHERN BAKERIES, LLC**

By: Hal P. Harlan

Printed: Hal P. Harlan I

Title: President

LESSEE:

**HOPE BAKING COMPANY, INC.**

By: ______________________

Printed: Danny Serra

Title: President

The undersigned executes this Lease below for the purpose of guaranteeing the obligations of Lessor as specified in Section 2 of the Lease.

**HARLAN BAKERIES, LLC**

By: Hugh P. Harlan

Printed: Hugh P. Harlan

Title: President

[*Signature Page of Lease Agreement*]

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year first above written.

LESSOR:

**SOUTHERN BAKERIES, LLC**

By: ______________________________

Printed: ____________________________

______________________________

Title: ______________________________

LESSEE:

**HOPE BAKING COMPANY, INC.**

By: ______________________________

Printed: Danny Serra

Title: President

The undersigned executes this Lease below for the purpose of guaranteeing the obligations of Lessor as specified in Section 2 of the Lease.

**HARLAN BAKERIES, LLC**

By: ______________________________

Printed: ____________________________

Title: ______________________________

[*Signature Page of Lease Agreement*]

# LEASE AGREEMENT

## EXHIBIT A

Legal Description

<u>TRACT 2 (2700 East Third Street, Hope, AR 71801</u>:
A part of the SW1/4 of the NW1/4 and a part of the NW1/4 of the SW1/4 of Section 26, and a part of the NE1/4 of the SE1/4 nd a part of the SE1/4 of the NE1/4 of Section 27, all in Township 12 South, Range 24 West, Hempstead County, Arkansas, nd being more particularly described as follows:

Commence at a 2" bolt found for the NE corner of the said NE1/4 of the SE1/4 of Section 27, Township 12 South, Range 24 West and run thence S 1°32'06"W 282.51 feet along the easterly line of Section 27 to a 3/8" rod found at an existing fence corner, said point being the POINT OF BEGINNING, leaving the section line run thence N 89°05'23"W 494.93 feet along the fence to a 3/8" rod found at an existing fence corner, run thence S 1°30'27"W 122.98 feet to a point near a fence corner post (point could not be set because of proximity of corner post and the concrete base), run thence N 88°45'36"W 169.00 feet along the fence to a 3/8" rod set at an existing fence corner post, run thence S 1°31'09"W 88.34 feet to a 3/8" rod found at an existing corner post, run thence N 88°45'36"W 494.78 feet along the fence to a 3/8" rod found at a fence corner post, leaving the fence run thence N 1°13'23"E 262.04 feet to a 3/8" rod set on the southerly Right-of-Way of the Union Pacific Railroad (formerly the Missouri Pacific Railroad), run thence N 74°02'53"E 2155.96 feet along the said southerly Right-of-Way of the railroad to a 3/8" rod set at a point that is 50.0 feet west of, and perpendicular to the westerly Right-of-Way of U.S. Highway no. 67, leaving the railroad right-of-way run thence S 15°52'03"W 75.03 feet parallel to and 50.0 feet from the said westerly highway right-of-way to an 3/8" rod set, run thence S 11°34'42"W 200.56 feet also parallel to and 50.0 feet from the highway right-of-way to an "X" chiseled in a concrete drive, run then S 15°52'03"W 74.50 feet along a line 50.0 feet from and parallel to the highway right-of-way to an "X" chiseled in a concrete drive, run thence along a curve to the right with a delta angle of 03°44'25" having a radius of 1832.31 feet and an arc length of 119.62 feet, with a chord bearing and distance of S 17°44'15"W 119.60 feet along the said line 50.0 feet from and parallel to the U.S. Highway 67 Right-of-Way to an "X" chiseled in the concrete drive, run thence S 79°00'00"E 50.55 feet to a 3/8" rod set on the westerly Right-of-Way of U.S. Highway no. 67, run thence along a curve to the right with a delta angle of 11°17'02" having a radius of 1882.31 feet and an arc length of 370.71 feet, with a chord bearing and distance of S 25°01'11"W 370.11 feet, along the said highway right-of-way to a cotton spindle set, said point being near the center of an asphalt driveway, leaving U.S. Highway no. 67 run thence N 51°27'23"W 368.27 feet along the approximate centerline of the driveway to an "X" chiseled in a concrete section of the said driveway, leaving the driveway run thence S 30°27'05"W 360.25 feet to, and then along a fence to a 3/8" rod found at an existing fence corner, run thence N 54°55'57"W 269.99 feet and bearing gradually southerly from an existing fence to a 1/2" pipe found in another fence and on the easterly line of Section 27, run thence N 1°32'06"E 59.76 feet along the said fence and the easterly line of Section 27, back to the POINT OF BEGINNING, containing 20.268 acres more or less.

## LEASE AGREEMENT

## EXHIBIT B

| | |
|---|---|
| Owner: | Southern Bakeries, LLC |
| Facility: | 2700 E. 3rd Street, Hope, Arkansas 71801 |
| Rent: | $20,500 per month during 2023, increasing annually each year thereafter by the percentage increase in the U.S. Consumer Price Index - All Items in the most recent 12 months for which the Index is available prior to January 1 of the respective year. |

**Hope Baking Amount Owed**
**As of August 6, 2026**
**Attachment H Detail**

| Month of Usage | Amount | Amount Paid | Remaining Amount |
|---|---|---|---|
| March 2023 | $ 340,565.58 | $ 340,565.58 | $ - |
| April 2023 | $ 621,546.06 | $ 484,693.25 | $ 136,852.81 |
| May 2023 | $ 380,335.39 | | $ 380,335.39 |
| June 2023 | $ 368,582.27 | | $ 368,582.27 |
| July 24023 | $ 95,112.95 | | $ 95,112.95 |
| August 2023 | $ 176,046.06 | | $ 176,046.06 |
| Count Difference Sept 2023 | $ 1,087,885.43 | | $ 1,087,885.43 |
| **Total Usage per Harlan** | **$ 3,070,073.74** | **$ 825,258.83** | **$ 2,244,814.91** |

**Exhibit H**

| Hope Baking/East Baking Amount Owed Under APA<br>As of September 8, 2026 | | |
|---|---|---|
| **Description** | **Amount Due** | |
| Expense Reimbursement | $ | 46,618.80 |
| AR Paid to Incorrect Company | $ | 216,428.74 |
| East Baking Finished Goods | $ | 26,262.39 |
| Disposed of Finished Goods | $ | 244,690.35 |
| Expenses Incurred on Behalf of Hope Baking | $ | 73,590.66 |
| Inventory Usage | $ | 2,244,814.91 |
| PPV | $ | 48,742.89 |
| Asset Note Receivable | $ | 1,500,000.00 |
| 8 Months Note Interest | $ | 79,221.93 |
| Silo Repair Increase | $ | 750,000.00 |
| **Total Due** | **$** | **5,230,370.67** |

| Hope Baking Amount Owed Under Lease<br>As of September 8, 2026 | | |
|---|---|---|
| **Description** | **Amount Due** | |
| 7 Months Rent | $ | 143,500.00 |
| Property Tax | $ | 259,951.14 |
| **Total Due** | **$** | **403,451.14** |

**Exhibit I**

**Hope Baking Amount Owed**
**As of August 6, 2026**

**Detail:** These finished goods were produced at Southern Bakeries in 2023 before the sale; however, the product was never sold out of the system. Therefeore, we haven't been reimbursed for it.

**Southern Bakeries, LLC.**
**Finished Good Inventory Reconciliation**
**Updated through 9.29.23 Activity**

| Facility | Part Number | Location | Desription | FMEASURE | Standard | | 09.29.2023 Inventory | | |
|---|---|---|---|---|---|---|---|---|---|
| HOPE | 378001 | HF | EastBaking 16ctFingerRoll51% Extnd | CS | $ | 35.3314 | 429 | $ | 15,157.17 |
| HOPE | 378003 | HF | EastBaking 8ct Hots 51% Extnd | CS | $ | 35.3314 | 211 | $ | 7,454.93 |
| HOPE | 378003 | HH | EastBaking 8ct Hots 51% Extnd | CS | $ | 35.3314 | 60 | $ | 2,119.88 |
| HOPE | 378010 | HF | EastBaking White Hots | CS | $ | 25.5068 | 60 | $ | 1,530.41 |
| **Grand Total** | | | | | | | **760** | **$** | **26,262.39** |



**Exhibit J**

RECEIVED
5-13-2026
Clerk & Master

IN THE CHANCERY COURT FOR HAMILTON COUNTY, TENNESSEE

| | |
|---|---|
| GRAIN CRAFT, LLC,<br>Plaintiff,<br>v.<br><br>JENNINGS COBBLE, LLC,<br>Defendant. | DOCKET NO.: 23-0819<br><br>PART II<br><br>Jury Demanded |
| JENNINGS COBBLE, LLC,<br>Third-Party Plaintiff,<br>v.<br><br>SOUTHERN BAKERIES, LLC,<br>HAL P. HARLAN, Third-Party Defendants,<br>HARLAN BAKERIES, LLC, Cross-Defendant, HOPE BAKING COMPANY, INC., and EAST BAKING COMPANY INC.,<br>Counter Defendants. | |
| SOUTHERN BAKERIES, LLC,<br>Third-Party Plaintiff/Counter-Defendant,<br>v.<br><br>HOPE BAKING COMPANY, INC., and EAST BAKING COMPANY INC.,<br>Third-Party Defendants/Counter-Plaintiffs. | |
| HOPE BAKING COMPANY, INC., and EAST BAKING COMPANY INC.,<br>Counter-Plaintiffs,<br>v.<br><br>SOUTHERN BAKERIES, LLC, HAL P. HARLAN, and HARLAN BAKERIES, LLC,<br>Counter-Defendants. | |

**ORDER OF JUDGMENT BY DEFAULT AND ORDER OF DISMISSAL AGAINST HOPE BAKING COMPANY, INC. AND EAST BAKING COMPANY, INC.**

26 MAY 15 AM 11: 52
FILED
HAMILTON CO CLERK & MASTER

ELECTRONICALLY FILED
2026 May 15 2:42 PM - 23CV-819
Hamilton County, Chancery Court

2E.26.05 0335

**Exhibit K**

On April 24, 2026, this Court held a final pretrial conference between the parties pursuant to Rule 16 of the Tennessee Rules of Civil Procedure and this Court's November 24, 2026, Scheduling Order[1]. Counsel for Southern Bakeries, LLC, ("Southern Bakeries") Hal P. Harlan, and Harlan Bakeries, LLC (collectively "Third-Party Defendants") and Jennings Cobble, LLC ("Jennings Cobble") were present at said final pretrial conference. Pursuant to this Court's March 16, 2026, Order, this Court permitted Hope Baking Company, Inc. ("Hope") and East Baking Company, Inc.'s ("East"), prior counsel to withdraw from representing Hope and East in this matter and further ordered that Hope and East must retain new counsel by April 9, 2026. Despite being ordered to retain counsel by April 9, 2026, Hope and East had no legal representation present at the final pretrial conference[2] and there was additionally no indication made by Hope and East to this Court that Hope and East intended to secure counsel in the future for purposes of this case.

Additionally, at the time of the April 24, 2026, final pretrial conference, Hope and East had previously been found to be in contempt of Court for failing to adhere to this Court's Orders requiring Hope and East to pay monies into the registry of the Court, requiring Hope and East to respond to Jennings Cobble's post-judgment discovery, and requiring Danny Z. Serra to appear for a post-judgment deposition. *See e.g.*, April 13, 2026, Order. Jennings Cobble's corresponding April 15, 2026, motion for the Court to enter the appropriate contempt sanctions against Hope and East as a result of the aforementioned failings of Hope and East, was addressed at the April 24, 2026, final pretrial conference.

Lastly, during the April 24, 2026, final pretrial conference, pursuant to Rules 16.04, 16.06 and 37.02 (c) of the Tennessee Rules of Civil Procedure, Third-Party Defendants orally moved for

---

[1] This Scheduling Order, was drafted by then current counsel for Hope and East, who later failed to appear.

[2] The Court took steps to makes sure that Hope and East were truly not present for the final pretrial conference, including sending Court staff outside of the courtroom to search for Hope and East.



ELECTRONICALLY FILED
2026 May 15 2:42 PM - 23CV-819
Hamilton County, Chancery Court

the dismissal of Hope and East's claims in the matter as well as for a judgment by default of the claims pending against Hope and East.

Taking into consideration Jennings Cobble's April 15, 2026, motion; Jennings Cobble's and Third-Party Defendants' oral motion; and Hope and East's previous instances of contempt; the Court decided to grant the dismissal of Hope and East's claims in the matter as well as enter a judgment by default in favor of Southern Bakeries on its pending claims against Hope and East pursuant to Rules 16.04, 16.06 and 37.02 (c) of the Tennessee Rules of Civil Procedure.

WHEREFORE, the Court hereby ORDERS, ADJUDGES, and DECREES as follows:

1. All of Hope and East's pending counterclaims against Third-Party Defendants are dismissed with prejudice.

2. The request for a default judgment against Hope and East is granted and a judgment by default is entered in favor of Southern Bakeries and against Hope and East.

3. All court costs are taxed to Hope and East, for which execution may issue if necessary.

4. Southern Bakeries is awarded all the relief requested in its Third-Party Complaint against Hope and East, including:

   a. A judgment against Hope and East in the amount of Six Hundred Eighty-five Thousand Dollars ($685,000.00);

   b. A judgment that East is liable to indemnify and hold Southern Bakeries harmless as alleged in its Third-Party Complaint;

   c. Its attorney's fees as requested in its Third-Party Complaint. Counsel for Southern Bakeries may file a separate motion detailing attorney's fees and costs incurred, and a hearing will be held on the amount of fees to be awarded at a later date;



ELECTRONICALLY FILED
2026 May 15 2:42 PM - 23CV-819
Hamilton County, Chancery Court

2E.26.05 0337

d. Post-judgment interest as permitted by Tennessee law; and

e. That court costs are taxed to Hope and East, for which execution may issue if necessary.

**ENTER.**

JEFFREY M. ATHERTON, CHANCELLOR

**APPROVED FOR ENTRY:**

**GEARHISER, PETERS, ELLIOTT & CANNON, PLLC**

By: ______________________
David G. McDowell, Esq.
Zachary T. Webber, Esq.
320 McCallie Avenue
Chattanooga, TN 37402
Phone: 423.756.5171
Fax: 423.266.1605
Email: dmcdowell@gearhiserpeters.com
zwebber@gearhiserpeters.com

&

**BOSE MCKINNEY & EVANS LLP**
Paul D. Vink, Esq.*
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
Phone: 317.684.5000
Fax: 317.684.5173
Email: pvink@boselaw.com
*admitted *pro hac vice*
*Attorneys for Southern Bakeries, LLC, Hal P. Harlan, and Harlan Bakeries, LLC*

**LOGAN-THOMPSON, P.C.**

By: Rob Norred w/ permission TMM 22918
Robert G. Norred, Jr., Esq. (BPR #012740)
PO Box 191
Cleveland, TN 37364
423-476-2251
rnorred@loganthompsonlaw.com
*Attorneys for Jennings Cobble, LLC*

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing has been served on all parties or their counsel in this case via U.S. mail, postage prepaid, and/or email via T.R.C.P. 5.02 as follows:

Robert G. Norred, Jr.
PO Box 191
Cleveland, TN 37364-0191
rnorred@loganthompsonlaw.com

Hope Baking Company, Inc.
906 West 5th St.,
Hope, AR 71801
c/o Billy Williams and Danny Z. Serra
dan@eastbaking.com
gweiner@weinerlegal.com

East Baking Company, Inc.
104 Whiting Farms Rd
Holyoke, MA 01040
c/o Danny Z. Serra
dan@eastbaking.com
gweiner@weinerlegal.com

This the 13th day of May 2026.

**GEARHISER, PETERS, ELLIOTT & CANNON, PLLC**

By: ______________________

On this 15th day of May, 2026, I certify that a copy of this order was mailed to the parties or their counsel.

RACHAEL J. KAPPERMAN, CLERK & MASTER

By: ______________________ DC&M

3

ELECTRONICALLY FILED
2026 May 15 2:42 PM - 23CV-819
Hamilton County, Chancery Court

2E.26.05 0339

IN THE CHANCERY COURT FOR HAMILTON COUNTY, TENNESSEE

| | |
|---|---|
| GRAIN CRAFT, LLC,<br>Plaintiff,<br>v.<br><br>JENNINGS COBBLE, LLC,<br>Defendant. | DOCKET NO.: 23-0819<br><br>PART II<br><br>Jury Demanded |
| JENNINGS COBBLE, LLC,<br>Third-Party Plaintiff,<br>v.<br><br>SOUTHERN BAKERIES, LLC,<br>HAL P. HARLAN, Third-Party Defendants,<br>HARLAN BAKERIES, LLC, Cross-Defendant, HOPE BAKING COMPANY, INC., and EAST BAKING COMPANY INC.,<br>Counter Defendants. | |
| SOUTHERN BAKERIES, LLC,<br>Third-Party Plaintiff/Counter-Defendant,<br>v.<br><br>HOPE BAKING COMPANY, INC., and<br>EAST BAKING COMPANY INC.,<br>Third-Party Defendants/Counter-Plaintiffs. | |
| HOPE BAKING COMPANY, INC., and<br>EAST BAKING COMPANY INC.,<br>Counter-Plaintiffs,<br>v.<br><br>SOUTHERN BAKERIES, LLC, HAL P. HARLAN, and HARLAN BAKERIES, LLC,<br>Counter-Defendants. | |

**ORDER SETTING AMOUNT OF ATTORNEY'S FEES AND COSTS AWARDED TO SOUTHERN BAKERIES, LLC'S AGAINST HOPE BAKING COMPANY, INC. AND EAST BAKING COMPANY, INC.**

2026 JUL 27 PM 2:27

FILED
HAMILTON CO CLERK & MASTER
US

On May 15, 2026, this Court entered an Order granting a Default Judgment ("Order") against Hope Baking Company, Inc. and East Baking Company, Inc. ("East and Hope"). In that Order, this Court also awarded Southern Bakeries, LLC's ("Southern Bakeries") its attorney's fees and costs incurred. On July 16, 2026, Southern Bakeries filed a motion to set the amount of attorney's fees ("Motion to set fees") to be awarded along with affidavits and ledgers of fees in support of the same.

On July 27, 2026, Southern Bakeries' Motion to set fees was heard by this Court, at which time there were no objections or opposition made to Southern Bakeries' Motion to set fees. Upon hearing no opposition, this Court's review of Southern Bakeries' Motion to set fees in the amount of $427,879.94, and this Court's review of the affidavits and ledgers of fees in support of the same, it is accordingly, **ORDERED** that:

a. Southern Bakeries' attorney's fees and expenses in the amount of 427,879.94 appear proper and reasonable to the Court; and

b. Said amount shall be immediately due and payable to Southern Bakeries by Hope and East, plus interest in the maximum applicable amount until paid in full, for which execution may issue if necessary.

**ENTER.**

JEFFREY M. ATHERTON, CHANCELLOR

**APPROVED FOR ENTRY:**

**GEARHISER, PETERS, ELLIOTT & CANNON, PLLC**

By: ______________________
David G. McDowell, Esq.
Zachary T. Webber, Esq.
320 McCallie Avenue

Chattanooga, TN 37402
Phone: 423.756.5171
Fax: 423.266.1605
Email: dmcdowell@gearhiserpeters.com
zwebber@gearhiserpeters.com

&

**BOSE MCKINNEY & EVANS LLP**
Paul D. Vink, Esq.*
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
Phone: 317.684.5000
Fax: 317.684.5173
Email: pvink@boselaw.com
*admitted *pro hac vice*
*Attorneys for Southern Bakeries, LLC, Hal P. Harlan, and Harlan Bakeries, LLC*

**LOGAN-THOMPSON, P.C.**

By:______________________________

Robert G. Norred, Jr., Esq. (BPR #012740)
PO Box 191
Cleveland, TN 37364
423-476-2251
rnorred@loganthompsonlaw.com
*Attorneys for Jennings Cobble, LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing has been served on all parties or their counsel in this case via U.S. mail, postage prepaid, and/or email via T.R.C.P. 5.02 as follows:

Robert G. Norred, Jr.
PO Box 191
Cleveland, TN 37364-0191
rnorred@loganthompsonlaw.com

Hope Baking Company, Inc.
906 West 5th St.,
Hope, AR 71801
c/o Billy Williams and Danny Z. Serra
dan@eastbaking.com
gweiner@weinerlegal.com

East Baking Company, Inc.
104 Whiting Farms Rd
Holyoke, MA 01040
c/o Danny Z. Serra
dan@eastbaking.com
gweiner@weinerlegal.com

This the 27th day of July 2026.

**GEARHISER, PETERS, ELLIOTT & CANNON, PLLC**

By: ______________________

On this 27th day of July, 2026, I certify that a copy of this order was mailed to the parties or their counsel.

RACHAEL J. KAPPERMAN, CLERK & MASTER

By: ______________________ DC&M